# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHIRLEY SHERROD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. A. No. 11-00477 (RJL) |
| v. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |
| ANDREW BREITBART, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# PLAINTIFF SHIRLEY SHERROD'S
# MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
# DEFENDANTS' MOTION TO DISMISS OR TO TRANSFER

Thomas D. Yannucci, P.C. (D.C. Bar #358989)
Michael D. Jones (D.C. Bar #417681)
Thomas A. Clare, P.C. (D.C. Bar #461964)
Beth A. Williams (D.C. Bar #502522)
Peter A. Farrell (D.C. Bar #975579)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Tel: (202) 879-5000
Fax: (202) 879-5200

*Attorneys for Plaintiff*

Dated: May 19, 2011

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................5

I. Venue Is Proper In This Court And Transfer Is Unwarranted.............................5

  A. The Removal Statute, 28 U.S.C. § 1441(a), Governs Venue In This Court. ..........6

  B. Venue Would Have Been Proper Under § 1391(a). ...............................................7

  C. Defendants Have Not Met Their "Heavy Burden" For Obtaining Transfer Under § 1404(a). ............................................................................................13

    1. The Private-Interest Factors Do Not Support Transfer.............................14

      a. Mrs. Sherrod's Choice Of Forum Is Entitled To Substantial Deference. ..............................................................................14

      b. Defendants Chose To Involve Themselves In A Dispute In This District And Routinely Travel Here When It Suits Their Interests. ...............................................................................16

      c. Defendants Do Not Identify A Single Witness Who Would Not Appear For Trial In This Court..............................................21

      d. Potential Sources Of Proof In California Do Not Support Transfer There........................................................................22

    2. The Public-Interest Factors Do Not Support Transfer.............................24

      a. Mrs. Sherrod's Straightforward Claims Do Not Require The Particularized Expertise Of Any Court..................................24

      b. Defendants Have Not Established That Court Congestion Supports Transfer........................................................................25

      c. This Is Not A California Controversy That Should Be Decided In California..............................................................25

II. The Complaint States Valid Claims Against All Defendants..............................27

  A. Standard of Review ............................................................................................27

  B. Defendants' Statements Are Not Protected "Opinion."........................................28

## TABLE OF CONTENTS (CONT'D)

Page

C.    Viewed Separately Or Considered Together As A Whole, Defendants'
Statements About Mrs. Sherrod Are Verifiably False And Defamatory. ..............32

D.    Defendants' Statements Are Reasonably Capable Of Defamatory
Meaning. ...................................................................................................38

E.    Defendants' Statements Are Indefensible Either As "Supportable
Interpretations" Or "Fair Comment." ....................................................39

F.    Mrs. Sherrod's Claims For Intentional Infliction Of Emotional Distress
And False Light Invasion Of Privacy Stand—And Survive—
Independently Of Her Claim For Defamation. ......................................43

G.    Defendants Have Not Shown That California Law Should Apply To The
Issues Raised In Their Motion To Dismiss............................................44

CONCLUSION.............................................................................................................45

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abecassis v. Wyatt*,
    669 F. Supp. 2d 130 (D.D.C. 2009) ........................................................................ 7

*\*Afro-American Publ'g v. Jaffe*,
    366 F.2d 649 (D.C. Cir. 1966) ................................................................. 30, 33, 36

*Aftab v. Gonzalez*,
    597 F. Supp. 2d 76 (D.D.C. 2009) .......................................................................... 7

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) .......................................................................................... 27

*Bates v. C & S Adjusters, Inc.*,
    980 F.2d 865 (2d Cir. 1992) ................................................................................... 9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................ 27, 28

*\*Benz v. Wash. Newspaper Publ'g Co.*,
    Civ. A. No. 05-1760 (EGS), 2006 WL 2844896 (D.D.C. Sept. 29, 2006) .............. 33, 35, 38

*Black v. City of Newark*,
    535 F. Supp. 2d 163 (D.D.C. 2008) ....................................................................... 7

*Blumenthal v. Drudge*,
    992 F. Supp. 44 (D.D.C. 1998) ...................................................................... 13, 20

*Boehner v. Heise*,
    410 F. Supp. 2d 228 (S.D.N.Y. 2006) ................................................................. 11

*Boisjoly v. Morton Thiokol, Inc.*,
    No. 87-0194, 1987 WL 11217 (D.D.C. May 14, 1987) ......................................... 23

*Chonic v. Wayne Cty. Cmty. Coll.*,
    973 F.2d 1271 (6th Cir. 1992) .............................................................................. 30

*Clawson v. St. Louis Post-Dispatch*,
    906 A.2d 308 (D.C. 2006) ..................................................................................... 43

*Cummings v. Western Trial Lawyers Ass'n*,
    133 F. Supp. 2d 1144 (D. Az. 2001) .................................................................... 11

iii

*Curtis Publ'g. Co. v. Vaughan*,
278 F.2d 23 (D.C. Cir. 1960) ........................................................ 33

*Dowd v. Calabrese*,
589 F. Supp. 1206 (D.D.C. 1984) ................................................ 45

*Dresbach v. Doubleday & Co.*,
518 F. Supp. 1285 (D.D.C. 1981) ................................................ 44

*Elemary v. Phillip Holzman AG*,
533 F. Supp. 2d 144 (D.D.C. 2008) ............................................. 8

*FC Inv. Group LC v. Lichtenstein*,
441 F. Supp. 2d 3 (D.D.C. 2006) ......................................... *passim*

*Fisher v. Wash. Post Co.*,
212 A.2d 335 (D.C. 1965) ............................................................ 40

*Foretich v. Advance Magazine Publishers, Inc.*,
765 F. Supp. 1099 (D.D.C. 1991) ................................................ 44

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ...................................................................... 29

*Hoffman v. Wash. Post Co.*,
433 F. Supp. 600 (D.D.C. 1977) .................................................. 33

*Ihebereme v. Capital One*,
730 F. Supp. 2d 40 (D.D.C. 2010) ............................................... 27

*International Painters & Allied Trades Indus. Pension Fund v. Tri-State Interiors, Inc.*,
357 F. Supp. 2d 54 (D.D.C. 2004) ................................... 14, 15, 16

*Jacobsen v. Oliver*,
201 F. Supp. 2d 93 (D.D.C. 2002) ........................................... 9, 10

*Jankovic v. Int'l Crisis Group*,
593 F.3d 22 (D.C. Cir. 2010) ................................................. 29, 40

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984) .......................................................... 10, 20, 24

*Klayman v. Barmak*,
634 F. Supp. 2d 56 (D.D.C. 2009) ............................................... 27

*Klayman v. Segal*,
783 A.2d 607 (D.C. Cir. 2001) ............................... 28, 33, 38, 39

*Kotan v. Pizza Outlet, Inc.*,
    400 F. Supp. 2d 44 (D.D.C. 2005) ....................................... 6

*Lamont v. Haig*,
    590 F.2d 1124 (D.C. Cir. 1978) ........................................ 7

*Lane v. Random House*,
    985 F. Supp. 141 (D.D.C. 1995) ....................................... 40

*Leroy v. Great W. United Corp.*,
    443 U.S. 173 (1979) ................................................ 7, 8

*MacElree v. Philadelphia Newspapers*,
    674 A.2d 1050 (Pa. 1996) ............................................. 31

*Manning v. Flannery*,
    No. 09-03190, 2010 WL 55295 (E.D. Pa. Jan. 6, 2010) ................... 8

*Marks v. Torres*,
    576 F. Supp. 2d 107 (D.D.C. 2008) ..................................... 7

*Mastro v. Potomac Elec. Power Co.*,
    447 F.3d 843 (D.C. Cir. 2006) ........................................ 45

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ............................................ 29, 35, 40

*Miracle v. N.Y.P. Holdings, Inc.*,
    87 F. Supp. 2d 1060 (D. Haw. 2000) ................................ 12, 23

*Modaressi v. Vedadi*,
    441 F. Supp. 2d 51 (D.D.C. 2006) ................................... 9, 10

*Moldea v. N.Y. Times*,
    22 F.3d 310 (D.C. Cir. 1994) .................................... *passim*

*Nichols v. G.D. Searle & Co.*,
    991 F.2d 1195 (4th Cir. 1993) ......................................... 7

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*,
    760 F.2d 312 (D.C. Cir. 1985) .................................. 7, 8, 9, 12

*O'Brien v. City of Saginaw*,
    No. 10-12700-BC, 2011 WL 8143 (E.D. Mich. Jan. 3, 2011) ........... 30, 39

*Park West Galleries, Inc. v. Hochman*,
    No. 08-12247, 2009 WL 728535 (E.D. Mich. Mar. 19, 2009) ............... 11

*Parnigoni v. St. Columbia's Nursery School*,
  681 F. Supp. 2d 1 (D.D.C. 2010) ............................................................ 28

*Pearce v. E.F. Hutton Group*,
  664 F. Supp. 1490 (D.D.C. 1987) ........................................................... 40

*Phillips v. Evening Star Newspaper Co*.,
  424 A.2d 78 (D.C. 1980) ......................................................................... 40

*Polizzi v. Cowles Magazines, Inc.*,
  345 U.S. 663 (1953) ......................................................................... 6, 7, 8

*Price v. Stossel*,
  620 F.3d 992 (9th Cir. 2010) .............................................................. 36, 41

*Puchalski v. Sch. Dist. of Springfield*,
  161 F. Supp. 2d 395 (E.D. Pa. 2001) .................................................. 31, 39

*Roots v. Mont. Human Rights Network*,
  913 P.2d 638 (Mont. 1996) ..................................................................... 30

*Schermerhorn v. Rosenberg*,
  426 N.Y.S.2d 274 (N.Y. App. Div. 1980) .............................................. 31

*Scott v. Jones*,
  984 F. Supp. 37 (D. Me. 1997) ............................................................... 14

*Shapiro, Lifschitz & Schram, P.C. v. Hazard*,
  24 F. Supp. 2d 66 (D.D.C. 1998) .......................................... 13, 21, 24, 25

*Sheraton Operating Corp. v. Just Corporate Travel*,
  984 F. Supp. 22 (D.D.C. 1997) .......................................... 14, 15, 20, 22

*Sierra Club v. Flowers*,
  276 F. Supp. 2d 62 (D.D.C. 2003) ............................................................ 8

*Taylor v. Carmouche*,
  214 F.3d 788 (7th Cir. 2000) ................................................................... 39

*Thayer/Patricof Educ. Funding L.L.C. v. Pryor Res., Inc.*,
  196 F. Supp. 2d 21 (D.D.C. 2002) ................................................... *passim*

*The Wilderness Soc'y v. Babbitt*,
  104 F. Supp. 2d 10 (D.D.C. 2000) .................................................... 25, 26

*Weyrich v. New Republic*,
  235 F.3d 617 (D.C. Cir. 2001) ........................................................ *passim*

vi

*White v. Fraternal Order of Police*,
　909 F.2d 512 (D.C. Cir. 1990) ............................................................. 29

*Zidon v. Pickrell*,
　344 F. Supp. 2d 624 (D.N.D. 2004) ....................................................... 14

## STATUTES

28 U.S.C. § 1391 .............................................................................. 5, 7, 9, 11

28 U.S.C. § 1404 ............................................................................. 2, 6, 13, 27

28 U.S.C. § 1406 .................................................................................... 5, 7

28 U.S.C. § 1441 ................................................................................. 2, 6, 8

## RULES

Fed. R. Civ. P. 12 .................................................................................. 5, 7

## OTHER AUTHORITIES

14C Fed. Prac. & Proc. § 3732 (4th ed. 2010) ............................................... 7

14D Fed. Prac. & Proc. Juris. § 3806 (3d ed. 2010) ........................................ 9

Restatement (Second) of Torts § 559 ........................................................ 30

## INTRODUCTION

When Plaintiff first filed her lawsuit in February 2011, Defendants Andrew Breitbart and Larry O'Connor each issued public statements taunting Mrs. Sherrod to "Bring it On,"[1] suggesting that Defendants were interested in defending the merits of their defamatory statements.  Now, however, several months later, they have thrown up a series of removal, transfer, and dismissal motions, each designed to impose a procedural artifice delaying or preventing an on-the-merits defense of their statements, and each designed to play games with the jurisdiction and venue of the federal courts.  Most troubling, however, is the fact that Defendants' various submissions to this Court demonstrate a consistent pattern of misstating the applicable legal standards and authorities—and also the facts alleged in the Complaint.

