UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHIRLEY SHERROD,<br><br>        Plaintiff,<br><br>    v.<br><br>ANDREW BREITBART, LARRY<br>O'CONNOR, AND JOHN DOE,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:11-cv-00477 (RJL)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT LARRY O'CONNOR'S MEMORANDUM IN SUPPORT OF MOTION TO
COMPEL COMPLIANCE WITH SUBPOENAS DIRECTED TO THE
UNITED STATES DEPARTMENT OF AGRICULTURE AND THE EXECUTIVE
<u>OFFICE OF THE PRESIDENT OF THE UNITED STATES</u>**

**TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................................... 2

III. ARGUMENT .................................................................................................................. 6

    A.   The documents O'Connor seeks are relevant to the parties' claims and
defenses ................................................................................................................ 6

        1.   The USDA and EOP discovery relates to whether Sherrod can
establish that the Blog Post caused her injury ......................................... 6

        2.   Information from the USDA and the EOP that supports defendants'
evaluation of Sherrod and her speech is relevant .................................. 10

    B.   The Department of Justice's proposal for production of USDA and EOP
documents is unreasonably deficient ................................................................. 11

        1.   The Government's proposed search terms would fail to uncover
approximately half of the responsive documents from USDA ............. 11

        2.   The DOJ's proposal would fail to uncover the communications within
Executive Office of the President .......................................................... 12

    C.   O'Connor's proposal for the production of USDA documents is reasonable
and not burdensome ........................................................................................... 12

    D.   O'Connor's proposal for the production of EOP documents is reasonable and
not burdensome .................................................................................................. 13

    E.   After sitting on its hands for more than three months, the Government cannot
now complain that a timely production would be too burdensome or
disruptive ........................................................................................................... 14

IV. CONCLUSION ............................................................................................................. 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Brown v. Petrolite Corp.*,
   965 F.2d 38 (5th Cir. 1992) ............................................................................................... 6

*Cheney v. U.S. District Court*,
   542 U.S. 367 (2004) ................................................................................................... 13, 14

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ............................................................................................ 10

*Phila. Newspapers v. Hepps*,
   475 U.S. 767 (1986) ......................................................................................................... 10

*Schoen v. Wash. Post*,
   246 F.2d 670 (D.C. Cir. 1957) ........................................................................................... 7

*Simon v. Shearson Lehman Bros*,
   895 F.2d 1304 (11th Cir. 1990) ......................................................................................... 6

*Zinda v. La.-Pac. Corp.*,
   409 N.W.2d 436 (Wis. Ct. App. 1989), *aff'd in part, rev'd in part on other grounds*,
   440 N.W.2d 548 (Wis. 1989) ............................................................................................ 6

## I.   INTRODUCTION

The United States Government refuses to make a reasonable production of documents in response to Defendant Larry O'Connor's subpoenas *duces tecum* on the United States Department of Agriculture ("USDA") and the Executive Office of the President ("EOP"). The subpoenas seek information relating to Plaintiff Shirley Sherrod, a former political appointee at the USDA, and her forced resignation on July 19, 2010 by Secretary Tom Vilsack. Agreeing with commentary by Andrew Breitbart and Larry O'Connor regarding a March 27, 2010 speech she gave to a Georgia chapter of the NAACP, the USDA repeatedly asserted that she was not acting appropriately for a public official before reversing course two days later.[1] Despite this central role in the case, the Government claims that it is has no relevant information and should not have to make a comprehensive search for documents in response to the subpoenas.

The relevance, however, flows directly from Sherrod's claims for defamation, false light and intentional infliction of emotional distress. For each, she must establish that O'Connor's and Breitbart's actions were the natural and proximate cause of any harm that she allegedly has suffered. The USDA knew far more about Sherrod's controversial speech than Breitbart and O'Connor when they commented on it in the July 19, 2010 blog post (the "Blog Post"). Yet despite this knowledge – which included Sherrod's "side" of the story – the USDA nevertheless forced her to resign and publicly chastised her. Whether there were other reasons for the USDA's actions, including whether the Blog Post was a pretext for the USDA to force her out, are legitimate questions and relevant to whether defendants proximately caused her injury. The subpoenas also seek evidence concerning the Government's evaluation of Sherrod's remarks and her conduct in office, which would further support and defend O'Connor and Breitbart's opinions, commentary, and criticism of Sherrod.