*First*, Defendants have filed a Special Motion to Dismiss under the District of Columbia Anti-SLAPP Act of 2010, an act that—by their own admission—did not become effective until March 31, 2011, nearly a month and a half *after* the Complaint in this case was filed.  To compound this obvious problem, Defendants fail entirely to explain how the Act could possibly have any retroactive effect; instead, they merely conclude it is retroactive in a footnote with a cursory citation to a case that was limited and distinguished by the D.C. Court of Appeals just last year.  Moreover, Defendants offer *no* explanation for why their motion is not procedurally defaulted by the plain language of the statute they are attempting to employ—given that they filed more than two weeks *after* the statutory deadline had passed.  With all of these (and other) fatal flaws, Defendants' "special" motion fails as a matter of law and should be summarily rejected.

---

[1]  *See*  http://biggovernment.com/publius/2011/02/12/andrew-breitbart-on-pigford-lawsuit-bring-it-on/; http://twitter.com/#!/Stage_Right/status/37248165400952832 ("Oh... in case anyone missed it, because it was kind of late on Saturday night when I said it... let me repeat: 'Bring it on!'").

**Second**, Defendants' motion to dismiss based on venue is similarly flawed in its treatment of legal authority.  Fully cognizant that this case was originally filed in D.C. Superior Court and then removed **by Defendants** to this Court, Defendants nonetheless argue for dismissal under a statute that would only apply if the case had originally been brought here.  For that straightforward reason, much of their brief is moot.  Defendants then compound their mistake by asserting that caselaw predicated on a version of the venue statute amended by Congress **twenty-one years ago** dictates the correct venue.  It does not.  The removal statute, 28 U.S.C. § 1441, governs venue in this case and makes venue proper here.

Even putting aside Defendants' many analytical missteps, Defendants fall far short of their heavy burden for obtaining transfer under 28 U.S.C. § 1404(a).  Plaintiff's choice of forum is appropriate.  As Defendants concede, Mrs. Sherrod **could not** have filed this suit in her home state of Georgia.  The District of Columbia is therefore the closest forum to her home in which she could have sued.  And it is well-established that Defendants cannot have the case transferred if the result would merely shift the inconvenience from defendant to plaintiff.  Moreover, as this Court has repeatedly noted, a defendant must show that third-party witnesses would not voluntarily appear here and must establish the availability of compulsory process to compel the attendance of unwilling third-party witnesses in the transferee district.  *See, e.g.*, *Thayer/Patricof Educ. Funding L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 34 (D.D.C. 2002).  Defendants have not even addressed this in their brief.  In this case, both sides will certainly want to obtain testimony from the USDA officials who were involved in the decision to fire Mrs. Sherrod on the basis of Defendants' defamatory statements.  Indeed, Defendants **themselves** have stated in no uncertain terms, both in writing and directly to the Court during the April 7, 2011 conference in chambers, that they will seek discovery from USDA officials and from third parties in the

District of Columbia related to the *Pigford* cases that are currently pending before Judge Friedman of this Court.[2]   Although Plaintiff unequivocally believes that *Pigford*-related discovery is irrelevant to this case, Defendants should not be permitted to transfer this case all the way to California only to turn around and demand discovery and testimony from third parties located in the very district they left.  Defendants' pleadings make clear, however, that this is exactly what they intend to do.

*Third*, Defendants argue that complete diversity demands this case be tried in federal court at the same time they loudly and repeatedly claim to the press that the third defendant in this case is an "individual in Georgia."   Nevertheless, Defendants argue to this Court that Defendant John Doe's citizenship and *their own knowledge of Doe's identity* are irrelevant to the Court's jurisdiction.  They are not.  By asking this Court to ignore their public statements and countenance their concealment of John Doe's identity, Defendants hope that they can simply maintain federal jurisdiction long enough to reach their ultimate goal: transfer to California.  But, for the many reasons stated in Plaintiff's Reply in Support of Her Motion to Remand, the Court should reject Defendants' effort to manipulate federal jurisdiction and venue in this manner— and reject their transparent effort to convert this Court into a temporary "way station" on their way to the west coast.

*Finally*, in an effort to divert the Court's attention from the narrow, specific defamatory statements *about Mrs. Sherrod* that are the subject of this action, Defendants veer far afield of the legally relevant facts alleged in the Complaint.  Defendants suggest that because they are journalist-bloggers writing about public affairs, they have the license to malign and defame

---

[2]   *See* Defs.' Anti-SLAPP Mem. at 4 [Dkt. 24]; March 14, 2011 Letter A. Kroll to T. Clare at 2 (requesting that Mrs. Sherrod preserve all documents relating to "the settlement awarded to New Communities, Inc. … and related applications, pleadings, and other non-privileged documents in the *Pigford v. Vilsack* class action matter") (Ex. 1).

someone when it helps them to "turn[] the rhetorical tables" on a political issue.  *See* Defs.'
Mem. at 20 [Dkt. 22].  Indeed, there is little other explanation for the inclusion in Defendants'
brief of ***pages*** of background detailing the arguments between the NAACP and the Tea Party in
2009 and 2010.  *Id.* at 16-21.  Defendants attempt to justify their actions as mere "rhetorical,"
"hyperbolic" statements made in the midst of battle.  *Id.* at 30.  But Shirley Sherrod was not part
of that political battle.  In fact, she was not even a member of the NAACP when they honored
her with an award in March 2010.  Mrs. Sherrod had no way of knowing that Defendants were
about to take her speech—a speech about ***overcoming*** racial barriers—edit it until it was devoid
of her intended meaning, and broadcast it to a national audience to show she was "admitting"
racism.  Those are the facts of this case contained in the Complaint, and that is exactly the type
of behavior that finds no protection from the First Amendment.

Defendants' posture here is especially ironic because the tactics and statements they
defend exemplify exactly what they claim to be fighting against.  According to their brief,
Defendant Breitbart was a "well-known [] defender of the Tea Party" who was angered when
"claims of racial slurs were being fabricated by the 'left' and the 'progressive media' as a tactic
to marginalize growing support for the Tea Party movement."  *Id.* at 17-18.  To get back at them,
however, Mr. Breitbart falsely accused Mrs. Sherrod of the same type of prejudice that was being
unfairly leveled at the Tea Party.  That tactic is unacceptable, no matter who employs it.  In
Defendants' case, however, by specifically and falsely stating that Mrs. Sherrod admitted
practicing racial discrimination in the course of her federal duties, it amounts to defamation.

This case is not about politics, the Tea Party, or the NAACP.  It is about specific false
and misleading statements made about one woman who had nothing to do with the controversy
Defendants so meticulously describe in their brief.  At the end of the day, Defendants'

extraneous arguments about politics neither affect the posture of this case nor obscure the validity of Plaintiff's claims.   On the legal and procedural issues, their repeated and obvious analytical errors undercut the credibility of their arguments.   Defendants' motions should be denied, and Plaintiff would welcome the opportunity for oral argument to more fully discuss these issues with the Court.

This brief is divided into two parts.   In the first part, Plaintiff addresses why venue is proper in this Court when the correct statute is applied, and further explains why Defendants have failed to meet their "heavy burden" for obtaining transfer to California.   In the second part, Plaintiff focuses on Defendants' specious argument that the Complaint fails to state a valid claim for defamation because Defendants' statements are non-actionable "opinion."   Even a cursory review of the Defendants' statements, the national uproar they created, and the important context that Defendants knowingly and recklessly omitted from the misleading video clip described in the Complaint, reveals them to be anything but.

**ARGUMENT**

## I.      Venue Is Proper In This Court And Transfer Is Unwarranted.

Defendants' venue arguments rest on layer upon layer of incorrect statements of law. The fundamental error of Defendants' brief is the contention that 28 U.S.C. § 1391(a)—the general federal venue provision that applies only to cases *originally* "brought" in federal court— governs venue in this removed case.   *See* Defs.' Mem. at 5.   It does not.   Defendants compound their mistake by also asserting that caselaw under a *now-defunct* version of § 1391(a) dictates that the Central District of California is the one-and-only federal venue for Mrs. Sherrod's claims.   *See id.* at 7, 10.   It is not.   And with these incorrect predicates in place, Defendants declare that the Court must dismiss or transfer the case under 28 U.S.C. § 1406(a) and Rule 12(b)(3).   It may not.   Venue is proper here.

5

Alternatively, Defendants ask the Court to transfer the case to the Central District of California solely because they believe 28 U.S.C. § 1404(a) allows them to substitute their convenience for the convenience of all the other parties and witnesses in this case. *See* Defs.' Mem. at 11-16. It does not. Because Defendants have not otherwise met their heavy burden of showing that the private- and public-interest factors or the "interest[s] of justice" require transfer to California, Defendants' motion should be denied.

### A.      The Removal Statute, 28 U.S.C. § 1441(a), Governs Venue In This Court.

Nearly six decades ago, the Supreme Court held that "§ 1391 has no application" to a case that is removed from state court. *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665 (1953). Instead, the removal statute itself—28 U.S.C. § 1441(a)—governs venue. *Id.* The reason is straightforward: "Section 1391(a) limits the district in which an action may be 'brought,'" but a removed case is not "'brought' in the District Court"; it is "brought in a state court." *Id.* at 665-66. Once a state case is removed, "[s]ection 1441(a) expressly provides that the proper venue … is 'the district court of the United States for the district and division embracing the place where such action is pending.'" *Id.* at 666 (quoting 28 U.S.C. § 1441(a)). Because Defendants removed this case from D.C. Superior Court, the relevant "district and division" is this Court. Venue thus is proper here. *See Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 46 (D.D.C. 2005) ("Because this case was filed in the Superior Court for the District of Columbia and defendants voluntarily removed it to this Court, this Court is the proper venue under § 1441(a).").

Defendants, however, do not so much as mention *Polizzi* or § 1441(a) in their brief. Instead, they devote page after page to the assertion that venue is improper because "none" of § 1391(a)'s subsections "appl[y]." Defs.' Mem. at 5 (emphasis omitted); *see also id.* at 6-11. In one sense, Defendants are correct: Section 1391(a)'s subsections do not "appl[y]" because they

are irrelevant to this removed case.  *See Polizzi*, 345 U.S. at 666; *see also* 14C Fed. Prac. & Proc. § 3732 (4th ed. 2010) ("[T]he general venue statutes, [§§ 1391-1393], do not apply to cases that have been initiated in a state court and removed to a federal court.  It therefore is immaterial that the federal court to which the action is removed would not have been a proper venue if the action originally had been brought there. … Once removed, the propriety of the venue is governed by [§ 1441(a)], and it simply is immaterial whether venue was proper in the state court in which the action was filed; the state venue statutes no longer apply.").

In short, Defendants made this Court the correct federal venue for this case by removing it; they cannot now complain that venue is improper.  This simple point defeats Defendants' motion to dismiss or to transfer for improper venue, and it distinguishes all of the statutes, rules, and cases on which they rely for support.  *See* Defs.' Mem. at 4-8 & n.1 & n.2 (citing Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1406(a); 28 U.S.C. § 1391(a); *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979); *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 760 F.2d 312 (D.C. Cir. 1985); *Lamont v. Haig*, 590 F.2d 1124 (D.C. Cir. 1978); *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993); *Aftab v. Gonzalez*, 597 F. Supp. 2d 76 (D.D.C. 2009); *Abecassis v. Wyatt*, 669 F. Supp. 2d 130 (D.D.C. 2009); *Black v. City of Newark*, 535 F. Supp. 2d 163 (D.D.C. 2008); *Marks v. Torres*, 576 F. Supp. 2d 107 (D.D.C. 2008); *Elemary v. Phillip Holzman AG*, 533 F. Supp. 2d 144 (D.D.C. 2008); *Sierra Club v. Flowers*, 276 F. Supp. 2d 62 (D.D.C. 2003); *Manning v. Flannery*, No. 09-03190, 2010 WL 55295 (E.D. Pa. Jan. 6, 2010)).