---

[1] The subpoenas to the USDA and the EOP are attached as Exhibits 2 and 3, respectively.

O'Connor served the subpoenas on the USDA and EOP in November 2013. Since then, the Government has made one and only one proposal on December 19, 2013, for a process to search, identify, and collect responsive documents. An analysis of the Government's proposal based on USDA documents already made public showed that it would fail to uncover approximately half of the responsive documents. To ensure a more complete production, counsel for O'Connor provided the Government a counter-proposal with additional keywords to search the critical 16-day time period in July 2010 surrounding Sherrod's resignation. Thereafter, to accommodate the Government's claims of alleged burden, O'Connor has reduced significantly the number of search terms in his proposal. But for three months the Government has refused to add search terms or even begin collecting documents. And just this past week it has claimed that it will take several months merely to collect the e-mails while it reserves all objections on relevance and privilege.

Accordingly, O'Connor hereby moves to compel production of documents from the USDA and EOP and seeks an order requiring the Government to make a prompt production of documents based on the reasonable keyword search protocol attached hereto as Exhibit 1.

## II.   FACTUAL BACKGROUND

The USDA's role in this case began well before BigGovernment.com published a single word about Shirley Sherrod in Andrew Breitbart's Blog Post on July 19, 2010. Four days earlier, on July 15, at least three USDA officials, including Sherrod's direct supervisor, were alerted to a video clip on YouTube that showed Sherrod making her racially charged speech that is the subject of this lawsuit.[2] The video contained Sherrod's statements that she was reluctant to give "the full force" of her assistance to a troubled white farmer, but that she later decided to help

---

[2] Big Government, NAACP Bigotry in their ranks, YOUTUBE (July 19, 2010), available at http://www.youtube.com/watch?v=t_xCeItxbQY (attached as Exhibit 4).

him. In e-mail exchanges with her supervisor, other USDA officials, and the two U.S. senators from Georgia, Sherrod claimed that the video was taken out of context, emphasized that she had helped the white farmer, and noted that the anecdote in the video clip referred to events from more than twenty years before.[3]

Sherrod claims that the Blog Post was defamatory because it was "misleading,"[4] but if there was anyone who should *not* have been "misled," it was Sherrod's bosses at the USDA. They knew Sherrod. They had vetted her background prior to her appointment.[5] They were familiar with her track record in that position. And they were on notice, from Sherrod herself, of the purported full "context" of her controversial speech.

Notwithstanding their knowledge of these key facts, dozens of internal government e-mails demonstrate that USDA officials, with encouragement from the White House, were among the harshest critics of Sherrod after the video made news. USDA e-mails released under the Freedom of Information Act ("FOIA") reveal a chain reaction of outrage that rippled swiftly through the agency and culminated in Sherrod's forced resignation. For example, on the morning of July 19, Chris Mather, the USDA's communications director, e-mailed colleagues: "Urgent, This is horrible."[6] Krysta Harden, an assistant secretary at the USDA who was traveling with Secretary Tom Vilsack that day, responded that the Secretary was "absolutely sick and mad over the S Sherrod issue" and wanted her put on administrative leave "immediately."[7]

---

[3] The video had been uploaded to YouTube by O'Connor, who had intended to set the video as "private" for viewing only by his colleagues. But unbeknownst to O'Connor at the time, he inadvertently made it available for public viewing. As many as 40-50 people viewed the video, and at least two separately e-mailed Sherrod on July 15, 2010. Sherrod responded, copying the USDA officials. *See* Selection of E-mails Released by USDA Pursuant to FOIA (attached as Exhibit 5) at FOIA Production ("FP") 001, 003.
[4] *E.g.*, Compl. ¶ 4 [Dkt. 1, Ex. B].
[5] Ex. 5, FP 013-019.
[6] Ex. 5, FP 005.
[7] Ex. 5, FP 056.