### B.     Venue Would Have Been Proper Under § 1391(a).

Even if § 1391(a) did apply—which it does not—this Court would still be a proper venue because (at a minimum) "a substantial part of the events or omissions giving rise to the claim" occurred in the District of Columbia.  *See* 28 U.S.C. § 1391(a)(2).  Here, too, Defendants misstate the law.  They contend that the Central District of California is the ***only*** possible federal

venue for this case because Mrs. Sherrod's "claim arose" there and nowhere else.  *See* Defs.' Mem. at 7-8 (arguing that venue is improper here because there are more "significant ties to California" and Defendants must have defamed Mrs. Sherrod from California).   In support, Defendants cite the Supreme Court's *Leroy v. Great Western United Corp.* decision and the D.C. Circuit's *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant* decision, arguing that those cases show "this action was filed in a judicial district that was ***obviously incorrect***" and that "the proper judicial district" is in Los Angeles.  *See id.* at 7 (emphasis in original); *but see* 28 U.S.C. § 1441(a); *Polizzi*, 345 U.S. at 665-66.

 *Leroy* and *Noxell*, however, applied a now-defunct version of § 1391.   At the time, § 1391(a)(2) provided for transactional venue "only in ***the*** judicial district … in which the claim arose."  *See Leroy*, 443 U.S. at 178 n.8 (interpreting the similar language of § 1391(b)(2)); *Noxell*, 760 F.2d at 315 (same).[3]  Applying that language, *Leroy* explained that in the "unusual case in which it [was] not clear that the claim arose in only one specific district," the "convenience of the defendant" was one of several factors that could be used to break the tie and "assign[] … the locus of the claim."  *See Leroy*, 443 U.S. at 185.  *Noxell*, in turn, applied the *Leroy* factors to arrive at the concluding language Defendants block-quoted in their brief.  *See* Defs.' Mem. at 8 (quoting *Noxell*, 760 F.2d at 317).

 In 1990, however, "Congress amended § 1391(a) by adding the more expansive language of § 1391(a)(2) in an effort to avoid wasteful litigation when different forums were involved in a dispute."  *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 108 (D.D.C. 2002).   As Wright & Miller explains, "[t]he significance of the *Leroy* decision was diminished greatly, if not entirely, by amendments to the general venue statutes that were enacted by Congress in 1990."  14D Fed.

---

[3]     Emphasis added, internal quotations, and citations omitted unless otherwise noted.

Prac. & Proc. Juris. § 3806 (3d ed. 2010).  Under the amended statute, "plaintiffs are not required to establish that" their chosen venue "has the most substantial contacts to the dispute, but rather only that 'a substantial part of the events occurred' [there]."  *Jacobsen*, 201 F. Supp. 2d at 108 (quoting 28 U.S.C. § 1391(a)(2)).  As a result, unlike the days of *Leroy* and *Noxell*, considerations like the defendants' convenience are largely beside the point because courts no longer have to break ties to "determine which forum represents the 'best' venue." *See id.*; *see also Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir. 1992) ("Many of the factors in *Leroy*—for instance, the convenience of defendants and the location of evidence and witnesses— are most useful in distinguishing between two or more plausible venues.  Since the new statute does not, as a general matter, require the District Court to determine the best venue, these factors will be of less significance.").

Defendants' brief thus "misapprehends the question of law that the Court must answer." *Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 57 (D.D.C. 2006); *see FC Inv. Group LC v. Lichtenstein*, 441 F. Supp. 2d 3, 11 (D.D.C. 2006) ("[I]t is no longer appropriate to ask which district … has the most significant connection to the claim.").  As *Modaressi* explained:

> Nothing in section 1391(b)(2) mandates that a plaintiff bring suit in the district where the ***most substantial*** portion of the relevant events occurred, nor does it require a plaintiff to establish that every event that supports an element of a claim occurred in the district where venue is sought.  To the contrary, a plaintiff need only show that "*a* substantial ***part*** of the events or omissions giving rise to the claim occurred" in that district.

*Modaressi*, 441 F. Supp. 2d at 57 (emphasis in original).  As a result, a plaintiff often "will have a choice among multiple districts where a substantial portion of the underlying events occurred," *id.*, and venue in the District of Columbia may be proper "even if it might also be proper elsewhere," *Jacobsen*, 201 F. Supp. 2d at 108-109.  *Cf. Keeton v. Hustler Magazine, Inc.*,

465 U.S. 770, 780 (1984) ("There is no justification for restricting libel actions to the plaintiff's home forum.").

Defendants fail to acknowledge the amended transactional-venue standard, arguing instead that the Court must narrowly consider only the Defendants' specific tortious acts. *See* Defs.' Mem. at 6-7. Setting aside that Defendants offer no support for their assertion that these acts **must** have been committed in California, *id.*,[4] under the amended statute, "a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Lichtenstein*, 441 F. Supp. 2d at 11. In fact, a simple, uncontested "communication transmitted to or from the district" may be sufficient. *Id.* For that reason, the Court "should review ***the entire sequence of events*** underlying the claim" to determine whether the liberal standard of the amended § 1391(a)(2) has been satisfied. *See id.*

Under this correct standard, venue would be proper in this Court even ***if*** § 1391(a)(2) applied to this case. As the Complaint alleges, and as Defendants admit in their own brief, Mr. Breitbart was "[a]ngered by the NAACP's claims of racism against the Tea Party"—which arose at a rally in the District of Columbia—and therefore "used Mrs. Sherrod to further his own agenda of counter-attacking the NAACP with claims of racism." *See* Compl. ¶ 62; *see also id.* ¶ 66; Defs.' Mem. at 17-18 (describing in their Statement of Facts the events at a March 20, 2010 Tea Party rally on Capitol Hill). In doing so, Defendants inserted themselves into a controversy in this District by using their blog post "and the 'video proof' allegedly embedded within it" in an attempt to "embarrass the NAACP and its members"—defaming Mrs. Sherrod in the process. *See* Compl. ¶ 30. The White House and senior USDA officials in the District of

---

[4]    At this point in the case, before discovery has begun, there is nothing to show that Defendants committed their tortious acts in California. Indeed, the ubiquity of internet connections, and their admitted live-blogging and live-coverage from Washington, D.C. of the Conservative Political Action Committee (CPAC) Convention in February 2011 illustrate Defendants' ability to "do their jobs" from anywhere. *See infra* at 17-20.

Columbia then immediately demanded Mrs. Sherrod's resignation because of Defendants' false statements. *Id.* ¶¶ 72-79.  And although Mr. Breitbart asserted he "could care less about Shirley Sherrod" because his focus was on the Tea Party's dispute with the NAACP in Washington, D.C., *see id.* ¶ 4, he nevertheless prodded Attorney General Holder at the Department of Justice in Washington, D.C. to "hold accountable fed appointee Shirley Sherrod for admitting practicing racial discrimination," *id.* ¶ 60.  These facts establish that "a substantial part of the events … giving rise to" Mrs. Sherrod's claims occurred in this district, *see* § 1391(a)(2)—as courts around the country have recognized in similar circumstances.  *See, e.g.*, *Park West Galleries, Inc. v. Hochman*, No. 08-12247, 2009 WL 728535, at *6 (E.D. Mich. Mar. 19, 2009) (defamation action proper in Michigan, even though defendant wrote defamatory statement in Arizona, because "the articles were published on the internet and were, therefore, published to persons in Michigan"); *Boehner v. Heise*, 410 F. Supp. 2d 228, 240 (S.D.N.Y. 2006) (defamation action proper in New York even though the defendants wrote and sent the defamatory letter in Wisconsin); *Cummings v. Western Trial Lawyers Ass'n*, 133 F. Supp. 2d 1144, 1150 (D. Az. 2001) (defendant's argument "that venue in Arizona is improper because 'all of the alleged actions complained of occurred in Colorado'" was "without merit"); *Miracle v. N.Y.P. Holdings, Inc.*, 87 F. Supp. 2d 1060, 1072 (D. Haw. 2000) (defamation action proper in Hawaii, even though defendants wrote and published the defamatory article from New York, because they "circulated newspaper subscriptions in Hawaii" and plaintiff suffered harm there).

Defendants, however, conspicuously omit this sequence of events from their venue arguments, asserting instead that "there are virtually no ties between the claims in this action and the District of Columbia."  *See* Defs.' Mem. at 8 (citing *Noxell* 760 F.2d at 317).  "No ties," that is, until the reader reaches the "substantive section" of Defendants' brief.  *Id.* at 16-44.  There,

11

Defendants' brief turns on a dime to argue that "[t]he broad context" of Mrs. Sherrod's claims is "illuminating," *id.* at 32, and asks the Court to recognize that Defendants acted "squarely in the context of [the] months-long and very loud public clash between Tea Party conservatives and the NAACP and its allies in Congress," *id.* at 20—a "public clash" that arose in Washington, D.C. Defendants cannot claim (as Mr. Breitbart ironically stated in his blog post) that "context is everything" when it comes to their defenses, yet expect the Court to ignore the very same facts when it comes to venue.

Moreover, as stated above and in the Complaint, the connections between this case and the District of Columbia are substantial.  Mrs. Sherrod was hired by people in D.C., trained by people in D.C., supervised by people in D.C., and fired by people in D.C.  She was fired because of false and misleading information that Defendants disseminated in D.C. via their blog and web postings.  And although personal jurisdiction over Mr. Breitbart and Mr. O'Connor is not at issue as it was in the *Drudge* case—because Defendants were personally served in the District of Columbia while attending a conference here, as they do frequently—the Court's comments on the connections between the Drudge Report website and D.C. rings true here as well:

> [T]he subject matter of the Drudge Report primarily concerns political gossip and rumor in Washington, D.C. …  Drudge specifically targets readers in the District of Columbia by virtue of the subjects he covers and even solicits gossip from District residents and government officials who work here. …  He should have no illusions that he was immune from suit here.

*Blumenthal v. Drudge*, 992 F. Supp. 44, 56-57 (D.D.C. 1998).  Similarly, Defendants' website (BigGovernment.com) focuses directly on issues pertaining to Washington, D.C., and the federal government.  It should be no surprise to Defendants—especially given the "context" they offer in the second part of their brief—that an action against them would be properly brought in the District of Columbia.

Defendants made venue proper, first and foremost, by removing this case.  Moreover, a substantial part of the events giving rise to Mrs. Sherrod's claims occurred in the District.  Venue in this Court is therefore not "obviously incorrect," Defs.' Mem. at 7 (emphasis omitted); it is proper.  The Court therefore should deny Defendants' motion to dismiss or to transfer for improper venue under § 1406(a).

## C. Defendants Have Not Met Their "Heavy Burden" For Obtaining Transfer Under § 1404(a).

Because venue is proper in this Court, Defendants cannot obtain transfer unless they meet their "heavy burden of establishing that plaintiff['s] choice of forum is inappropriate" under 28 U.S.C. § 1404(a).  *See Thayer*, 196 F. Supp. 2d at 31.  That statute allows the Court to transfer the case only if Defendants "demonstrate that the balance of convenience of the parties and witnesses and the interest of justice are in [their] favor."  *Id.*   To do so, Defendants "must make a substantial showing that transfer is **necessary**" in light of the private- and public-interest factors.  *Lichtenstein*, 441 F. Supp. 2d at 13; *see Thayer*, 196 F. Supp. 2d at 31  ("It is almost a truism that a plaintiff's choice of a forum will rarely be disturbed …."); *see also Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 71 (D.D.C. 1998) ("[T]he Court may not transfer a case from a plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by the plaintiff.").  "[T]he plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request."  *Sheraton Operating Corp. v. Just Corporate Travel*, 984 F. Supp. 22, 25 (D.D.C. 1997).