John Berge, Harden's deputy, wrote a few hours later, "She should be fired. As an appointee, she has no recourse."[8] Harden agreed: "This is awful," she wrote. "If [Vilsack] can right out fire her he will or ask for her resignation. How soon can he move?"[9]

By 6:35 p.m., Cheryl Cook, a USDA deputy undersecretary, had placed four increasingly panicked phone calls to Sherrod.[10] During the fourth call, Cook demanded that Sherrod, who was driving, pull over to the side of the road and immediately submit her resignation. According to Sherrod, Cook told her that the White House had demanded the resignation.[11] Nearly simultaneously, Secretary Vilsack released the first of two public statements condemning Sherrod. In his first public comment, the Secretary stated that "there is zero tolerance for discrimination at USDA, and I strongly condemn any act of discrimination against any person."[12] The next morning on July 20, 2010, Christopher Lu, a top adviser to President Obama, e-mailed a USDA official and said that the White House was pleased with "how quickly" the USDA "took this action."[13] Later that day, after Sherrod took to the airwaves to broadcast her story, Secretary Vilsack doubled-down in a second public statement, stating that he demanded her resignation for two reasons: one, because the controversy would make it more difficult for the USDA to move forward on correcting past civil rights injustices at the USDA, and two, "rightly or wrongly," the controversy would cause situations where her decisions would be called into question.[14] As a USDA official told the press, "She did tell her side but it didn't matter. Her comments undermine the public trust that we are equal and fair."[15]

---

[8] Ex. 5, FP 007.
[9] Ex. 5, FP 009.
[10] Ex. 5, FP 055.
[11] Compl. ¶ 76.
[12] Ex. 5, FP 023.
[13] Ex. 5, FP 028.
[14] Ex. 5, FP 036.
[15] Ex. 5, FP 033.

Even as the agency was doing all it could to sever ties with Sherrod, the e-mails make clear that high-ranking agency officials understood the "full context" of Sherrod's speech all along. For instance, more than two hours before Cook's final phone call to Sherrod demanding her resignation, Dallas Tonsager, the USDA undersecretary of rural development, e-mailed Secretary Vilsack and other officials explaining Sherrod's side of the story:

> Shirley explained to Cheryl [Cook] that this piece of tape shows only one small part of a longer story she told of her personal transformation beyond race, and is about a farmer who came to see her in 1986 when she was working as a farm advocate. The rest of the story apparently explains how she came to assist this farmer and many other white farmers during this time period.[16]

Of course, the video excerpt in the Blog Post itself makes clear that Sherrod ultimately helped the white farmer and that she was discussing "her personal transformation beyond race."[17] And Sherrod herself had already explained them to her bosses before and right after the Blog Post was published.[18] In other words, Secretary Vilsack, the USDA, and the White House could not have been duped by a "misleading" video or a critical blog post; they understood all of the relevant facts better than anyone. Yet they chose to cut ties with Sherrod anyway – and they did so hastily, harshly, and heavy-handedly, only then to abruptly reverse course two days later and offer her job back.

What is less clear at this stage is why the agency acted this way. The e-mails produced under FOIA are heavily redacted and many appear to be missing completely. For instance, e-mails about Sherrod's role in *Pigford v. Glickman*, a high-profile class action lawsuit alleging racial discrimination against black farmers by the USDA, and that lawsuit's relation to Sherrod's termination, are redacted. In addition, the Government failed to produce any e-mails that were

---

[16] Ex. 5, FP 008. *See also* Ex. 5, FP 020 (Vilsack's chief of staff: "Has anyone had direct conversation with the USDA staff to hear her explanation?" Deputy chief of staff: "Yes…").
[17] Compl., Ex. A.
[18] Ex. 5, FP 001, 003.

collected from Sherrod's own e-mail account. Also missing are e-mails or other documents explaining Secretary Vilsack's complete about-face on July 21. The Government contends that his public statement – claiming that, based on the release of the full video of the speech by the NAACP, her statements were taken out of context – fully explains the Government's position. But it doesn't. The full video of the speech, which was released by the NAACP the night before, provided no information that the USDA did not already have.

## III.   ARGUMENT

### A.   <u>The documents O'Connor seeks are relevant to the parties' claims and defenses.</u>

O'Connor's subpoenas to the USDA and the EOP target four main categories of information: (1) communications between and among government officials and others regarding Sherrod, her speech and her termination; (2) documents relating to the speech itself, which was given in March 2010; (3) documents addressing Sherrod's appointment and performance in office as a USDA official; and (4) documents concerning the defendants. While the subpoenas broke down the categories into specific requests to assist the Government's collection of the information, there are not, as the Government incorrectly asserts, more than 80 different *categories* of requests. Each category is directly relevant to the claims and defenses in this case.