Here, again, Defendants are wrong on the law.  Although they pay cursory attention to the interest factors, the gist of Defendants' argument is that § 1404(a) allows them to substitute their convenience for the convenience of all the other parties and witnesses in this case.  "The Central District of California," Defendants contend, "is plainly more favorable to the Defendants

in terms of convenience," Defs.' Mem. at 14, and their convenience trumps "Sherrod's chosen venue," *id.* at 13, even though she does not live in California, nor does John Doe, nor any other third-party or witness.  Indeed, Defendants do not identify a single third-party or witness for whom the District of Columbia is inconvenient.

Section 1404(a), however, does not permit transfer where it would "merely shift the balance of inconvenience from Defendant to Plaintiff" or "shift the inconvenience from Defendant's witnesses to Plaintiff's witnesses."  *International Painters & Allied Trades Indus. Pension Fund v. Tri-State Interiors, Inc.*, 357 F. Supp. 2d 54, 57 (D.D.C. 2004); *see also id.* ("[C]onvenience of the parties is … insufficient to persuade th[e] Court that a transfer is warranted."); *Scott v. Jones*, 984 F. Supp. 37, 46 (D. Me. 1997) (denying defamation defendant's motion to transfer where "venue in California would simply shift the burden of litigating in an out-of-state forum from" one defendant to another); *Zidon v. Pickrell*, 344 F. Supp. 2d 624, 633 (D.N.D. 2004) (denying defamation defendant's motion to transfer).  Indeed, "even if a transfer would significantly benefit the defendant, the Court will not grant the motion if the result merely would shift the inconvenience from [d]efendant[ ] to [plaintiff]."  *Sheraton*, 984 F. Supp. at 26 (partial alteration in original).  Instead, for this factor to benefit the defendant, "***the net convenience***" of the parties and witnesses must increase—and that is just one of several factors. *Id.* (denying motion to transfer to California).  Defendants' motion falls well short of this standard.

### 1.    The Private-Interest Factors Do Not Support Transfer.

#### a.    Mrs. Sherrod's Choice Of Forum Is Entitled To Substantial Deference.

Defendants begin their brief by contending that Mrs. Sherrod's "decision to sue [them] outside her home state of Georgia, in a court located more than 600 miles from the place of her

residence, is entitled to no deference whatsoever."  Defs.' Mem. at 1.  That is not correct.  As an initial matter, Defendants' contention is inconsistent.   At the same time they criticize Mrs. Sherrod for not filing her suit in Georgia, *id.* at 12-13, they also assert that "***this action could not have been brought in Georgia*** because [Defendants] are not subject to personal jurisdiction [there]," *id.* at 10 (emphasis altered).

More important, "[t]he plaintiff's choice of a forum is 'a paramount consideration' in ***any*** determination of a transfer request"; residency is not an essential predicate to deference.  *See Thayer*, 196 F. Supp. 2d at 31.  To be sure, the plaintiff "is given ***additional*** deference when [she] is a resident of the forum district," but a court may not disregard the plaintiff's forum selection simply because she sued outside her home state—especially where, as here, Defendants themselves concede she could ***not*** have sued in her home state.  *See Tri-State Interiors*, 357 F. Supp. 2d at 56.

Indeed, Mrs. Sherrod's forum selection ***is*** entitled to heightened deference because she chose to sue in a forum with "meaningful ties" to the controversy.   *See Lichtenstein*, 441 F. Supp. 2d at 13.  As discussed above, Defendants themselves assert that they defamed Mrs. Sherrod in response to a "furious rhetorical battle between the Tea Party and the NAACP" that arose here, *see* Defs.' Mem. at 32, and they deliberately reached into this forum to "turn[] the rhetorical tables" with the deceptive blog post "that is the subject of Sherrod's lawsuit," *see id.* at 20.  *See also Lichtenstein*, 441 F. Supp. 2d at 13 ("The District of Columbia is not a forum without meaningful ties to the controversy, as Defendants allege, but is the location into which Defendants deliberately reached ….").  Mrs. Sherrod did not file her claims in some far-flung district in a transparent attempt at forum shopping.  She chose the location of events that

Defendants admit are central to her claims and is closest to her residence.   Her selection therefore is entitled to substantial deference.

> **b.** **Defendants Chose To Involve Themselves In A Dispute In This District And Routinely Travel Here When It Suits Their Interests.**

Defendants' assertion that it would be inconvenient for them to litigate here is belied by their own actions.   According to Defendants, they "typically" work on Mr. Breitbart's websites while in California, *see* Defs.' Mem. at 3, and Mr. Breitbart purportedly "would not be able to perform many of his duties as publisher of and contributor to the Breitbart Websites from Washington, D.C.," *id.* at 4.   *See also* Breitbart Decl. ¶ 13 [Dkt. 20]; O'Connor Decl. ¶ 4 [Dkt. 21].   Defendants also argue that litigation here would disrupt their time with their families, a particular hardship for Mr. O'Connor, who explains that "[he] and his wife, who works part time, are the primary caretakers for their children, two of which have special needs."   Defs.' Mem. at 4; O'Connor Decl. ¶¶ 5-6.   Defendants' arguments do not support transfer for at least three reasons.

First, as explained above, § 1404(a) does not allow transfer "merely [to] shift the balance of inconvenience from Defendant to Plaintiff."   *Tri-State Interiors*, 357 F. Supp. 2d at 54. Although Mrs. Sherrod empathizes with Mr. O'Connor and his personal situation, Mrs. Sherrod also has personal reasons for wanting this case to be tried as close to her home as possible.   It is difficult for Mrs. Sherrod to travel just as Mr. Breitbart and Mr. O'Connor claim it is difficult for them.   *See* Sherrod Decl. ¶¶ 2-3, 9-11 (Ex. 2).   Mrs. Sherrod is older than either Defendant; she suffers from diabetes and back problems and lives alone with her husband, Charles, who also suffers from diabetes and cancer.   *See* Compl. ¶ 90.   They, too, have special needs, and it would be no less difficult for Mrs. Sherrod to litigate in California than it would be for Defendants to

litigate here.[5]  Although Defendants may prefer to defend this case near their homes, they cannot

obtain transfer solely for their ease.

Second, in this age of iPhones, iPads, BlackBerrys, and laptops, Defendants' claim that

they could not attend to Mr. Breitbart's websites while litigating here strains credulity.  Indeed,

Mr. O'Connor recently made this point himself—chastising as "incredible and, frankly,

unacceptable" a reporter's claim that she could not correct a blog post on the *New York

Observer*'s website because she was temporarily out of the office.[6]  As Mr. O'Connor put it:

> Ms. Stoeffel, let's get real.  I edit a web site and I own two Verizon broadband
> cards and a smart phone that can amend the site at any moment.  If for some
> reason those devices fail, I have two colleagues I can call at any given moment to
> fix an error on the site.  And Breitbart.com is a relatively small operation.  Surely
> there are systems in place at the *New York Observer* to fix an outright lie that
> appears on their site.

*Id.*  Defendants do not explain why these same tools would not allow them to meet the needs of

Mr. Breitbart's websites while they spend a few days across the coming months litigating in the

District.

Third, Defendants fail to mention that they routinely travel to the District when it suits

their interests to do so—further contradicting their position.  In fact, both Mr. Breitbart and Mr.

O'Connor were ***personally hand-served with the Complaint in the District of Columbia*** while

voluntarily attending a conference here and promoting their websites and radio show.  Indeed,

within ***days*** of filing his motion to transfer, Mr. Breitbart traveled to the District to attend at least

two separate events:

---

[5]     Although Mrs. Sherrod does travel when she must, she often declines to engage in cross-country travel for these
reasons.

[6]     *See*       http://bigjournalism.com/sright/2011/04/22/new-york-observer-knowingly-lies-to-its-readers-despite-
privately-acknowledging-error/.

- On April 21, 2011, Mr. Breitbart attended an event hosted by DC Caller and Americans for Tax Reform to promote his new book.[7]

- That same week, Mr. Breitbart attended an event hosted by the Heritage Foundation, again to promote his book.[8]

These appearances in the District followed at least four others in the few months since

Mrs. Sherrod filed her complaint:

- On March 12, 2011, Mr. Breitbart co-hosted a radio program with Representative Michelle Bachman on D.C.-based radio station WMAL to discuss the *Pigford* litigation pending in this courthouse.[9]

- On February 10, 11, and 12, 2011, Mr. Breitbart spent several days in the District attending the CPAC Conference at the Marriott Wardman Park Hotel, where he was personally served with the summons and Complaint in this case.[10]

- On February 10, 2011, Mr. Breitbart hosted a party at the 18th Street Lounge for the organization "GOProud."[11]

- On February 8, 2011, Mr. Breitbart gave a speech at George Washington University, where he saw fit to condemn Mrs. Sherrod as "a much worse person than I ever thought."[12]

These appearances are typical of a pattern of frequent trips here:

- On September 12, 2010, Mr. Breitbart gave a speech at the "Taxpayer March on Washington" rally;[13]

---

[7]   *See* http://www.youtube.com/watch?v=ctRbMZenPU0.

[8]   *See* http://biggovernment.com/rbluey/2011/04/27/andrew-breitbarts-heritage-foundation-speech-on-righteous-indignation/; *see also* http://www.youtube.com/watch?v=OPgT4KEPufs; http://www.youtube.com/watch?v=2GCcVtpWVQc.

[9]   *See* http://www.breitbart.tv/rep-bachmann-obama-may-used-pigford-to-win-black-vote-from-hillary/; *see also* http://www.wmal.com/Article.asp?id=2132974&spid=28718.

[10]   *See, e.g.*, http://video.cpac.org/speaker/andrew-breitbart (video of Defendant Breitbart's keynote speech at the 2011 CPAC conference in Washington, D.C.).

[11]   *See* http://www.goproud.org/goproud-announces-cpac-%e2%80%9cbig-party%e2%80%9d-with-andrew-breitbart-headlined-by-singersongwriter-sophie-b-hawkins/.

[12]   *See* http://gwrepublicans.org/2011/02/andrew-breitbart-to-discuss-media-bias-with-the-college-republicans/.

[13]   *See* http://www.freedomworks.org/912-taxpayer-march-on-washington-2010.

- On April 15, 2010, Mr. Breitbart attended and spoke at a Tea Party rally that was part of "Washington, D.C. Tax Day";[14]

- From February 19-21, 2010, Mr. Breitbart attended the CPAC Conference at the Marriott Wardman Park Hotel;[15] and

- On October 21, 2009, Mr. Breitbart held a press conference at the National Press Club.[16]

Presumably, there are others.[17]  Indeed, just days ago Mr. Breitbart admitted on a radio show: "I think that I spend *a lot of time* [unintelligible] you know, in Washington, maybe, you know, two weeks, three weeks out of the year.  And every time I get on the plane, I feel like I'm leaving Las Vegas, thinking thank god I'm leaving this hell hole."[18]  Notwithstanding Mr. Breitbart's obvious contempt for the District of Columbia, Plaintiff would expect that a trial in this case would take less time than Defendant Breitbart has already admitted he voluntarily spends in D.C.

Mr. O'Connor routinely travels here, too:[19]

- On April 10, 2011, Mr. O'Connor publicly alerted his "DC pals" that it "[l]ooks like I'll be there tomorrow,"[20] explaining that he'd be spending nearly a week in the District.[21]

---

[14]   *See* http://bigjournalism.com/fross/2010/04/16/andrew-breitbart-at-the-tax-day-tea-party-in-washington/.

[15]   *See, e.g.*, http://video.cpac.org/speaker/andrew-breitbart (video of Defendant Breitbart's keynote speech at the 2010 CPAC conference in Washington, D.C.).

[16]    *See* http://www.life.com/image/92145778.

[17]   In addition to these personal appearances, Mr. Breitbart has been a frequent contributor to the *Washington Times*.

[18]   *See* http://www.urbanskishow.com/b/Interview:-Andrew-Breitbart/601198878093888423.html.