### 1.   <u>The USDA and EOP discovery relates to whether Sherrod can establish that the Blog Post caused her injury.</u>

It is well established that Sherrod must prove that it was the defendants' alleged conduct, not something else, that caused her harm. *Simon v. Shearson Lehman Bros*, 895 F.2d 1304, 1316 (11th Cir. 1990) (applying California law) (defamation plaintiff terminated from job bears burden of proving "the slanderous statement was both factual cause and proximate cause of [plaintiff's] termination"); *see also Brown v. Petrolite Corp.*, 965 F.2d 38, 43 (5th Cir. 1992) (a defamation plaintiff must prove that defamatory language proximately caused his or her injury);

6

*Zinda v. La.-Pac. Corp.*, 409 N.W.2d 436, 442 (Wis. Ct. App. 1989) (plaintiff's "burden to show that the loss was attributable to the defamation, not to [his] wrongful discharge."), *aff'd in part, rev'd in part on other grounds*, 440 N.W.2d 548 (Wis. 1989). As the D.C. Circuit has held, there is "no doubt" that a defamation plaintiff must show that her harm "was the natural and proximate consequence of the alleged inaccuracies contained in the article, and not the result of other causes[.]" *Schoen v. Wash. Post*, 246 F.2d 670, 672 (D.C. Cir. 1957).

The Complaint alleges that the Blog Post caused her harm: "by causing Mrs. Sherrod's forced resignation from the USDA"; "by inhibiting [her] successful performance of her previous job duties"; "by limiting [her] future career prospects"; and "by subjecting [her] to unwanted attention, harassment and persecution."[19] In addition, O'Connor has asserted the affirmative defense that he cannot be liable for harm caused by "the acts of others."[20] To the extent any of Sherrod's alleged harm was caused by the Obama Administration, Secretary Vilsack, or others, that evidence is directly relevant to claims and defenses in this case.

Furthermore, the existence of this evidence is far from speculative. The FOIA e-mails show that Sherrod's role in the *Pigford v. Glickman* litigation (known as "*Pigford I*"), and not the Blog Post, may well have caused Secretary Vilsack to ask for her resignation. *Pigford I* involved allegations by African-American farmers that federal loan officers at the USDA had "systematically thwarted [the farmers'] attempts to borrow money to farm" because of their race.[21] Sherrod, her husband Charles, and an organization that they appear to have resurrected for purposes of the *Pigford* litigation, New Communities, Inc., were major claimants in the case.

Just days before Sherrod was appointed to her federal position at USDA, New

---

[19] Compl., p. 36, Count 1.
[20] Answer of Defendant Larry O'Connor [Dkt. 38], p. 13, Aff. Defense 18.
[21] Sharon LaFraniere, *U.S. Opens Spigot After Farmers Claim Discrimination*, N.Y. TIMES (April 25, 2013), available at http://www.nytimes.com/2013/04/26/us/farm-loan-bias-claims-often-unsupported-cost-us-millions.html?_r=0.

7

Communities and the Sherrods were awarded more than $13 million for their claims in *Pigford I*, including $300,000 to the Sherrods for purported "mental anguish" caused by USDA. The settlement was the largest awarded in the *Pigford I* litigation. In her book, *The Courage to Hope*, Sherrod noted that her appointment as Georgia Director of Rural Development made her the boss of the same administrators at USDA that she had had to "nudge and confront" during the *Pigford I* case, implying that her role in *Pigford I* may not have endeared her to others at the agency.[22] Thus, although Sherrod has tried to redirect attention away from her settlement and the controversy surrounding whether *Pigford I* was "a magnet for fraud" and subject to systematic abuse,[23] the USDA e-mails and other evidence reveal that *Pigford I* was very much part of the discussion surrounding her termination.[24]

Indeed, during July 2010, a controversial bill was pending in Congress to appropriate more than $1 billion for settlements to a second wave of plaintiffs in what is known as *Pigford II*.[25] USDA's Assistant Secretary for Congressional Relations Krysta Harden and her deputy – both of whom would have been responsible for helping to shepherd *Pigford II* funding legislation through Congress – were among the first to call for Sherrod's firing.[26] They also immediately began contacting key members of Congress, "authorizers" and "appropriators."[27] The e-mails