[19]   In light of Defendants' extensive travel and connections here, it is no wonder they carefully distinguish their contacts with the District ("[n]either Breitbart nor O'Connor have [sic] ever lived or worked in D.C.," Defs.' Mem. at 4) from their contacts with Georgia ("neither Breitbart nor O'Connor regularly does or solicits business, engages in any other persistent court [sic] of conduct, or derives substantial revenue from goods used or consumed or services rendered in Georgia," *id.*).

[20]   *See* http://twitter.com/#!/Stage_Right/status/57193431495221251.

[21]   *See* http://twitter.com/#!/Stage_Right/status/57198268232372224.

- On February 9, 10, 11, and 12, 2011, Mr. O'Connor spent several days in the District attending the CPAC Conference at the Marriott Wardman Park Hotel, where he was personally served with the summons and Complaint in this case.[22]

- On February 19, 20, and 21, 2010, Mr. O'Connor spent several days in the District attending the CPAC Conference, again at the Marriott Wardman Park Hotel.[23]

In short, Defendants' plea of "inconvenience" carries little weight. They intentionally and voluntarily inserted themselves into a controversy in the District of Columbia, and they routinely travel here when it suits their economic or personal interests to do so. Although they may now feel that it would be a burden to defend litigation in this forum, they "should have considered that possibility before [they] chose to" defame Mrs. Sherrod. *See Sheraton*, 984 F. Supp. at 26-27 ("The Court is not unsympathetic to the defendant's argument that it will be a burden to defend the litigation in Washington, D.C.; however, the defendant should have considered that possibility before it chose to do business in Washington, D.C."); *Thayer*, 196 F. Supp. 2d at 35 (same); *Lichtenstein*, 441 F. Supp. 2d at 13; *see also Keeton*, 465 U.S. at 781 ("Hustler Magazine, Inc., has continuously and deliberately exploited the [forum] market" and thus "must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine."); *Drudge*, 992 F. Supp. at 57 ("[California resident Matt Drudge] should have had no illusions that he was immune from suit" in the District of Columbia because he "specifically targets readers in the District of Columbia by virtue of the subjects he covers and even solicits gossip from District residents and government officials who work here.").

---

[22]  *See, e.g.*, http://www.blogtalkradio.com/stage-right/2011/02/10/cpac-day-1 (February 9, 2011 broadcast of Defendant O'Connor's nightly internet program from the CPAC conference in Washington, D.C.).

[23]  *See, e.g.*, http://www.youtube.com/watch?v=MIeByOeERpY (video or Defendants O'Connor and Breitbart appearing at the 2010 CPAC conference in Washington, D.C.).

c.      **Defendants Do Not Identify A Single Witness Who Would Not Appear For Trial In This Court.**

Although Defendants' brief includes a conclusory reference to the convenience of witnesses as a basis for transfer, *see* Defs.' Mem. at 12, they have to do much more to show that this factor supports their motion.  In particular, Defendants must demonstrate "what a non-resident witness will testify to, the importance of the testimony to the issues in the case, and whether that witness is willing to travel to a foreign jurisdiction." *Thayer*, 196 F. Supp. 2d at 33 (denying motion to transfer where defendants did not demonstrate that out-of-state witnesses would refuse to testify in the District of Columbia).  Otherwise, the Court must assume "that the witnesses will voluntarily appear," and "mere inconvenience to the witnesses alone is not enough to warrant transfer." *Lichtenstein*, 441 F. Supp. 2d at 14 (denying motion to transfer where defendants "neither set forth the specific topic about which [the] witnesses will testify nor assert[ed] that [the] witnesses would be unwilling to travel to the District of Columbia").

Defendants, however, have not identified even one witness who would refuse to appear for trial, depriving the case of critical testimony.  In fact, the only potential California witnesses in the case (at this point) are Defendants, who must appear because they are parties.  The remaining potential witnesses are either in the District (*e.g.*, Mrs. Sherrod's former supervisors at USDA, *see* Compl. ¶ 23) or in Georgia (*e.g.*, John Doe, Roger and Eloise Spooner, *see id.* ¶¶ 12, 27), which is substantially closer to the District than California.  *See Hazard*, 24 F. Supp. 2d at 73 (denying transfer to California where "defendants' complaints about the expense of transporting [California] witnesses" to the District carried little weight because "plaintiff would face similar transportation expenses for its witnesses" upon transfer to California).  Absent a contrary showing, this Court must presume that John Doe (who is a party), the Spooners, and other witnesses in Georgia or elsewhere will voluntarily appear, or that their testimony could be

"obtained by other means, such as written or videotaped depositions." *See id.*; *Sheraton*, 984 F. Supp. at 26 (denying transfer to California where "the defendant has not suggested that" a California witness would not appear for trial in the District); *Thayer*, 196 F. Supp. 2d at 34 (finding that the "possible unavailability" and "mere inconvenience" to non-resident witnesses did not support transfer and stating that "[e]ven witnesses unwilling to appear at trial can be subjected to videotape depositions that adequately capture their demeanor and credibility for purposes of a trial").

### d. Potential Sources Of Proof In California Do Not Support Transfer There.

Defendants also contend that "if there is any evidence to support Sherrod's claims, it is likely to be found in the Central District of California." Defs.' Mem. at 15. But yet again, Defendants overlook Mrs. Sherrod, John Doe, and all of the other identified potential witnesses in the case. Their evidence is not in California. Also conveniently absent from Defendants' brief is their stated intention to seek discovery related to the *Pigford* litigation—a discrimination class action pending before Judge Friedman in this Court. *See* Defs.' Anti-SLAPP Mem. at 3-4. As Defendants' counsel told this Court at the initial conference, Defendants believe (for reasons they have not articulated) that *Pigford* is relevant to this case—and they apparently hope to put Judge Friedman and the twelve years of *Pigford* litigation on trial for supposedly being what Mr. Breitbart has called "a festering case of widespread corruption" and "a saga of fraud and financial manipulation … incubated by an activist judge."[24]

---

[24] *See* http://biggovernment.com/publius/2010/12/06/the-pigford-shakedown-how-the-black-farmers-cause-was-hijacked-by-politicians-trial-lawyers-community-organizers-leaving-us-with-a-billion-dollar-tab/; *see also* Mar. 14, 2011 Letter A. Kroll to T. Clare at 2 (requesting that Mrs. Sherrod preserve all documents relating to "the settlement awarded to New Communities, Inc. … and related applications, pleadings, and other non-privileged documents in the *Pigford v. Vilsack* class action matter") (Ex. 1).

To be clear, Mrs. Sherrod believes that *Pigford* has **no** bearing on her claims.  But it goes without saying that the Court should not grant Defendants' motion to transfer this case across the country only to see Defendants demand discovery—and compulsory process that would be *issued by this Court*—related to a case pending **in this very courthouse**.  *See, e.g.*, *Boisjoly v. Morton Thiokol, Inc.*, No. 87-0194, 1987 WL 11217, at *2 (D.D.C. May 14, 1987) ("[T]he existence of litigation in one forum recommends that related litigation remain in the same forum" and can be "the most compelling factor in determining the appropriateness of transfer" in light of "the need for fair and efficient administration of justice.").

Ultimately, this is not a complex business dispute or similar action involving millions of pages of documents and voluminous other evidence.  "Even if, as Defendants contend, many of the wrongful acts did occur outside of the District of Columbia [something for which they provide no evidence], Defendants have not pointed to the existence of any factors that would cause them to experience extreme hardship" if their motion to transfer is denied.  *Lichtenstein*, 441 F. Supp. 2d at 13.  In today's era of photocopying, fax machines, Federal Express, PDF files, and digital images, the fact that Defendants possess discoverable material in California—which they presumably will send to their D.C.-based counsel[25] anyway—does not support transfer.  *See Thayer*, 196 F. Supp. 2d at 36 ("[T]he location of documents, given modern technology, is less important in determining the convenience of the parties.");  *see also Miracle*, 87 F. Supp. 2d at 1073 (denying defamation defendants' motion to transfer from Hawaii to New York because "in this era of fax machines and discount air travel, it is not unreasonable to require a party to litigate in a distant forum").

---

[25]   Both Mr. O'Connor and Mr. Breitbart have hired national law firms with significant presence in the District of Columbia.  Both Defendants have already appeared for a conference in this Court via their D.C.-based counsel.

## 2. The Public-Interest Factors Do Not Support Transfer.

With respect to the public-interest factors, Defendants offer little more than the conclusory assertion that "**none** of [them] weighs in favor of maintaining this action within this District." *See* Defs.' Mem. at 16. Yet again, Defendants misapprehend the law. The burden is not on Mrs. Sherrod to defend the convenience of litigating here; it is on Defendants to "make a substantial showing that transfer is necessary" in light of the public-interest factors. *See Lichtenstein*, 441 F. Supp. 2d at 13. They have not done so.

### a. Mrs. Sherrod's Straightforward Claims Do Not Require The Particularized Expertise Of Any Court.

Defendants assert that, "to the extent that the laws of the District of Columbia and California conflict, the Central District of California is likely to have more experience and familiarity with the law governing Sherrod's claims." Defs.' Mem. at 15. Defendants, however, have not established any such conflict of laws. *See Hazard*, 24 F. Supp. 2d at 73 n.6 (denying transfer to California where defendants "failed to demonstrate that a true conflict exists between the laws of the competing jurisdictions, a threshold issue in choice of law analysis"). Nor have they shown that in the event of conflict, California law—as opposed to D.C. law or Georgia law (which they do not even mention)—would apply to Mrs. Sherrod's claims. *See infra.* at 44-45; *cf. Keeton*, 465 U.S. at 776 ("False statements of fact harm both the subject of the falsehood **and** the readers of the statement. [A state] may rightly employ its libel laws to discourage the deception of its citizens."); *id.* at 776-77 ("The tort of libel is generally held to occur wherever the offending material is circulated" and "it is beyond dispute that [every state] has a significant interest in redressing injuries that actually occur within the [s]tate"—"even in a state in which [plaintiff] has hitherto been anonymous.").

24

For purposes of Defendants' motion, the Court need not reach these issues.  The only real issue at this stage is whether transfer is necessary because this Court would struggle to apply another state's defamation laws.  It would not.  *See Lichtenstein*, 441 F. Supp. 2d at 14 (finding that even if another state's laws "will be applied in this case, Defendants have not demonstrated that this Court will have difficulty doing so"); *Thayer*, 196 F. Supp. 2d at 36 (finding that the potential application of another state's laws did not support transfer because "[f]ederal courts today … are often called upon to apply state laws, especially on common legal issues").

> **b.**     **Defendants Have Not Established That Court Congestion Supports Transfer.**

Next, Defendants contend that, "[a]though the dockets of both this Court and the Central District of California are congested, this Court has not hesitated to transfer cases [there] when the circumstances warrant."  Defs.' Mem. at 15.  But the fact that the Court has transferred other cases to California says little about whether it should transfer ***this*** case.  Rather, Defendants must show that the Central District of California's docket is lighter than this Court's, such that the case would be resolved much more efficiently there.  Defendants mention no facts and offer no evidence on this score.  *Hazard*, 24 F. Supp. 2d at 73 ("Because defendants have provided the Court with no information regarding the level of congestion of the transferee court, the Court cannot conclude that this factor weighs in their favor.").

> **c.**     **This Is Not A California Controversy That Should Be Decided In California.**

Finally, Defendants do not even address the third public-interest factor, presumably because they know it does not favor them—"the local interest in deciding local controversies at home."  *The Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000).  This case involves defamation on a national scale and of national significance, purportedly motivated by what Defendants claim was their desire to "criticize[] the Democratic Party, the NAACP, and the

media for manufacturing a 'racial schism,'" *see* Defs.' Mem. at 23, "squarely in the context of [the] months-long and very loud public clash between Tea Party conservatives and the NAACP and its allies in Congress," *id.* at 20.  As the Complaint explains, "[t]he Defendants' defamatory statements touched off a national media firestorm" in which "[n]ews stations across the country immediately and repeatedly aired [Defendants'] deceptively-edited video and echoed [their] false claims," forcing Mrs. Sherrod to resign under duress from the White House and the Secretary of Agriculture.  *See* Compl. ¶¶ 5, 70-79.