---

[22] Shirley Sherrod, *The Courage to Hope* (Atria 2012) at 133.
[23] LaFraniere, *supra* note 21.
[24] For example, one heavily redacted USDA e-mail dated July 20, 2010 had a subject line that referenced Sherrod's "Track B Decision." Track B refers to the track in the *Pigford I* settlement where a claimant can attempt to prove actual damages (and thus obtain an increased award) as opposed to the standard settlement amount. Ex. 5, FP 041.
[25] President Obama would state just a few weeks after Plaintiff's resignation that funding the $1.25 billion *Pigford II* settlement, which had been stalled in Congress for more than seven months, was a "priority." *See* Rachel Slajda, *Obama: Pigford II Settlement For African-American Farmers Is A 'Priority,'* TALKING POINTS MEMO (Sept. 10, 2010), available at http://talkingpointsmemo.com/muckraker/obama-pigford-ii-settlement-for-african-american-farmers-is-a-priority.
[26] Ex. 5, FP 007, 009.
[27] *See, e.g.*, Ex. 5, FP 054.

further show that the USDA and White House were assembling and sharing information about Sherrod's massive settlement in *Pigford I*.[28]

The NAACP, Congressional Black Caucus, and Federation of Southern Cooperatives all raised concern about Sherrod and possible adverse effects on pending *Pigford II* funding legislation.[29] Furthermore, after a meeting with Secretary Vilsack about her resignation on August 24, 2010, Sherrod herself directly linked the *Pigford II* litigation and her termination in a joint press conference with the Secretary: "I want to say thank you to the Secretary for the updates on *Pigford* and the discussion we've had had this morning about what happened."[30]

The e-mails also show that government officials who viewed the same video as Breitbart and O'Connor and had even *more* information also perceived Sherrod's story about the white farmer as a racist tale and, as the Blog Post suggested, that she viewed her work through a "prism of race and class distinctions."[31] The fact that USDA officials also were "deeply disturbed" by Sherrod's statements, notwithstanding their consideration of Sherrod's explanation, suggests that they acted for reasons separate and apart from anything Breitbart and O'Connor had done.[32]

There can be no dispute, as the e-mails document, that a number of factors were at play when Sherrod was forced to resign. Yet the limited (and heavily redacted) information leaves a number of open questions. For instance, why did the USDA and the White House time and

---

[28] Ex. 5, FP 044 (internal correspondence regarding Sherrod's *Pigford I* claim and decision, subject line: "HELP [SHERROD TRACK B DECISION]."), 039-041 (earlier correspondence in same e-mail chain regarding Sherrod's *Pigford I* claim), 037 (asking aide to send information about *Pigford* to reporter), 042-043 (e-mail from reporter asking about *Pigford II* settlement funding and whether her *Pigford I* settlement had anything to do with Sherrod's hiring or resignation).
[29] Ex. 5, FP 029-030 (NAACP), 050-051 (Congressional Black Caucus), 047-049 (Federation of Southern Cooperatives).
[30] Transcript, USDA Press Conference (Aug. 24, 2010), available at http://www.usda.gov/wps/portal/usda/usdahome?contentidonly=true&contentid=2010/08/0421.xml (attached as Exhibit 6).
[31] Compl., Exhibit A.
[32] Ex. 5, FP 008.

again ignore Sherrod's explanations?  Why did USDA official Cheryl Cook claim that it was the White House that had demanded her resignation when Secretary Vilsack later claimed that it was his decision alone?  Why did Secretary Vilsack completely reverse his decision when he knew about the "context" of her remarks from Sherrod herself prior to her resignation?  The Government's contention that the Secretary's public comments are all that the parties need is not a basis for refusing to provide relevant information concerning who and what was responsible for allegedly injuring Sherrod as she claims.

        **2.**    **Information from the USDA and the EOP that supports defendants' evaluation of Sherrod and her speech is relevant.**

O'Connor is entitled to information that will support his evaluation and characterization of Sherrod and her speech.  It is well-established that the plaintiff bears the burden of proving falsity.  *See Phila. Newspapers v. Hepps*, 475 U.S. 767, 775 (1986).  To the extent that the commentary in the Blog Post is substantially supported by information from the USDA and the EOP, Sherrod cannot succeed on her defamation claim.  *Moldea v. New York Times Co.*, 22 F.3d 310, 318-19 (D.C. Cir. 1994) ("'[s]ubstantial truth' is a defense to defamation").