Once the falsity of Defendants' statements became known, "national media figures," the Secretary of Agriculture, the White House Press Secretary, and the President of the United States apologized to Mrs. Sherrod.   *Id.* ¶¶ 82-83.   None of these events is indicative of a local California controversy.  *See, e.g.*, *The Wilderness Soc'y*, 104 F. Supp. 2d at 14 ("[The Cabinet Secretary's] heavy involvement thus highlights the significance of this issue to the entire nation."); *see also id.* at 17   (stating that "the decision of the *New York Times* to editorialize about" an issue in Alaska showed that it was "not a local dispute affecting only the local residents").   Indeed, in his public-relations response to this lawsuit, Mr. Breitbart himself asserted that President Obama and Secretary Vilsack are so central to the case that they should have been "name[d] as co-Defendants" because "it is they who fired [Mrs. Sherrod], and who … denied her due process."[26]

At bottom, Defendants have not met their "heavy burden of establishing that plaintiff['s] choice of forum is inappropriate," *Thayer*, 196 F. Supp. 2d at 31, especially where, as here, there is no question that this Court has personal jurisdiction over defendants, Defendants' own brief concedes that Plaintiff could not have filed in her home forum, and a substantial part of the

---

[26]    *See* http://biggovernment.com/publius/2011/02/12/andrew-breitbart-on-pigford-lawsuit-bring-it-on/.

events upon which Plaintiff's claims are based occurred in the District of Columbia and will require evidence and witnesses from this forum.   Nor have Defendants shown that the "interest[s] of justice" support their position.   Accordingly, and in light of the foregoing, the Court should deny Defendants' motion to transfer under § 1404(a).

## II.     The Complaint States Valid Claims Against All Defendants.

Defendants alternatively move to dismiss on the ground that Plaintiff fails to state a claim, but their weak arguments on this score cannot be squared with Plaintiff's specific, documented Complaint detailing Defendants' numerous defamatory statements.   Though Defendants employ various twists of fact and logic in an attempt to remold their statements as constitutionally protected "opinions," they cannot escape the fact that they flatly stated—to a national audience—that Mrs. Sherrod admitted practicing racial discrimination in her USDA position.   This is a verifiably false fact based on nothing but Defendants' edited video, which itself intensifies the false and misleading nature of the statements.   Mrs. Sherrod's claims are plainly sufficient to satisfy the pleading standard.

### A.     Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The allegations in [the] plaintiff's complaint are presumed true at this stage and all reasonable factual inferences must be construed in plaintiff's favor."   *Ihebereme v. Capital One*, 730 F. Supp. 2d 40, 46 (D.D.C. 2010); *see also Klayman v. Barmak*, 634 F. Supp. 2d 56, 60 (D.D.C. 2009) ("When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor.").   The inquiry "is therefore restricted to the facts as alleged by

27

plaintiffs, which must be sufficient 'to raise a right to relief above the speculative level.'" *Parnigoni v. St. Columbia's Nursery School*, 681 F. Supp. 2d 1, 11 (D.D.C. 2010) (quoting *Twombly*, 550 U.S. at 555).

At the Rule 12(b)(6) stage in defamation actions, it is improper to dismiss a complaint "which alleges defamation if the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning." *See Klayman v. Segal*, 783 A.2d 607, 612 (D.C. Cir. 2001). "If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury." *Id.* at 613. Falsity is presumed. *See id.* at 614. The Court must also determine "whether a reasonable factfinder could conclude that a statement expressed or implied a verifiably false fact about [the plaintiff]." *Weyrich v. New Republic*, 235 F.3d 617, 624 (D.C. Cir. 2001). "[S]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Moldea v. N.Y. Times*, 22 F.3d 310, 313 (D.C. Cir. 1994).

### B.    Defendants' Statements Are Not Protected "Opinion."

Defendants' publications clearly and falsely state that Mrs. Sherrod admitted practicing racial discrimination in her USDA position. She did no such thing. In an attempt to defend their defamatory actions, Defendants make a number of tenuous and questionable legal and linguistic interpretations. Principally, Defendants assert that their speech was "subjective, non-verifiable opinion" and is therefore "protected by the Constitution." Defs.' Mem. at 29. That is simply not the case.

As a threshold matter, the First Amendment affords no protection to factual assertions capable of being proved false, even where they are couched as opinions. Indeed, the Supreme Court has eschewed any "artificial dichotomy between 'opinion' and fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990). As the Court explained, "expressions of 'opinion' may often

imply an assertion of objective fact." *Id.* at 18.  Thus, "the Supreme Court's decision in [*Milkovich*] made clear that the First Amendment gives no protection to an assertion sufficiently factual to be susceptible of being proved true or false, ***even if*** the assertion is expressed by implication in a statement of opinion." *Jankovic v. Int'l Crisis Group*, 593 F.3d 22, 27 (D.C. Cir. 2010); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974) ("[T]here is no constitutional value in false statements of fact.").  As the D.C. Circuit has further explained, "there is no wholesale exemption from liability in defamation for statements of 'opinion.' Instead, statements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." *Moldea*, 22 F.3d at 313.

In determining whether to grant a motion to dismiss because a statement is a non-actionable opinion, falsity is presumed.  Therefore, the key inquiry is whether a statement is ***capable*** of verification.  *Weyrich*, 235 F.3d at 624 ("Verifiability is therefore a critical threshold question at the Rule 12(b)(6) stage.").  "In other words, even with a *per se* opinion, the question is whether the person has made an assertion that can reasonably be understood as implying provable facts." *White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990).  Courts have consistently held that accusations that another has committed specific acts of racism or racial discrimination are not constitutionally protected opinions.  Rather, such specific accusations are verifiable and therefore actionable.  For example, in *Afro-American Publishing v. Jaffe*, the D.C. Circuit found a newspaper article defamatory where it specifically accused the plaintiff of acts of racial discrimination:

> The Article, captioned ONE MAN'S WAR IN SE AGAINST THE AFRO, stated that plaintiff, by canceling his subscription, 'would appear to be a bigot,' and that he told a story about [an African-American] customer's ignorance which he said illustrated the low level of intelligence of the people in the neighborhood near his drugstore.… It suffices, in support of the judgment, that the column under discussion would be reasonably understood by the average reader in the

29

> community concerned to signify that plaintiff is a bigot, racially prejudiced, and scornful of the Negro Race.… ***Where readers would understand a defamatory meaning liability cannot be avoided merely because the publication is cast in the form of an opinion, belief, insinuation, or even question.*** A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community.

*Afro-American Publ'g v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966).  Similarly, the Sixth Circuit has described the defamatory impact of accusing college administrators of firing employees on account of race and gender "obvious."  *Chonic v. Wayne Cty. Cmty. Coll.*, 973 F.2d 1271, 1276 (6th Cir. 1992).  In fact, at least one federal district court denied a motion to dismiss based on the bare accusation that the plaintiff was "racist" where the accusation implied specific acts of racial discrimination.  *See O'Brien v. City of Saginaw*, No. 10-12700-BC, 2011 WL 8143, at *5 (E.D. Mich. Jan. 3, 2011).  The court explained that because "[t]he accusations were a direct attack on Plaintiff's job performance, and indeed led the Steering Committee to decline to renew his contract," plaintiff had stated "a plausible claim for relief."  *Id.*  The D.C. Circuit has even used the false attribution of a hypothetical racist statement to illustrate libel.  *See Moldea*, 22 F.3d at 315 (falsely characterizing a book as stating that "African Americans make poor football coaches" amounts to "libeling its author by portraying him as a racist").  Indeed, it has been established that merely stating that someone is a member of a group with known racist ideologies amounts to defamation.  *See, e.g.*, *Roots v. Mont. Human Rights Network*, 913 P.2d 638, 640 (Mont. 1996) ("The statement that [Plaintiff] is an organizer for the KKK contains a factual connotation which may be proven false.… We conclude, as did the District Court by implication, that the First Amendment does not shield [Defendant] from this action."); *see also* Restatement (Second) of Torts § 559 illus. 2 (accusing another of being a member of the Klu Klux Klan is defamatory).

Even more specifically, several cases expressly recognize that falsely imputing acts of racial discrimination to public officials in executing their duties is actionable.  In *MacElree v. Philadelphia Newspapers*, for example, the Court found a statement that the Plaintiff "was electioneering and was the David Duke of Chester County" defamatory, because "a reasonable person could conclude that this was an accusation that appellant was abusing his power as the district attorney, an elected office, to further racism and his own political aspirations.  Such an accusation amounts to a charge of misconduct in office." *MacElree v. Philadelphia Newspapers*, 674 A.2d 1050, 1054 (Pa. 1996).  Similarly, in *Schermerhorn v. Rosenberg*, the court explained that "a legislator's reputation and standing in the community could be seriously damaged by the suggestion that he believed blacks ought to be excluded from participating in the administration of an important urban renewal project in the city …." *Schermerhorn v. Rosenberg*, 426 N.Y.S.2d 274, 285 (N.Y. App. Div. 1980).  In yet another case, a federal district court determined it was actionable to accuse a public school football coach of making racist remarks during practices and games. *See Puchalski v. Sch. Dist. of Springfield*, 161 F. Supp. 2d 395, 408 (E.D. Pa. 2001).  The court explained that "[t]o impute racism to a plaintiff, particularly one for whom such an attitude could be incompatible with the proper performance of his public responsibilities, may be defamatory." *Id.*  Such a specific accusation, the court explained, went "beyond the realm of mere opinion or general characterization." *Id.* at 408 n.7.

Here, Defendants' statements that Mrs. Sherrod admitted practicing racial discrimination in her USDA position are the precise type of specific factual accusations that courts have found to be unprotected.  As in *Jaffe*, Defendants point to a ***single, specific incident***—a two-and-a-half minute segment of Mrs. Sherrod's speech where she allegedly admits discriminating against a "white farmer" in her federal position—to support their assertions of racism.  Whether or not

Mrs. Sherrod admitted to this in the video is unquestionably verifiable.  Indeed, as described below and in the Complaint, one need only view the full video of her speech to determine that Mrs. Sherrod admitted no such thing.  And if there were any doubt, Mr. Breitbart's subsequent "correction" stating that "the story [Mrs. Sherrod] tells refers to actions she took before she held that federal position" plainly admits as much.  *See* Compl. ¶ 39.

Moreover, any suggestion that Defendants' statements are protected because they are couched in an opinion piece is belied by the very title of Mr. Breitbart's post: "***Video Proof***: The NAACP Awards Racism – 2010."[27]  While opinion may be ***part*** of the post, it is clear that Defendants' main objective was to uncover and expose a federal official admitting racism in the course of her federal duties and, most important, to provide "video proof" of that racism by reference to a specific instance in which Mrs. Sherrod allegedly discriminated against a "white farmer" on account of his race.  As such, its specific accusations are verifiably false and therefore outside the protection of the First Amendment.

### C. Viewed Separately Or Considered Together As A Whole, Defendants' Statements About Mrs. Sherrod Are Verifiably False And Defamatory.

For purposes of this motion, falsity is presumed.  "When the Court is presented with a Rule 12(b)(6) motion to dismiss a defamation action, the Court must ***assume the falsity*** of the statements at issue and that the statements were made by the defendants with knowledge of their falsity or reckless disregard for their truth."  *Benz v. Wash. Newspaper Publ'g Co.*, Civ. A. No. 05-1760 (EGS), 2006 WL 2844896, at *3 (D.D.C. Sept. 29, 2006) (citing *Segal*, 783 A.2d at 614 ("[W]e must assume, as the complaint alleges, the falsity of any express or implied factual

---

27    Defendant Breitbart's Blog Post is titled "Video ***Proof***: the NAACP Awards Racism—2010."   Because Defendants rely on the Merriam-Webster dictionary to support their arguments, Defs.' Mem. at 38, the first definition of "Proof" bears emphasis: "the cogency of evidence that compels acceptance by the mind of a ***truth or a fact***."   http://www.merriam-webster.com/dictionary/proof.

statements made in the article.")).  Defendants attempt to challenge the falsity of their statements by arguing that they are "substantially true" or based on "truthful disclosed facts."  Defs.' Mem. at 35, 43.  At this stage, however, arguments of "substantial truth" are entirely irrelevant.