The Blog Post commented that Sherrod viewed her work at USDA through a "prism of race and class distinctions."[33]  E-mails, documents and other information from the USDA that show how Sherrod conducted her work during her short tenure at the USDA are thus directly relevant.  In her March 27, 2010 speech, Sherrod criticized current federal programs "with business and industry" that had given "not one dime to black business."[34]  She also spoke about a family that had recently come to her for assistance concerning their "515 acres of land" and

---

[33] Compl., Exhibit A.
[34] Transcript, NAACP Video of Ms. Sherrod's March 27, 2010 Speech Available at http://www.naacp.org/news/entry/video_sherrod/ (attached as Exhibit 7) at 21:2-12.

10

bemoaned to her audience that there was a "white man already lined up to buy it."[35] To the extent USDA has similar information about Sherrod's views and conduct, it is relevant.

B. **The Department of Justice's proposal for production of USDA and EOP documents is unreasonably deficient.**

1. **The Government's proposed search terms would fail to uncover approximately half of the responsive documents from USDA.**

The Department of Justice ("DOJ") proposal principally includes (1) a search of e-mails from a group of USDA employees for the names and titles of the parties to this action; and (2) a search of the e-mail accounts of Sherrod and two of her Georgia State Rural Development colleagues using just seven keyword search terms.[36] To test the effectiveness of this proposal, counsel for O'Connor ran the DOJ's search terms through the incomplete and heavily redacted FOIA documents. Approximately 46 percent of the documents did not contain a single term on DOJ's search term list, documents even the USDA acknowledged were responsive to the FOIA requests concerning Secretary Vilsack's decision to seek Sherrod's resignation.[37]

For example, the DOJ's proposal would have missed USDA's Director of Communications asking Secretary Vilsack's Deputy Chief of Staff, "Did Shirley ever send us the whole tape?"[38] It also would have missed the response to that e-mail: "I never heard from her."[39] O'Connor's proposal would capture those communications. Similarly, the DOJ proposal would have failed to pick up the discussions between Secretary Vilsack and high-ranking members of

---

[35] *Id.* at 23:24-24:1-9.
[36] The DOJ's search proposal is attached as Exhibit 8.
[37] *See* Memorandum of the Department of Justice [Dkt. 89] (filed Feb. 20, 2010) at 5 (identifying FOIA request for all e-mails concerning Sherrod, her speech and her resignation, among other things).
[38] Ex. 5, FP 038.
[39] Ex. 5, FP 038. On July 15, a full four days before the Blog Post was published, a USDA official had also asked Sherrod for the tape of her full speech. *See* Ex. 5, FP 002 ("If you can link me to the entire tape and I see this was out of context I will do what I can to get your entire message out."). It appears that Sherrod never responded by e-mail and never provided the tape.

the White House including Chief of Staff Rahm Emanuel, Press Secretary Robert Gibbs, and Cabinet Secretary Christopher Lu.[40]

A search term list that fails to uncover half of the documents is unreasonably restrictive.

### 2. The DOJ's proposal would fail to uncover the communications within Executive Office of the President.

The DOJ's proposal is restricted to the USDA's documents and would not uncover communications internal among White House staff. The EOP documents also have not been collected and searched, even though the subpoena was served more than three months ago. The limited, available documents from USDA strongly suggest that there were internal EOP communications concerning the decision to seek Sherrod's resignation and Secretary Vilsack's public statement vehemently criticizing her. For example, USDA Director of Communications remarked to a White House spokesman regarding the White House's involvement: "I guess some folks over there are circling wagons."[41] Once Sherrod was asked to resign, a White House communications director commented to the USDA regarding Secretary Vilsack's public statement: "We're good with this version on this end. Counsel has cleared the language."[42]

### C. O'Connor's proposal for the production of USDA documents is reasonable and not burdensome.

To make the search term list reasonably effective at identifying relevant documents, O'Connor respectfully requests that the Court require USDA and the EOP to supplement DOJ's proposed list with the search terms identified in the protocol attached as Exhibit 1. Each of the

---

[40] Ex. 5, FP 045, 046. *See also* Ex. 5, FP 007, 022, 024, 025, 026, 027, 032, 034, 035, 038, 042, 044, 047, 052-053.

[41] Ex. 5, FP 011-012.