Even if the presumption of falsity were not required, presuming falsity here would not be difficult.   That is because Defendants' statements are ***actually false*** and plainly capable of verification: Mrs. Sherrod did not discriminate against anyone while serving in her USDA position, and she certainly did not admit doing so.

Defendants attempt to blunt the overall defamatory impact of their publications by isolating individual statements and removing them from context.  *Id.* at 33-42.  But courts do not pick out and isolate individual phrases in determining the defamatory impact of a publication; the publication is considered as a whole.  *Hoffman v. Wash. Post Co.*, 433 F. Supp. 600, 603 (D.D.C. 1977) ("The meaning of the article must first be determined construing its words together in context."); *Jaffe*, 366 F.2d at 655 ("Appellant's publication must be taken as a whole, and in the sense in which it would be understood by readers to whom it was addressed. … What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interest."); *Curtis Publ'g. Co. v. Vaughan*, 278 F.2d 23, 26 (D.C. Cir. 1960) ("The publication must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.  So the whole item, including display lines, should be read and construed together, and its meaning and signification thus determined.").

As alleged in the Complaint, Defendants' publications—including those on BigGovernment.com, YouTube.com, and Twitter.com—when taken as a whole, clearly accuse Mrs. Sherrod of admitting that she exercised her USDA job in a racially discriminatory manner.

*See* Compl. ¶ 93.  It bears emphasis that Mrs. Sherrod has asserted a single count of defamation against Defendants, not separate counts for each defamatory statement contained in the Complaint.  As described below, several individual statements in Defendants' publications are independently defamatory, but they should not only be considered individually.  Instead, those statements must be construed together to discern the defamatory impact of the entire publication. Indeed, Defendants cannot reasonably question that they intended to accuse Mrs. Sherrod of admitting that she practiced racial discrimination in her USDA position, especially when they expressly did so in at least three separate statements:[28]

- "Mrs. Sherrod admits that in her federally appointed position, overseeing over a billion dollars …. She discriminates against people due to their race."

- "[T]his federally appointed executive bureaucrat lays out in stark detail, that her federal duties are managed through the prism of race and class distinctions."

- "The clip shows 'video evidence of racism coming from a federal appointee and NAACP award recipient.'"

*Id.* ¶ 94.  Viewed together—as a reader would have likely viewed and understood them—there is no question of Defendants' intention: to tell the world that they had "video proof" of a federal appointee abusing her position and admitting racism in the course of her federal duties.  The capability for verification is obvious.

But even when considered in isolation, each of the six[29] specific defamatory statements made by Defendants is capable of verifiable falsity and defamatory meaning.  Again, falsity is presumed.  *Benz*, 2006 WL 2844896, at *3.  And yet, because Defendants' statements are so

---

[28] A fourth statement was posted by Defendant Breitbart on Twitter that same day: "Will Eric Holder's DOJ hold accountable fed appointee Shirley Sherrod for admitting practicing racial discrimination?"  *Id.*

[29] For purposes of this brief, Mrs. Sherrod adopts numbering scheme for the individual statements used by Defendants.

obviously false, it underscores the fact that—even if characterized as "opinion"—they plainly imply an actionable assertion of objective fact.  *See Milkovich*, 497 U.S. at 18.

- **Statement #1**: "Mrs. Sherrod admits that in her federally appointed position, overseeing over a billion dollars …. She discriminates against people due to their race."

- **Statement #2**: "The clip shows 'video evidence of racism coming from a federal appointee and NAACP award recipient.'"

- **Statement #3**: "[T]his federally appointed executive bureaucrat lays out in stark detail, that her federal duties are managed through the prism of race and class distinctions."

- **Statement #6**: "Will Eric Holder's DOJ hold accountable fed appointee Shirley Sherrod for admitting practicing racial discrimination?"

These four statements, each plainly accusing Mrs. Sherrod of admitting that she practiced racial discrimination in her USDA position, are clearly capable of being proved false.  To begin with, Mrs. Sherrod did not hold a federal position at the time the events in her story occurred; in fact, the events happened ***over twenty years before*** she began her USDA position.  Indeed, in the full video Mrs. Sherrod ***expressly*** states that she was referring to events that occurred in "May of '87."[30]  Furthermore, Defendants' subsequent "correction" that Mrs. Sherrod's story occurred before she held her USDA position is a clear admission that the excerpted video falsely stated that Mrs. Sherrod was referring to actions she had taken in her USDA role.  *See* Compl. ¶ 39.

Additionally, as the full video makes clear, Mrs. Sherrod never "admits" to racial discrimination of any kind; to the contrary, her full story describes how she went above and beyond to help the "white farmer."  *See id.* ¶¶ 27-28, 51.  In fact, throughout her full speech Mrs. Sherrod repeatedly stresses the need to move past race as a basis for aiding those in need. *Id.* ¶ 43.  Moreover, Defendants' suggestion that Mrs. Sherrod is somehow distorting the

---

[30]   *See* NAACP Videos, Shirley Sherrod: the FULL Video, at 19:23-19:27 (July 20, 2010), http://www.youtube.com/watch?v=E9NcCa_KjXk.

meaning of Statement #1 by failing to disclose all of the introductory slides is incorrect.  First, Defendants' claim that Slide 3 ("On March 27, 2010, while speaking at the NAACP Freedom Fund Banquet") was "purposefully omitted from the Complaint" is flatly wrong.  *See* Defs.' Mem. at 42.  Mrs. Sherrod not only included the contents of ***all five*** introductory slides in her Complaint, she even included color images of the slides themselves.  Compl. ¶¶ 32-36.  Second, there is no question that the basis for Defendants' false and defamatory accusation in Statement #1 is the deceptively edited video of her NAACP speech.  Indeed, because the deceptively edited video purports to be "Video Proof" for Defendants' defamatory accusations, the statements are even ***more*** misleading than they would otherwise be.  *See Price v. Stossel*, 620 F.3d 992, 1002 (9th Cir. 2010) (potential for injury to reputation to be heightened where quotation was "published using a medium in which the viewer actually sees and hears the plaintiff utter the words").

Defendants also claim that Statement #6 is not actionable based on the spurious argument that "a question is not a statement of fact."  Defs.' Mem. at 30.  But the D.C. Circuit rejected this argument long ago: "Where readers would understand a defamatory meaning, liability cannot be avoided merely because the publication is cast in the form of an opinion, belief, insinuation, ***or even question.***  A statement about one's attitude is defamatory if it tends to lower him in the esteem of the community."  *Jaffe*, 366 F.2d at 655.  While the statement may end with a question mark, there is nothing rhetorical about it.  It is a call to action by Mr. Breitbart to the Attorney General to "hold accountable" Mrs. Sherrod for "admitting practicing racial discrimination," the conduct Mr. Breitbart falsely accused her of doing.  Despite its publication in what Defendants describe as a "playful" medium, *see* Defs.' Mem. at 24, the statement is directly illustrative of the seriousness of the conduct of which Mrs. Sherrod is accused.  Mr. Breitbart clearly implies

that Mrs. Sherrod engaged in criminal wrongdoing and that her conduct rose to a level requiring investigation by the nation's top law enforcement official—hardly a flippant allegation.

- **Statement #4**: "In the first video, Sherrod describes how she racially discriminates against a white farmer."

- **Statement #5**: "Her speech is a 'racist tale.'"

Far from generally accusing Mrs. Sherrod of being "racist" or exhibiting "racism," these statements each accuse Mrs. Sherrod of committing *specific* acts of racial discrimination.  As such, they certainly imply—if not outright express—a verifiably false fact about her.  *See Weyrich*, 235 F.3d at 624 ("[S]tatements of opinion can be actionable if they imply a provably false fact …."").  Statement #4 specifically states that she discriminated against a single white farmer.  Similarly, Statement #5 accuses Mrs. Sherrod of telling a story touting racism.  Both statements are plainly capable of being proven false.

Again, as the full video makes clear, Mrs. Sherrod did not discriminate against Roger Spooner, the "white farmer" who is the subject of her story.  Compl. ¶¶ 27-28, 51.  Rather, Mrs. Sherrod provided extraordinary assistance to Mr. Spooner, and helped to save his farm from foreclosure—something he has publicly credited her for doing.  *Id.* ¶ 27.  Additionally, throughout her full speech Mrs. Sherrod *repeatedly* emphasizes the need for racial harmony. *Id.* ¶ 43.  In the video clip, Mrs. Sherrod may appear to tell a "racist tale" *only because* Defendants deliberately excluded the portions of her speech where she emphatically disclaims racism and describes in detail the extraordinary assistance she in fact provided to Mr. Spooner. *Id.* ¶¶ 40-42.

At bottom, Defendants cannot claim that their defamatory statements, even when considered in isolation, are non-actionable when they are clearly capable of being proven false by the full content of Mrs. Sherrod's speech.  Because falsity is presumed at this stage, *Benz,*

37

2006 WL 2844896, at *3, Mrs. Sherrod need only show that Defendants' accusations are *verifiable*, not that they are *false*.  The fact that the falsity here is so obvious, at this early stage of the litigation, reinforces the strength of her claims.

### D.   Defendants' Statements Are Reasonably Capable Of Defamatory Meaning.

Defendants further strain credulity by suggesting in their brief that their statements are non-actionable because certain of the terms they use "no longer carry any objective defamatory weight under libel law."  Defs.' Mem. at 34.  This is a bold assertion in any context, but it is especially audacious here given the national uproar that arose when Defendants first broadcast their statements about Mrs. Sherrod's racist "admissions." *See* Compl. ¶¶ 5, 70.  Certainly the media, the USDA, and the general public thought the accusations about Mrs. Sherrod lowered her in professional standing.

At this stage of the case, Mrs. Sherrod need only show that Defendants' statements were "reasonably susceptible of a defamatory meaning." *Segal*, 783 A.2d at 612 (stating that at the Rule 12(b)(6) stage, it is improper to dismiss a complaint "which alleges defamation if the communications of which the plaintiff complains were reasonably susceptible of a defamatory meaning").  "Whether a statement is capable of a defamatory meaning is a question of law, but 'it is only when the court can say that the publication is not reasonably capable of *any* defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous.'" *Id.* at 612-13  (quoting *Weyrich*, 235 F.3d at 627).  "[A] statement is defamatory if it tends to injure [the] plaintiff in [her] trade, profession or community standing, or lower [her] in the estimation of the community." *Id.* at 613.   "If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury." *Id.*

Here, the specificity and context of Defendants' statements exacerbates their defamatory nature.  Incredibly, Defendants suggest that their statements are non-actionable because the term "'racist' [] has been stripped of its objective defamatory meaning."  Defs.' Mem. at 34.  It has not.  As the Seventh Circuit has explained, a statement that one exercises his job in a racist manner *is* actionable:

> [W]hether a given supervisor is a racist, or practices racial discrimination in the workplace, is a mundane issue of fact, litigated every day in federal court. "Felton is a racist" is defamatory, and a person who makes an unsupported defamatory statement may be penalized without offending the first amendment.

*Taylor v. Carmouche*, 214 F.3d 788, 793 (7th Cir. 2000); *see also O'Brien*, 2011 WL 8143, at *5 (bare assertion that the plaintiff was "racist" stated a claim where "[t]he accusations were a direct attack on Plaintiff's job performance"); *Puchalski*, 161 F. Supp. 2d at 408 (accusations that a high school football coach made racist statements was actionable because to "impute racism to a plaintiff, particularly one for whom such an attitude could be incompatible with the proper performance of his public responsibilities, may be defamatory").