[42] Ex. 5, FP 023. In addition, White House "officials" reportedly have acknowledged in background interviews that "the White House was more involved in the immediate response to the video of [Ms.] Sherrod's remarks than officials initially let on." *See* Mary Clare Jalonick, *Sherrod firing: emails reveal White House role*, CHRISTIAN SCIENCE MONITOR (March 8, 2012), available at http://www.csmonitor.com/USA/Latest-News-Wires/2012/0308/Sherrod-firing-emails-reveal-White-House-role.

search terms in this protocol comes from USDA documents released pursuant to FOIA requests. As such, the Government cannot contend that these terms are not reasonably calculated to lead to the discovery of relevant evidence. The size and scope of the search term list (and the number of individuals whose e-mails need to be searched) is necessary and reflective of the extensive communications within USDA and the White House about Sherrod, her speech, her resignation and the aftermath of her resignation. Since they are proven to identify documents the relevance of which even USDA has acknowledged, it cannot be disputed that the search terms in Exhibit 1 are appropriate to identify additional relevant documents.

O'Connor's proposal in Exhibit 1 for the search and production of USDA documents is not burdensome. It essentially limits the search of e-mails to one keyword – Sherrod – except for a key 16-day period in 2010, where it requires a search using multiple terms. To the extent that these searches return an unwieldy number of documents, counsel for O'Connor has informed the Government that the proposal may be re-evaluated.

### D. O'Connor's proposal for the production of EOP documents is reasonable and not burdensome.

The Government asserts, on the one hand, that the EOP played no part in the decision to ask Sherrod to resign,[43] but on the other, that it purportedly has a multitude of documents relating to its involvement that would present burdens of constitutional proportions. The Government cites *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), where it sought mandamus, but there are significant dissimilarities between the discovery in *Cheney* and the EOP subpoena.

In *Cheney*, Vice President Cheney was a party and personally the subject of exceedingly

---

[43] The Government contends that Secretary Vilsack's statement to the press on July 21, 2010 that "[t]here was no pressure from the White House" to ask Plaintiff to resign [Dkt. 89-4 at 1-2] forecloses discovery on the issue. Secretary Vilsack, however, is neither the finder of fact nor the arbiter of relevance in this litigation. As demonstrated herein, *supra* at 4, 11-12, there is more than sufficient foundation to conclude that the EOP was directly involved with Sherrod's termination.

13

broad discovery requests, including interrogatories and sweeping document requests. The Supreme Court made clear that "[w]ere the Vice President not a party in the case, the argument that the Court of Appeals should have entertained an action in mandamus, notwithstanding the District Court's denial of the motion for certification, might present different considerations. Here, however, the Vice President and his co-members on the NEPDG are the subjects of the discovery orders," which raised the prospect of "distract[ing]" the Executive Branch "from the energetic performance of its constitutional duties." 542 U.S. at 381-82.

By contrast, mindful of the President's important constitutional duties, O'Connor simply requests the attention of IT staff, not senior EOP employees or officials, let alone the Vice President (as in *Cheney*) or the President himself. The protocol attached hereto as Exhibit 1 simply requires a search of archived e-mail of ten EOP employees (whose involvement is undisputed) using a single computer search term over a 16-day period and no interrogatories. The narrow scope of O'Connor's requests stands in stark contrast to the exceedingly broad requests in *Cheney*, which "asked for everything under the sky," *id.* at 387, replete with "detailed and far-ranging interrogatories and sweeping requests for production of documents." *Id.* at 396.

E.  **After sitting on its hands for more than three months, the Government cannot now complain that a timely production would be too burdensome or disruptive.**

The parties' subpoenas were served more than three months ago, in October and November of 2013. Even under its own conservative estimates, if the Government had begun collecting documents in the weeks following its receipt of those subpoenas, it would be done by now. By choosing not to take prudent steps to begin collecting documents in response to the subpoenas – even those covered by *its own insubstantial proposal* – the Government cannot now complain that a timely production would be too burdensome or disruptive. Whatever burden or disruption may exist is of the Government's own making.

14

## IV. CONCLUSION

For the foregoing reasons, Defendant Larry O'Connor respectfully requests that the Court compel production of the documents in response to his subpoenas to the USDA and EOP and require the Government to implement the search protocol and document collection as set forth in Exhibit 1.

Respectfully submitted,

/s/ Mark I. Bailen
Bruce W. Sanford (356568)
Bruce D. Brown (457317)
Mark I. Bailen (459623)
BAKER & HOSTETLER LLP
1050 Connecticut Ave. NW, Suite 1100
Washington, DC 20036
Tel: 202-861-1715
Fax: 202-861-1783
bsanford@bakerlaw.com
bbrown@bakerlaw.com
mbailen@bakerlaw.com

*Attorneys for Defendant Larry O'Connor*