Here, while Defendants certainly call Mrs. Sherrod a "racist," their statements also go further.  The statements alleged in the Complaint are not vague allegations of racism, but of Mrs. Sherrod's "admit[ted]" discrimination against a "white farmer," in the context of specific instances, in the course of exercising her federal duties.  To make matters worse, Defendants claim to have "video proof" of it.  Falsely accusing a public official of committing racist acts in the course of her federal duties falls squarely within the bounds of actionable defamation.

### E.   Defendants' Statements Are Indefensible Either As "Supportable Interpretations" Or "Fair Comment."

Finally, the suggestion that Defendants' statements are protected because they are "supportable interpretations" of "truthfully" disclosed facts or "fair comment" is ridiculous.  In this case, the "truthful" disclosed facts upon which Defendants purport to have based their

opinions are the deceptively edited and highly misleading video clips.  For the reasons stated above, Defendants' statements are verifiable facts, not opinions.[31]  But even if Defendants' statements were opinions, the law "protects only opinions based on true facts, accurately disclosed."  *Jankovic*, 593 F.3d at 28.  As the Supreme Court has made clear, "[e]ven if the speaker states the facts upon which he bases his opinion, ***if those facts are either incorrect or incomplete***, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact."  *Milkovich*, 497 U.S. at 19.  The reasoning behind this is simple: Without knowing the full truth on which the author bases his "opinion," the reader is in no position to determine the accuracy of the author's statements for himself.  Defendants can hardly quibble with this law, since they cite it in their brief.  As they explain: "[T]he common law doctrine of fair comment 'applies where the reader is aware of the factual foundation for a comment, and therefore can judge independently whether the comment is reasonable.'"  Defs.' Mem. at 30 (citing *Lane v. Random House*, 985 F. Supp. 141, 150 (D.D.C. 1995)).[32]

---

[31]   The fair comment privilege does not protect statements that are false, or that are based on misstatements of fact.  *See Fisher v. Wash. Post Co.*, 212 A.2d 335, 337 (D.C. 1965) (the fair comment privilege "goes only to opinions expressed by the writer and does not extend to misstatements of fact"); *see also Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 88 (D.C. 1980) ("[The fair comment] privilege, however, has been restricted to extend protection only to opinion, not misstatements of fact."); *Jankovic*, 593 F.3d at 29 ("a conclusion based on a misstatement of fact is not protected by the [fair comment] privilege").  In fact, the continued viability of the "fair comment" defense has been questioned by this Court.  *Pearce v. E.F. Hutton Group*, 664 F. Supp. 1490, 1502 (D.D.C. 1987) ("While the fair comment privilege has been recognized in this jurisdiction, it is clear that the doctrine is now obsolete ….").

[32]   Defendants' repeated citation to *Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) (*Moldea II*) provides them no help.  In *Moldea II*, the court premised its entire analysis on the fact that the allegedly defamatory statements were found in the context of a book review:  "[the original majority opinion] failed to take sufficient account of the fact that the statements at issue appeared in the context of a book review, a genre in which readers expect to find spirited critiques of literary works that they understand to be the reviewer's description and assessment of texts that are capable of a number of possible rational interpretations."  *Id.* at 311.  Critically, the court provided an entire section of its opinion on the "relevancy of the book review context."  In that context, the reader expects a critique and can always read the full book to reach conclusions for himself.  In this case, by contrast, Breitbart's blog post was framed as a journalistic exposé, and the reader had nothing but a misleading, edited clip by which to judge the truth of Breitbart's "interpretations."

Indeed, the Ninth Circuit held just last year that even an exact quote can be defamatory when it is presented in a misleading context.  In *Price v. Stossel*, a network television program broadcast a video clip containing a statement made by a television evangelist.  *See Stossel*, 620 F.3d at 995.  The program suggested the minister was boasting about his vast wealth.  In reality, however, the clip was excerpted from part of a longer sermon in which the minister was speaking from the perspective of a hypothetical person who, though wealthy, was spiritually unfulfilled.  The court held that because the statement was presented "in a misleading context, thereby changing the viewer's understanding of the speaker's words," the plaintiff satisfied the California anti-SLAPP statute's requirement of likely being able to prove that the clip "as broadcast, was false."  *Id.* at 995, 1003.

Here, the video excerpts relied on by Defendants are false and misleading, and certainly not "truthful."  Indeed, as in *Stossel*, rather than mitigating the statements, the addition of the video excerpt to the blog post ***exacerbates*** the defamation by making the average reader believe that Mrs. Sherrod was admitting racial discrimination in her federal job.  In fact, one of the key defamatory statements at issue in this case was embedded in the video itself and served as a prelude to frame the misleading clip.

As detailed above, the portions of Mrs. Sherrod's speech where she explains the extensive help she gave Roger Spooner, Compl. ¶¶ 27-28, 51, the portion where she discusses the date of the story,[33] and the portions where she explains the moral of her story—that race should not play a role in helping those in need, *id.* ¶ 43—were all ***cut*** from Defendants' video. The Complaint describes in detail precisely how Defendants took Mrs. Sherrod's words out of context and distorted the true message of her speech.  *Id.* ¶¶ 30-46.  Among other things,

---

[33]    *See* NAACP Videos, Shirley Sherrod: the FULL Video, at 19:23-19:27 (July 20, 2010).

Defendants removed critical introductory statements by Mrs. Sherrod spoken ***just seconds before*** her story about the Spooners.  *Id.* ¶ 41.  And if the video excerpt itself were not enough to evidence the incorrect and incomplete facts upon which Defendants' statements are based, one need only take notice of the national public reaction to viewing the video clip.  The media reaction was deafening and universal: relying on the deceptively edited video clip, everyone (including senior USDA and White House officials and members of the national media) assumed that Defendants' "interpretation" was correct—that Defendants had caught a federal official admitting racial discrimination in her job.  For all the reasons stated, that was clearly not the case.  Indeed, the USDA, the President of the United States, and members of the national media (but not Defendants) apologized to Mrs. Sherrod when the truth—and the full video—was revealed.  In light of the video excerpt's obviously misleading nature, Defendants' claim that "the clip captures the gist of her speech" is truly mind-boggling.  *See* Defs.' Mem. at 28.

Finally, Defendants' suggestion that their accusations of racism are supported by the second video clip, wherein Mrs. Sherrod encourages audience members to apply for jobs at the USDA, underscores the weakness of their motion.  As an initial matter, it is abundantly clear that Defendants marshaled support for their defamatory accusations from the first video, and not the second.  In fact, Statement #1 ("Mrs. Sherrod admits that in her federally appointed position, overseeing over a billion dollars ... She discriminates against people due to their race.") is embedded within, and sets the stage for, the first video.  Defendants concede this point in stating that the "Five Headlines characterize and announce what the viewer is about to see on the video clip."  Defs.' Mem. at 40.  Second, it takes a huge logical leap—and quite frankly, defies credibility—to argue that the second clip justifies or provides the "truthful" underlying facts for Defendants' statements, making them non-actionable.  In the second clip, Mrs. Sherrod notes

that African-Americans typically shy away from agriculture, but she encourages the audience to nonetheless consider these jobs, noting—in a period of tough economic times—that the USDA provides job security.  She states:

> I grew up on a farm and I didn't want to have anything to do with agriculture, but she was right: there are jobs at USDA.  And many times there are no people of color to fill those jobs because we shy away from agriculture.  We hear the word "agriculture" and we think only of working in the fields.  And you've heard of a lot of layoffs, but have you heard of anybody in the federal government losing their job?  That's all I need to say.[34]

While one may understandably question the propriety of the strong federal job security that Mrs. Sherrod seemingly touts, this clip in no way supports Defendants' defamatory statements that Mrs. Sherrod is telling a racist tale or is admitting discrimination.  She is talking to a NAACP audience about a field historically lacking African-Americans, and she is encouraging job application.  Nowhere is she saying that she would hire an African-American over a white person, and in no way is she describing discrimination.  Defendants grasp at straws by suggesting that the second video clip somehow justifies their statements.

**F.**   **Mrs. Sherrod's Claims For Intentional Infliction Of Emotional Distress And False Light Invasion Of Privacy Stand—And Survive—Independently Of Her Claim For Defamation.**

Defendants incorrectly assert that "District of Columbia law also bars claims for false light or intentional infliction of emotional distress where the court determines that there is no defamation as a matter of law."  Defs.' Mem. at 43.  The case Defendants cite, *Clawson v. St. Louis Post-Dispatch*, 906 A.2d 308, 317 (D.C. 2006), does not support their proposition.  In *Clawson*, because a central premise of the plaintiff's complaint was held incorrect as a matter of law, the court simply held that there was no error in dismissing all claims based on that premise, including those for false light and emotional distress.  *Clawson*, however, ***does not*** stand for the

---

[34]   NAACP Videos, Shirley Sherrod: the FULL Video, at 1:39-2:12 (July 20, 2010)

proposition that false light and emotional distress claims necessarily fail if the defamation claim fails.  In fact, the D.C. Circuit—in a case cited three times by Defendants—has expressly stated that comments may be actionable for false light even where they are not defamatory: "We remind the District Court, before finding that a statement is not actionable, because it is not reasonably capable of defamatory meaning, it must also satisfy itself that the statement does not arguably place [the Plaintiff] in a 'highly offensive' light."  *Weyrich*, 235 F.3d at 628; *see also id.* (explaining that the defamation and false light "inquiries, though similar, may sometimes produce different results.").

Moreover, courts have consistently explained that defamation, false light invasion of privacy, and intentional infliction of emotional distress are separate torts with different (though similar) elements.  *See, e.g.*, *Dresbach v. Doubleday & Co.*, 518 F. Supp. 1285, 1293 (D.D.C. 1981) ("Plaintiff may make both a false light claim and libel claim regarding the same material, as the two actions require different elements of proof.");  *Foretich v. Advance Magazine Publishers, Inc.*, 765 F. Supp. 1099, 1110-11 (D.D.C. 1991) ("Many of the elements of defamation and intentional infliction of emotional distress are essentially the same. … To the extent elements of and defenses to the two claims may vary, it seems best to leave both claims for trial ….").  Accordingly, these claims stand on their own and cannot be automatically dismissed even if the defamation claim fails.

### G.   Defendants Have Not Shown That California Law Should Apply To The Issues Raised In Their Motion To Dismiss.

In arguing that Mrs. Sherrod's claims for false light and intentional infliction of emotional distress should be dismissed, Defendants suggest in a footnote that California law should apply if a conflict of laws exists.  *See* Defs.' Mem. 42-43 n.38.  It should not.  As an initial matter, Defendants' cursory choice-of-law argument is strange since they repeatedly rely

on District of Columbia law and federal District of Columbia cases throughout their briefs **and** have filed a concurrent motion to dismiss under the new D.C. Anti-SLAPP Act. Moreover, Defendants have not shown that California law should apply over District of Columbia law (or Georgia law, for that matter) given that Mrs. Sherrod suffered direct injury here by reason of her loss of reputation, and it is the law on which both parties rely. *See Weyrich*, 235 F.3d at 626 (in defamation actions "the weight of authority considers that the law to be applied is … [that of] the place where the plaintiff suffered injury by reason of his loss of reputation.") (alteration in original); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (same); *see also Dowd v. Calabrese*, 589 F. Supp. 1206, 1210 (D.D.C. 1984) ("The weight of authority considers that the law to be applied is not that of the place where the offending article was written, researched, or published …."). In short, Plaintiff strongly contests that California law would apply. Should the Court consider this issue, Plaintiff would welcome the opportunity for further briefing.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss or to transfer should be denied.

Dated:  May 19, 2011                                 Respectfully submitted,

      /s/ Thomas A. Clare, P.C.
Thomas D. Yannucci, P.C. (D.C. Bar #358989)
Michael D. Jones (D.C. Bar #417681)
Thomas A. Clare, P.C. (D.C. Bar #461964)
Beth A. Williams (D.C. Bar #502522)
Peter A. Farrell (D.C. Bar #975579)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
thomas.yannucci@kirkland.com
michael.jones@kirkland.com
thomas.clare@kirkland.com
beth.williams@kirkland.com
peter.farrell@kirkland.com

*Attorneys for Plaintiff*