UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SHIRLEY SHERROD,**

**Plaintiff,**

**v.**

**SUSANNAH BREITBART,** *et al.*,

**Defendants.**

Case No. 1:11-cv-00477 (RJL)

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY OF FACTS AND LAW ......... **Error! Bookmark not defined.**

II.  ADDITIONAL FACTS IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ....................................................................**Error! Bookmark not defined.**

A.   Andrew Breitbart. ...............................................**Error! Bookmark not defined.**

B.   Mrs. Breitbart. ...................................................**Error! Bookmark not defined.**

C.   Mr. Breitbart's Participation In The Events Leading Up To The Editorial. .............. **Error! Bookmark not defined.**

D.   The Editorial ......................................................**Error! Bookmark not defined.**

E.   The Aftermath ....................................................**Error! Bookmark not defined.**

F.   Mrs. Sherrod's Full Speech................................**Error! Bookmark not defined.**

G.   Mrs. Sherrod Makes Repeated Threats to Sue, Deliberately Waits Until After November 2010 Mid-term Elections, And Finally Serves Mr. Breitbart and Mr. O'Connor When They Attending the Annual Conservative Political Action Committee Convention In Washington DC, Seven Months After The Editorial Was Published. ....**Error! Bookmark not defined.**

III. ADDITIONAL ARGUMENT WARRANTING SUMMARY JUDGMENT IN FAVOR OF MR. BREITBART................................................................**Error! Bookmark not defined.**

A.   The Plaintiff Bears the Burden of Proof on Summary Judgment in Libel Cases. ..... **Error! Bookmark not defined.**

B.   The Allegedly Defamatory Statements Must Be Considered in the Immediate and Broader Context in Which They Were Published.............**Error! Bookmark not defined.**

1.   Broader Context ............................................**Error! Bookmark not defined.**

2.   Specific Context............................................**Error! Bookmark not defined.**

3.   The Statement Itself ......................................**Error! Bookmark not defined.**

C.   When Read In Context, The Rhetorical Hyperbole In The Editorial Is Constitutionally Protected, Non-Actionable Fair Commentary and Opinion. ........... **Error! Bookmark not defined.**

D.   Mrs. Sherrod Must Prove Each Element of Her Claims, Including Actual Malice By Clear and Convincing Evidence, Separately Against Each Defendant...**Error! Bookmark not defined.**

E.   Mrs. Sherrod Cannot Satisfy Her Heightened Burden of Establishing That Mr. Breitbart Acted With Actual Malice At the Time of Publication. ....**Error! Bookmark not defined.**

IV.  CONCLUSION ....................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC,*
 975 F. Supp. 2d 1 (D.D.C. 2013) ........................................................................... 30

*Adelson v. Harris,*
 973 F. Supp. 2d 467 (S.D.N.Y. 2013) ................................................................... 30

*Afro-American Publ'g Co. v. Jaffe,*
 366 F.2d 649(D.C. Cir. 1966) ............................................................................... 28

*Biro v. Condé Nast,*
 963 F. Supp. 2d 255 (S.D.N.Y. 2013) ................................................................... 34

*Cantrell v. Forest City Publ'g Co.,*
 419 U.S. 245 (1974).............................................................................................. 34

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986).............................................................................................. 28

*Farah v. Esquire Magazine,*
 736 F.3d 528 (D.C. Cir. 2013)......................................................................... 28, 29

*Gray v. St. Martin's Press, Inc.,*
 221 F.3d 243 (1st Cir. 2000)................................................................................. 34

*Greenbelt Coop. Publ'g. Ass'n v. Bresler,*
 398 U.S. 6 (1970)............................................................................................ 30, 31

*Hamilton v. Paulson,*
 542 F. Supp. 2d 37 (D.D.C. 2008)........................................................................... 7

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
 491 U.S. 657 (1989).............................................................................................. 27

*Hoffman v. Washington Post Co.,*
 433 F. Supp. 600(D.D.C. 1977),........................................................................... 34

*Knievel v. ESPN,*
 393 F.3d 1068 (9th Cir. 2005) .............................................................................. 29

*Lohrenz v. Donnelly,*
 350 F.3d 1272 (D.C. Cir. 2003)............................................................................. 27

*McFarlane v. Esquire Magazine,*
 1994 U.S. Dist. LEXIS 9497 (D.D.C. June 8, 1994)............................................. 35

*McFarlane v. Esquire Magazine,*
 74 F.3d 1296 (D.C. Cir. 1996)......................................................................... 27, 35

*Moldea v. New York Times,*
 22 F.3d 310 (D.C. Cir. 1994)........................................................................... 29, 30

*Murray v. Bailey,*
 613 F. Supp. 1276 (N.D. Cal. 1985) ..................................................................... 34

*National Ass'n of Letter Carriers v. Austin,*
  418 U.S. 264 .......................................................................................... 29, 31

*New York Times v. Sullivan,*
  376 U.S. 254 (1964).......................................................................... passim

*Ollman v. Evans,*
  750 F.2d 970 (D.C. Cir. 1984) ............................................................ 29, 31

*Parisi v. Sinclair,*
  774 F. Supp. 2d 310 (D.D.C. 2011) .......................................................... 34

*Parsi v. Daioleslam,*
  890 F. Supp. 2d 77 (D.D.C. 2012) ...................................................... 27, 28

*Phoenix Newspapers, Inc. v. Church,*
  537 P.2d 1345(1975),.............................................................................. 35

*Revell v. Hoffman,*
  309 F.3d 1228 (10th Cir. 2002) ............................................................... 34

*Secord v. Cockburn,*
  747 F. Supp. 779 (D.D.C. 1990) ........................................................ 27, 28

*St. Amant v. Thompson,*
  390 U.S. 727 (1968)....................................................................... 27, 34, 35

*Tate v. Dist. of Colum.,*
  627 F.3d 904 (D.C. Cir. 2010) ................................................................. 28

*Underwager v. Channel 9 Australia,*
  69 F.3d 361 (9th Cir. 1995) ..................................................................... 29

*Washington Ass'n for Television and Children v. FCC,*
  712 F. 2d 677 (D.C. Cir. 1983) .................................................................. 7

*Washington Post v. Robinson,*
  935 F.2d 282 (D.C. Cir. 1991) ................................................................... 7

*Weyrich v. New Republic, Inc.,*
  235 F.3d 617 (D.C. Cir. 2001) ................................................................. 31

**Rules**

Fed. R. Civ. P. 56(e) ................................................................................... 28

Fed. R. Evid. 201(b)...................................................................................... 7

## <u>SUBSTITUTED DEFENDANT SUSANNAH BREITBART'S MEMORANDUM OR LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

Defendant Susanna Breitbart (Mrs. Breitbart), in her capacity as successor to defendant Andrew Breitbart (deceased), submits the following Memorandum of Points and Authorities (the "Memo") in support of her Motion for Summary Judgment (the "Motion"). Defendant Larry O'Connor concurrently, and separately, also moves for summary judgment on the basis of the same core set of facts.[1] Out of respect for Court's time and resources, Mrs. Breitbart will not repeat verbatim but rather hereby incorporates Mr. O'Connor's Memorandum Points and Authorities by this reference, and submits this Memo in further support of her Motion. Mrs. Breitbart also respectfully asks the Court to read Mr. O'Connor's brief first, before reading her Memo.

## I.       INTRODUCTION AND SUMMARY OF FACTS AND LAW

The statements at the center of this controversial libel case were published by notoriously opinionated conservative journalists who exercised their Constitutional right to critique and criticize a public speech made by a federal official about politics and race relations, subjects of unquestionable public importance. Speech of this nature, especially when considered in context, constitutes non-actionable opinion and fair commentary and thus cannot be silenced, chilled or deemed defamatory without irreparably infringing the First Amendment protections afforded to all members of the press. Governing United States Supreme Court precedent provides that even if the defendants' rhetorical hyperbole is viewed as fact, this case cannot survive summary judgment unless the Court is presented with clear and convincing evidence that one or both of the defendants acted with actual malice at the time of publication. The Court does not need to

---

[1] Plaintiff's Complaint generally pleads each of her three claims against "Defendants," without distinguishing between the actions of Defendants Andrew Breitbart (deceased), Larry O'Connor and John Doe (dismissed). As explained in section III.D *infra*, Plaintiff must prove each element of her claims separately, as to each defendant.

even reach the issue of actual malice, however.  Once the Court reads the entirety of the editorial at issue and then views the video embedded therein, the Court will be compelled to determine that the alleged defamatory statements of "fact" are non-actionable, rhetorical hyperbole as a matter of law.

Despite a year of relentless discovery, plaintiff Shirley Sherrod ("Mrs. Sherrod" or "Plaintiff") cannot come close to supporting her core allegations with actual facts, let alone meeting her legal burden of clear and convincing proof.  Nor have the past four and a half years changed the nature of what the defendants published about her.  Defendants' editorial statements were and remain no more actionable than any of the constitutionally protected political rhetoric written and spoken each day in newsprint, on Internet news and blog sites, on any of the less overtly opinionated cable news programs, or the countless other publications integral to the marketplace of ideas in a society founded on the fundamental right of free expression.  When the all the facts are considered--most importantly the <u>video</u> of Mrs. Sherrod's speech viewed in the context of the complete text of defendants' <u>written editorial</u>--decades of libel jurisprudence mandate an order of summary judgment in favor of defendants as to each of Mrs. Sherrod's claims.

*     *     *

In March 2010, some eight months after being appointed Georgia Director Rural Development within the United States Department of Agriculture ("USDA"), Mrs. Sherrod delivered a racially provocative speech at a NAACP fundraiser in Douglas, Georgia, a farming community located 200 miles southeast of Atlanta.  Approximately 17 minutes into her 43-minute prepared remarks, Mrs. Sherrod told the seemingly all black audience how she discriminated against a farmer in need of her assistance solely based on the color of his skin:

> *The first time I was faced with having to help a white farmer save his farm, he took a long time talking.  He was trying to show me he was superior to me.  I know what he was doing.  But he had come to me for help.  What he didn't know while he was taking all that time trying to show me he was superior to me was I was trying to decide just how much help I was going to give him.  **I was struggling with the fact that so many black people have lost their farmland, and here I was faced with having to help a white person save their land.  So, I didn't give him the full force of what I could do***.  (Emphasis added.)

Exhibit A to the Declaration of Mark I. Bailen in Support of Defendant Larry O'Connor's Motion for Summary Judgment ("Bailen Decl.") (video); Exhibit B to Bailen Decl. (transcript).

In the portion that followed, Mrs. Sherrod explained how she sent this man to a white lawyer, figuring "his own kid" (her words)—meaning a white person--would take care of him, and then how some six months later she did help him, but only after he returned to her and she formed the belief that the white lawyer had neglected his client because he was poor.  Thus, Mrs. Sherrod admitted in her own words, and it is irrefutable, that she committed an act of racial discrimination; she just was fortunate that she got the opportunity to rectify her mistake six months later.

The full relevance and impact of Mrs. Sherrod's words and, perhaps most importantly, the disturbing reaction of the audience can only truly be appreciated by viewing the <u>video</u> of her speech.  Transcripts and block quotes do not show how her eyes roll as she describes how the white farmer supposedly tried to demonstrate his superiority.  Nor do the words on the page convey the contemptuous tone of Mrs. Sherrod's voice as she says "I was trying to decide just how much help I was going to give him" and "I didn't give him the full force of what I could do."  Similarly, as Mrs. Sherrod spoke these words, only the video shows how members of the audience--who obviously had no idea where her story was heading--reacted by nodding in agreement, laughing and voicing their encouragement and approval.

Mrs. Sherrod's controversial statements were not just witnessed by the NAACP's dinner guests that night.  Her speech was being videotaped, and the recording of her speech quickly

made its way to a local television station.   Mrs. Sherrod's speech aired publicly for days after

the event and her remarks caught the attention of a man in Georgia—identified in the Complaint

as "John Doe"—who had never met Sherrod and happened upon her speech by chance.   As he

listened, he was struck by several of Mrs. Sherrod's racially divisive comments.   In addition to

the above-quoted portion, he heard this federal official tell the NAACP audience that "people of

color" should apply for jobs at the USDA because they wouldn't get fired.   He also heard her

repeatedly use words and phrases such as "we," "us," and "black lawyers" when referring to

members of her race, and "own kind," "white man," "white lawyer," and "one of his own" when

referring to white people.

     In 2010, Mr. Breitbart (like many others) was troubled by what he saw as an escalation of

a fabricated, politically motivated NAACP campaign to undermine the Tea Party as an important

mid-term election approached.   On July 12, 2010, the NAACP's outspoken President, Ben

Jealous, seized national headlines at the NAACP's annual convention by publicly calling upon

the Tea Party to rid itself of its supposed "racist elements."   Mr. Jealous' rhetoric resonated with

Mr. Breitbart, a vocal supporter of the Tea Party and other grass roots conservative movements

who, in the previous several months, had publicly criticized the NAACP and others in the black

community for voicing similar, unproven public race-based accusations against the Tea Party.

Mr. Breitbart recalled Doe's news tip and thought it might be relevant to illustrate the hypocrisy

of the NAACP's latest rebuke of the Tea Party.

     Once Mr. O'Connor and Mr. Breitbart were satisfied that Doe's information was

accurate, they turned their attention to writing an online editorial for publication on

BigGovernment.com, a conservative, politically themed website operated by Breitbart.com,

LLC, a company Mr. Breitbart founded several years earlier.

The strongly worded editorial, published on July 19, 2010 on BigGovernment.com responds directly to the NAACP's efforts to brand the Tea Party as racist.  <u>In order to fully and fairly decide this motion, the Editorial must be read in its entirety.</u>

The first thing of note is that the title of the Editorial--"Video Proof: The NAACP Awards Racism"—makes no mention of Mrs. Sherrod.  In fact, Mrs. Sherrod's name does not appear in any of next 800 words.  More than half of the 1400-word piece, instead, is devoted to context; notably, a discussion of the relevant political events and controversies that had been brewing for the previous three months.  The editorial then condemns the NAACP's use of racial scare tactics to undermine the Tea Party movement in the eyes of the black electorate.  The point then is punctuated by the embedded video excerpt of Mrs. Sherrod's speech about the white farmer, which the editorial uses to demonstrate the hypocrisy and impossible nature of the NAACP's call to the Tea Party to adopt the NAACP's supposed zero tolerance for racism within its ranks.  The editorial further criticizes the mainstream media for its bias and willingness to help the Democratic Party fuel and exploit racial tensions for political gain.  It also questions the Obama administration's social policies and uses a second video excerpt of Mrs. Sherrod's speech--where she tells black people to apply for government jobs claiming they won't be fired—to criticize the NAACP and the administration for encouraging black Americans to rely on the government for work rather than their own individual and entrepreneurial capabilities.  The <u>entirety</u> of the editorial and the embedded video is constitutionally protected because it expresses non-verifiable opinions, descriptions and fair comment based on and about truthful disclosed facts—*i.e.,* Sherrod's own words.

Mrs. Sherrod's case presents the allegedly defamatory statements out of context and focuses heavily on the events that transpired in the hours and days after the editorial and

embedded video excerpts of her speech were posted on BigGovernment.com.  She claims, as the

lynchpin of her case, that she was unjustly forced to resign by the Secretary of the USDA and the

White House who based their knee-jerk reaction on alleged factual inaccuracies in the editorial.

A year of painstaking discovery obtained from the USDA and the White House shows otherwise.

There is no proof that any of the government officials who forced her out had ever read the

editorial or obtained any information about Mrs. Sherrod from BigGovernment.com before they

decided her fate that day.  The evidence also is clear that none of these government officials were

"duped" by any alleged errors published by defendants.  Mrs. Sherrod no longer was welcome to

serve at the pleasure of the administration because she gave a racially inappropriate, politically

embarrassing speech that the USDA Secretary labeled as poor "judgment" and that, according to

White House e-mails, should never have been given.[2]

These and other post-publication facts are relevant in terms of context and demonstrate

that summary judgment is warranted.  Nevertheless, these facts are not essential for purposes of

this motion under the actual malice rules of *New York Times v. Sullivan*, 376 U.S. 254 (1964),

which focuses on what occurred prior to publication and must be applied to public official libel

plaintiffs like Mrs. Sherrod.  In contrast to what happened after the editorial was published, the

pre-publication events—which all have been disclosed by defendants--were rather routine and

unremarkable when considered in the history of libel and First Amendment jurisprudence:

journalists receive a news tip from a source about a public figure giving a public, political speech

about issues of public importance; they corroborate the substance of the information; they

publish facts believed to be true; and they add commentary and criticism without any subjective

misgivings about the truth of any material facts.

---

[2] Ex. GG to Bailen Decl. (Lu e-mail, 7/21/10); Ex. HH to Bailen Decl.(Gibbs e-mail, 7/21/10); Ex. II to Bailen Decl. (Jarrett e-mail, 7/21/10).

Simply put, defendants' editorial is part of the perpetual, constitutionally protected public debate and dialogue about American politics and race relations; Mrs. Sherrod has no legally significant, much less clear and convincing, evidence of actual malice; and nothing published by defendants proximately caused her swift ouster from the USDA.  This case thus must join the litany of other public-official libel cases that have been summarily dismissed in this Circuit and others as a matter of law under long-standing, well-settled Supreme Court precedent.

## II.     ADDITIONAL FACTS IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT[3]

### A.     **Andrew Breitbart**.

Andrew Breitbart was a well-known, outspoken journalist, political commentator, author, and supporter of conservative causes.[4]  After working for the Huffington Post and the Drudge Report, Mr. Breitbart founded Breitbart.com, LLC, which over time launched, owned and operated a number of news and opinion websites, including Breitbart.com, Breitbart.tv and BigGovernment.com.  *Id.*, *See* also ECF No. 20 (Breitbart Declaration) ¶ 3.  Like Mr. Breitbart, the company's websites unapologetically spoke (and continue to speak) in a "conservative" voice and frequently covered (and still cover) stories and/or offer opinions and commentary on subjects the "mainstream media" tend to ignore.

---

[3] Mrs. Breitbart incorporates by reference the fact section in O'Connor's Memorandum of Points and Authorities and offers the additional facts set forth herein.

[4] *See, e.g.*, Complaint (ECF No. 1-2) at ¶ 10; Wikipedia Entry for Andrew Breitbart, available at http://en.wikipedia.org/wiki/Andrew_Breitbart; James Taranto, Taking on the "Democrat-Media Complex," Wall Street Journal (Oct. 16, 2009) available at http://online.wsj.com/news/articles/SB10001424052748704471504574451703003340362?mod=WSJ_hpp_sections_opinion&mg=reno64-wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB10001424052748704471504574451703003340362.html%3Fmod%3DWSJ_hpp_sections_opinion.

Mrs. Breitbart requests that this Court take judicial notice of factual information available in the public domain described herein pursuant to Federal Rule of Evidence 201(b).  *See Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (judicial notice of newspaper articles); *Washington Ass'n for Television and Children v. FCC*, 712 F. 2d 677, 683 n.12 (D.C. Cir. 1983) (judicial notice of speech); Hamilton v. Paulson, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) (Walton, J.) (judicial notice of website).

Mr. Breitbart died suddenly on March 1, 2012.  He was only 43[5].  He never got the

opportunity to testify under oath and tell his side of the story in this case.  .  Prior to his death

Mr. Breitbart did, however, speak publicly about the events in question, and he consistently

maintained that the Editorial was about the NAACP, not Mrs. Sherrod, that he never called for

Mrs. Sherrod to be fired, and that at the time the Editorial was written and published, neither he

nor Mr. O'Connor had seen the entirety of Mrs. Sherrod's speech.[6]

      B.    **Mrs. Breitbart**.

Mrs. Breitbart became a party to this case in October 16, 2013, more than a year and a

half after Andrew Breitbart passed away.  *See* ECF No 64 (Mandate from D.C. Circuit).  By this

time, Mrs. Sherrod had received public apologies from NAACP President Ben Jealous, USDA

Secretary Vilsack, and President Obama.[7]  She also had been invited to return to the USDA (she

declined),[8] she had published a book about her life and the events in question,[9] and she had

received numerous honors, including a NAACP Image Award nomination.  Mrs. Sherrod easily

could have taken the high road, dropped the case and moved on with her life.  She did not.

Instead, she made the far more spiteful and gratuitous decision to continue claims that were very

---

[5] Pl.'s Mot. for Substitution of Deceased Def. Andrew Breitbart (ECF No. 68); *see also* Tim Mak, Andrew Breitbart dead at 43, Politico.com (March 1, 2012) , available at  http://www.politico.com/news/stories/0312/73493.html

[6] July 20, 2010 Interview, CNN with John King, available at http://johnkingusa.blogs.cnn.com/2010/07/20/breitbart-this-was-not-about-shirley-sherrod/?iref=allsearch; Ken Vogel, Breitbart, "I am public enemy No. 1," Politico.com (July 20, 2010) available at http://www.politico.com/news/stories/0710/
40117.html); Andrew Breitbart Appearance on Michael Savage Show (July 27, 2010) available at https://www.youtube.com/watch?v=hYqr8yPMIA0.
[7] See, e.g., July 20, 2010 Statement by NAACP on Resignation of Shirley Sherrod, available at http://www.naacp.org/press/entry/naacp-statement-on-the-resignation-of-shirley-sherrod1/;  USDA Press Release, Statement by Agriculture Secretary Tom Vilsack Regarding Shirley Sherrod, Release No. 0382.10 (July 21, 2010) available at http://www.usda.gov/wps/portal/usda/usdahome?contentidonly=true&contentid=2010/07/0382.xml; Jake Tapper and Huma Khan, *White House Apologizes to Shirley Sherrod, Ag Secretary Offers Her New Job*, ABC News (July 21, 2010), available at http://abcnews.go.com/Politics/shirley-sherrod-shell-back-usda-secretary-tom-vilsack/story?id=11215446.

[8] Ex. Z to Bailen Decl. (Sherrod Dep.) at 283:6-284:4.

[9] Ex. JJ to Bailen Decl. (Excerpts from Sherrod's Book).

personal as to Mr. Breitbart against the family he left behind.  *See* ECF No. 68 (Pl.'s Motion to

Substitute Mrs. Breitbart as Successor to Andrew Breitbart, deceased); ECF Minute Entry from

October 16, 2013 Hearing (granting substitution of Susannah Breitbart as successor to Andrew

Breitbart, deceased).

Mrs. Breitbart never imagined she would be in this position – mourning the loss of her

husband and raising their four children on her own, while at the same time defending a lawsuit

based on something Andrew wrote as part of his business.  *See* Exhibit 1 to Declaration of Daniel

Herbst ("Herbst Decl."), (Mrs. Breitbart's Interrogatory Responses to Plaintiff's Second Set of

Interrogatories).  She never before had any meaningful involvement in Andrew's business

affairs, she never maintained an office within the company, and has no knowledge of the events

at issue in this dispute.  *Id.*

C.     **Mr. Breitbart's Participation In The Events Leading Up To The Editorial**.

In the spring of 2009, activists on the political left began to refer to the nascent Tea Party

movement as "racist" in an effort to malign and marginalize this emerging political movement on

the political right.[10]  When these claims of Tea Party "racism" first surfaced, Mr. Breitbart joined

the campaign to refute those accusations and defend the Tea Party cause.[11]  He was well-known

as a defender of the Tea Party by the time its supporters gathered in Washington, DC for a four-

day rally in March 2010 to oppose passage of the controversial Affordable Care Act, now known

as "Obamacare."  On March 20, 2010, published reports began to appear claiming that attendees

at a Tea Party rally on Capitol Hill protesting the health-care bill spat on and shouted racial

---

[10] *See, e.g*., Countdown with Keith Olbermann (April 16, 2009), available at
http://www.youtube.com/watch?v=jAAHMDpk7Ik.  A transcript was attached to ECF No. 22-1.

[11] *See, e.g.*, Andrew Breitbart, Big Hollywood Crew Joins Tea Party Protest, BigGovernment.com (April 15, 2009),
available at http://bighollywood.breitbart.com/abreitbart/2009/04/15/bill-hollywood-crew-joins-tea-party-protest/;
Andrew Breitbart, Question Democratic Authority?  Not!, BigGovernment.com (April 19, 2009), available at
http://bighollywood.breitbart.com/abreitbart/2009/04/19/question-democratic-authority-not/(ECF No. 22-4).

epithets at members of the Congressional Black Caucus.[12]  In particular, members of the

Congressional Black Caucus alleged that as they walked through a sea of Tea Party members

holding up camera phones the "N-word" was hurled at them, not once, but 15 times.[13]  On March

25, 2010, a Pulitzer-prize winning columnist published under the headline "Tea Party proves me

right on racism" a syndicated opinion article stating that the Tea Party activists accused of

harassing the congressman "would not have said they were racists.  Racists never do."[14]  On

March 31, 2010, conservative Fox News host Bill O'Reilly made reference to "a number of

commentators" who "have called the Tea Party people racists."[15]

    Mr. Breitbart reacted to these serious accusations by publicly calling for proof.[16]  When

weeks passed and no audio or visual confirmation of the supposed slurs had surfaced, Mr.

Breitbart offered to make a $100,000 donation to the United Negro College Fund if anyone

produced audio or video footage in support of the published accounts.[17]  As part of his open

challenge, Mr. Breitbart posited that the claims of racial slurs were being fabricated by the "left"

and the "progressive media" as a tactic to marginalize growing support for the Tea Party

---

[12] *E..g.*, Paul Kane, 'Tea Party' Protestors Accused of Spitting on Lawmaker, Using Slurs, WASH. POST (Mar. 20, 2010), available at http://www.washingtonpost.com/wp-dyn/content/article/2010/03/20/AR2010032002556.html.  . (ECF No. 22-5).

[13] *E.g.*, Angelo Henderson, *Rep. Andre Carson and Rep. John Lewis Called the N-Word 15 Times,* WCHB AM, available at http://wchbnewsdetroit.com/detroit/angelohenderson/rep-andre-carsonand-rep-john-lewis-called-the-n-word-15-times-rep-emanuel-cleaver-was-spat-on-by-anti-healthcare-reform-protestor-what-does-these-times-remind-you-of/, (ECF No. 22-6).

[14] Leonard Pitts, Jr., Commentary, Tea Party proves me right on racism, MIAMI HERALD (March 25, 2010), available at http://www.mcclatchydc.com/2010/03/25/90975/commentary-tea-party-proves-me.html#ixzz1JbuhqPSf_).  (ECF No. 22-7); Joan Walsh, *Too much tea party racism*, SALON (Mar. 20, 2010) both attached to Exhibit E to Bailen Declaration.

[15] Bill O'Reilly, The O'Reilly Factor, FOX NEWS (March 31, 2010).  (ECF No. 22-8).

[16] *See* Larry O'Connor, *AP to Breitbart – Prove Tea Partiers Aren't Racist*, March 28, 2010) available at http://www.breitbart.com/Big-Journalism/2010/03/28/AP-to-Breitbart--Prove-Tea-Partiers-AREN---T-Racist.

[17] *See, e.g.*, Andrew Breitbart, Barack Obama's Helter Skelter, Insane Clown Posse, Alinsky Plans to Destroy America, BigGovernment.com (April 2, 2010), available at http://biggovernment.com/abreitbart/2010/04/02/barack-obamas-helter-skelter-insane-clown-posse-alinsky-plans-to-deconstruct-america/(ECF No. 22-9).

movement in the months leading to the November 2010 mid-term elections.  In fact, multiple

videos, with audio, showed no evidence that the epithets were made.[18]

On March 27, 2010, in the midst of the political debate over these events and as the

related racial tensions continued to build, Mrs. Sherrod gave the keynote speech at the NAACP's

20th Annual Freedom Fund Award Banquet in Baker, Georgia.[19]  Several days later, Mr.

Breitbart received a news tip from a man in Georgia who had watched portions of Mrs. Sherrod's

speech on a local television station (defendant "John Doe").[20]  This man had never met Mrs.

Sherrod but he knew she was a federal official and he was troubled by certain aspects of her

speech.  Declaration of "John Doe" ¶ 5 (Dkt. No 66-2); Doe Depo. 38:25-39:5. He also had

never met Mr. Breitbart, but he knew Mr. Breitbart's political views and his vocal defense of the

Tea Party against charges of racism.  Doe Decl. (ECF No. 66-2) at ¶6; Doe Depo., 45:19-23;

47:15-21 (Exhibit 2 to Herbst Decl.).  Doe's concise tip came by email and included his phone

number:

> "Obama appointee, Shirley Sherrod, Ga. Rural Development Director said at a taped
> NAACP meeting that she witholds [sic] financial help to "White People."  Taped last
> month.  [Name and phone number omitted]  And a lot more.  Shocking.

Mr. Breitbart called Doe.  Their conversation was brief.  Mr. Breitbart asked for the video of the

entire speech.  Ex. F to Bailen Decl. (Doe Dep.) at 62:3-22.  Doe agreed to send it.  *Id.*  Doe also

asked Mr. Breitbart not to reveal his name if he decided to use this information in any future

publications.  Mr. Breitbart agreed.  Doe Decl., 7-8; Doe Depo. 64:21-65:12; Ex. D to Bailen

---

[18] *See*, *e.g.*, Andrew Breitbart, No More Beer Summits: Tea Party 'N-Word' Incident Didn't Happen, and the
Congressional Black Caucus Owes America an Apology (April 26, 2010), available at
http://biggovernment.com/abreitbart/2010/04/02/barack-obamas-helter-skelter-insane- clown-posse-alinsky-plans-
to-deconstruct-america/(ECF No. 22-10), Exhibit E to Bailen Declaration..

[19] Ex. A, B to Bailen Decl. (Sherrod Video and Transcript).

[20] Doe Deposition, Ex. F to Bailen Decl. (Doe Dep.) at 44:1-23, 45:12-23.; Ex: D to Bailen Decl. (O'Connor dep. at
90:7-92:1); Doe Declaration (ECF No 66-2).

Decl. (O'Connor Dep) at 206:4-8;  Doe Decl. (ECF No. 66-2) at ¶ 8.  This was the one <u>and only</u>

time Mr. Breitbart and Doe ever spoke over the phone.  Ex. F to Bailen Declaration (Doe

Deposition) at 20:11-17; 48:23-24; Doe Decl. (ECF No. 66-2) at ¶ 7.  . ..

     Doe sent a DVD as promised.  Ex. F to Bailen Decl. (Doe Dep. at 61:25-63:6); Ex. D to

Bailen Decl. (O'Connor Dep.  at 90:19-91:8).  Neither Mr. Breitbart nor Mr. O'Connor could get

it to play.  Doe Decl. (ECF No. 66-2) at ¶ 9; Doe Depo. 77:21-78:16 (Exhibit 2 to Herbst Decl.);

Ex. G to Bailen Decl. (DVD video file); Ex. D (O'Connor Dep.) at 90:20-91:2; Solov Depo.,

133:15-134:3 (Exhibit 4 to Herbst Decl.,).  They had no further contact with Doe until July 14,

2010.  Doe Depo. 79:4-13 (Exhibit 2 to Herbst Decl.).  During this three-month hiatus, the

accusations of "racism" against the Tea Party intensified.  O'Connor Memorandum at 5.  On July

13, 2010, during the national convention of the NAACP, they reached a crescendo.  That

evening, thousands of NAACP delegates unanimously passed a special resolution introduced by

its President, Ben Jealous, accusing the Tea Party of harboring "racist factions" and "bigoted

elements" and imploring for them to be "repudiated."[21]  The resolution received heavy

mainstream media coverage.  Nearly all of it was decidedly critical of the Tea Party's supposed

"racism."[22]

     The events of July 13, 2010 triggered Mr. Breitbart to recall Doe's earlier news tip.  The

next morning, at 8:36 a.m., Mr. Breitbart forwarded Doe's tip to Mr. O'Connor and others at the

company.  His short, metaphorical comment—"we are going to drop a bomb on naacp"--reflects

---

[21] Press Release, Nat'l Ass'n for the Advancement of Colored People, NAACP Delegates Unanimously Pass Tea Party Amendment (July 13, 2010), *available at* http://www.naacp.org/press/entry/naacp-delegates-unanimously-pass-tea-party-amendment, attached as Ex. H to Bailen Decl.

[22] *E.g.*, Krissah Thompson, *NAACP watches for 'tea party' racism, stirs controversy*, WASH. POST (July 14, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/07/12/AR2010071204471.html, attached as Ex. E to Bailen Decl.

that he clearly thought Doe's information could turn the tables on the NAACP.  Exhibit 6 to

Herbst Decl. [BNN_0001108].

Mr. O'Connor's response came two minutes later.  "I'll start researching her."  Exhibit 7

to Herbst Decl. [BNN_0001107].  Thirty-five minutes after that (9:03 a.m.), Mr. Breitbart asked

Mr. O'Connor to call Doe "and figure out how to get this video transferred."  Exhibit 8 to Herbst

Decl. [BNN_0004773].  Mr. Breitbart had started to map out the next series of moves.  Eight

minutes later, he emailed Mr. O'Connor and others with instructions on how to verify Doe's tip:

> "larry o needs to get the essence of what was said… confirm by hearing over the phone…
> getting transcribed best morsels… we'll tease with headline… then in morning add the
> quotes… always with video evidence to be released soon…"

Ex. D to Bailen Decl. (O'Connor Dep.) at 127:10-14; Exhibit 9 to Herbst Decl. [BNN_0012185].

The "headline" referenced in Mr. Breitbart's directive also appeared in this email.  It's hyperbole

was in line with the rhetoric that had come to define the public fueled between the NAACP and

the Tea Party: "Shock NAACP Award recipient in anti-white rage speech.  Audience responds

with laughter over Vilsack appointee's racist tirade."  Exhibit 9 to Herbst Decl. [BNN_0012185].

Mr. O'Connor reported back later in the day that Doe was working on sending the quotes

Mr. Breitbart had requested.  Mr. O'Connor also asked the company's acting Chief Technology

Officer, Darren Rush, to recommend how Doe could upload the video.  Exhibit 10 to Herbst

Decl. [BNN_0012184].  Mr. Breitbart was anxious to see the video and respond quickly to Mr.

Jealous' accusations.  He copied his colleagues on his email to Mr. Rush letting everyone know

they had to move quickly:  "Top priority, Darren.  This naacp story is ripe like never before.

They gave us a huge in.  Sooner the better.  All hands on deck."  [BNN_0012183].

Doe's email with quotes of Mrs. Sherrod's remarks about the white farmer was sent to

Mr. Breitbart at 10:00 that evening. Exhibit 11 to Herbst Decl. [BNN_0000838].  After

reiterating that Mrs. Sherrod "was the Georgia Rural Development Director," Doe wrote out two quotes of her speech:

> 1) "I was trying to decide just how much help I wanted to give him"

> 2) "I didn't give him the full force of what I could do"

Doe did not simply transcribe Mrs. Sherrod's words in isolation; he provided more context, signaled that her remarks were subject to interpretation, and reminded Mr. Breitbart that he wished to remain anonymous:

> Now, in the video, she does walk this back some, telling the audience that through prayer, she was able to do it, and found that it's about poor people, not just black and white.  But, I don't buy it, and she was just covering her ass.
> Again, please keep my name out of this. It was on public TV, and I live in a very small town and have a house payment**. :)**

Two hours later, Doe sent quotes from a second portion of the speech, where Mrs. Sherrod encourages young black people in the audience to apply for jobs in government because they won't get fired.  "Have you heard of anybody in the federal government losing their jobs?  That's all I need to say."  Mr. Breitbart forwarded this email and the previous email from Doe to Mr. O'Connor and others moments after he received them.  Exhibit 11 to Herbst Decl. [BNN_0000838]; Exhibit12 to Herbst Decl.[BNN_0010059].

After watching the video of Mrs. Sherrod's treatment of the white farmer, Mr. Breitbart took two additional steps to confirm the story was newsworthy.  First, he sought input from his colleagues, saying "we need all to make a decision on how to play. not enough to work with here." Exhibit 13 to Herbst Decl. [BNN_0012173]  Second, he reached out to two gentlemen outside the company he knew and trusted, sent them the video and other information on Mr. Sherrod, and asked for their counsel.  The first person he contacted was Niger Innis, Ex. D to Bailen Decl. (O'Connor Dep.) at 169:10-17, a black conservative whose father, Roy Innis, is a

well-known civil rights activist who founded the Congress of Racial Equality.  The younger Mr.

Innis responded quickly and had a strong reaction to what he saw on the video:

> This is an outrage. For a Federal official to not just admit, but brag about racially discriminating against a citizen. It is tragic, but thanks to racial racketeer "leadership" and their accomplices in the media, many Black Americans have become what we once despised. Ironically this comes AFTER a landmark (and justifiable) award was issued to black farmers that had been the victim of discrimination. These farmers and a number of nameless others are the reason that Sherrod has her job. Yet instead of doing her damn job she is attempting to score political points and show her "blackness" by being a bigot. How ironic that the Democratic Party that once countenanced Rednecks now countenances Blacknecks. It is the same racism, just the positions of victimizer and victimized has been reversed. Stay on top of this Andrew. We must continue to beat the drum in order to save our country. The President's election was supposed to stop this phenomenon and unify the country. His administration (I assume Sherrod is a part of it) has instead grown this payback racism exponentially to NO benefit of blacks today and in no tribute to past sufferings of our forefathers. If we don't stop this nonsense our country will go the way of the Balkans.  I am your partner in fighting this.

Ex. L to Bailen Decl. (Innis e-mail, 7/15/10).  Mr. Breitbart also sent the same information to J.

Christian Adams, a former prosecutor with the Department of Justice who turned whistle blower

in connection with the Obama administration's failure to prosecute the New Black Panther Party

for voter intimidation.  *Id.*  Mr. Adams also validated the newsworthy nature of the story.  Ex. M

to Bailen Decl. (Breitbart forwarding Adams e-mail, 7/16/10).

Mr. Breitbart sent Mr. Innis' and Mr. Adams' responses to his colleagues and they kept

moving forward.  Exhibit 14 to Herbst Decl. [BNN_0000833]; Exhibit 15 to Herbst Decl.

[BNN_0012156].  Later that day, July 15, 2010, Mr. Breitbart warned the NAACP that he was

about to turn the tables on them.  During an appearance on the Scott Hennen radio show, Mr.

Breitbart publicly stated "I have tapes tape of racism and it [is] an NAACP dinner.  You want to

play with fire?  I have evidence of racism and [it is] coming from the NAACP."  Exhibit 16 to

Herbst Decl. [BNN_0004769]

Over the course of the next three days, Mr. O'Connor spoke with Doe many times and worked with him to obtain the video excerpts he had described.[23]  The details of their many conversations are described in Mr. O'Connor's Memorandum.  O'Connor's Memorandum at p. 5-12.  Each time they spoke, Doe confirmed  he would send a working DVD of the entire speech. Ex. D to Bailen Decl. (O'Connor Brief at 98:4-98:7); Doe Depo 20:11-17; 120:11-15; Solov Depo., 177:14-24.

Mr. O'Connor prepared the initial draft of the written response to the NAACP on Sunday evening, July 18, 2010.  See O'Connor's Memorandum p. 11-12.  Earlier that day, the Sunday morning network news shows continued to provide Mr. Jealous with a pulpit, and he used the opportunity to spread his race-based, anti-Tea Party meme to a broader national audience.[24]  Mr. Breitbart and Mr. O'Connor were increasingly anxious to respond quickly to make sure their views would be part of the conversation in the same news cycle.  Ex. D to Bailen Decl. (O'Connor Brief at 244:17-245:20).  Mr. Breitbart finished revising the draft early Monday morning and sent it to O'Connor and Laurence Solov, the company's General Counsel, for their final review.  *Id.* at 12.  The final version of the 1400 word essay, entitled "Video Proof: The NAACP Awards Racism – 2010" (the "Editorial") was published on BigGovernment.com at approximately 8:20 a.m. Pacific Time on July 19, 2010.  Attached as Exhibit U to Bailen Decl.

D.    **The Editorial**

As noted above and explained further below, the alleged defamatory statements at issue in this case cannot be evaluated in isolation.  To properly determine whether any are actionable as a matter of law, each must be considered within the immediate context of the Editorial and

---

[23] Mr. Breitbart did not participate in any of these calls.  He only spoke with Doe once, back in April, after he received the initial email tip from Doe.  Exhibit 2 to Herbst Decl., Doe Depo 20:11-17; 120:11-15; Exhibit 4 to Herbst Decl.Solov Depo., 177:14-24; ]
[24] Exhibit N to Bailen Decl. July 18, 2010 Transcript, Face the Nation (CBS News)

also within the broader context of the political and social events which lead to their publication by the defendants.

In the first full paragraph of the Editorial, Mr. Breitbart sets forth his interpretation of the two video excerpts of Mrs. Sherrod's speech:

> In this piece you will see video evidence of racism coming from a federal appointee and NAACP award recipient and in another clip from the same event a perfect rationalization for why the Tea Party needs to exist.

> Ex. U to Bailen Decl.

In the next fifteen paragraphs of the Editorial, Mr. Breitbart provides the context and recaps the political events of the previous three months.  *Id.*  He describes how the Tea Party has come under attack from the NAACP as "racist."  *Id.*  He argues that no organization can live up to the NAACP's impossible "zero tolerance" standard and chastises the media and the Democratic Party for causing the NAACP/Tea Party race narrative to dominate the news in a "summer of economic and political discontent."  *Id.*  He argues that the Democratic Party is using the NAACP as its weapon to exploit "this nation's sensitive political schism for possible political gain."  *Id.*  After reviewing the accusations of the Congressional Black Caucus during the March Affordable Care Act rally, Mr. Breitbart argues that the CBC and the NAACP do not actually want racial harmony; they want political victory "and the race card is their Stradivarius." *Id.*  He then submits that the NAACP just decided to "double down" by issuing its formal condemnation of the Tea Party (a reference to Mr. Jealous' July 13 resolution) and criticizes the mainstream media for blindly covering the NAACP's maneuver without mentioning that no one ever came forward with evidence that the spitting and "N-word" incidents ever happened.  *Id.*

> But the new media will not be silenced.  It will not allow for the main stream media to propagate hateful and hurtful lies in order to save the Democratic Party from the toxic choices it has made over the past few years. And by bringing up race, and demanding a

zero tolerance of racism, the left, and the NAACP in particular, has opened itself up for scrutiny.

*Id.*

After providing this context, Mr. Breitbart introduces Mrs. Sherrod's white farmer story.

He explains why it is relevant, describes what she says, and provides his own commentary:

We are in possession of a video from [sic] in which Shirley Sherrod, USDA Georgia Director of Rural Development, speaks at the NAACP Freedom Fund dinner in Georgia. In her meandering speech to what appears to be an all-black audience, this federally appointed executive bureaucrat lays out in stark detail, that her federal duties are managed through the prism of race and class distinctions.

In the first video, Sherrod describes how she racially discriminates against a white farmer.  She describes how she is torn over how much she will choose to help him.  And, she admits that she doesn't do everything she can for him, because he is white.

Eventually, her basic humanity informs that this white man is poor and needs help.  But she decides that he should get help from "one of his own kind". She refers him to a white lawyer.

Sherrod's racist tale is received by the NAACP audience with nodding approval and murmurs of recognition and agreement.  Hardly the behavior of the group now holding itself up as the supreme judge of another groups' racial tolerance.

*Id.*

Mr. Breitbart then introduces the second video excerpt:

The second video affirms the real reason there is tension between the Democratic Party and a growing mass of middle Americans -- and it's not because of race.
The NAACP which has transformed from a civil rights group to a propaganda arm of the Democratic Party and social-justice politics, supports a new America that relies less on individualism, entrepreneurialism and American grit, but instead giddily embraces, the un-American notion of unaccountability and government dependence. Shirley Sherrod, a federal appointee who oversees over a billion dollars of federal funds, nearly begs black men and women into taking government jobs at USDA -- because they won't get fired.

Ex. U to Bailen Decl.

The Editorial concludes with four paragraphs of blistering criticism directed at the

Democratic Party, the NAACP, and the Obama Administration:

This is why the Democratic Party is scared. This is why the NAACP is scared. This is why black conservatives, previously marginalized as "Uncle Toms" by these progressive bullies, and shamefully, the NAACP, are coming out of the woodwork to join and, in many cases, lead the Tea Party movement.

The emerging Tea Party nation understands that the media has focused on the manufactured racial schism while intentionally ignoring the schism between free market thinkers and government expansionists, that the latter of which is brazen in its desire to transform America into a European-model welfare state with a healthy dose of socialism. It's unfortunate that the NAACP's recent resolution and false accusations have forced us to show you video 1 when video 2 is the bigger problem. That's not to say video 1 is not a problem, but this country can ill afford, in this time of economic peril, to waste our time poking and prodding at the racial hornet's nest that was supposed to have been removed with this post-racial presidency. But now President Obama and the modern-day Democrat party reveal they are anything but post-racial.

Yet again, the juxtaposition of the real video evidence shown here versus the mainstream media's straight faced reportage of the NAACP's baseless accusations demonstrates that, once again, the American main stream media has asserted itself as the number one enemy of the truth, when the facts don't fit the left-wing narrative.  Like the NAACP, it has become no better than Al Sharpton and Jesse Jackson in its willingness to exploit race for political ends and their unflinching support of the Obama's left-wing agenda.

*Id.*

E.    **The Aftermath**

Mrs. Sherrod was forced to tender her resignation from the USDA at 6:55 p.m. Eastern Time that same day, a mere eight hours after the Editorial was published.[25]  The official public announcement came from Secretary Vilsack, who said "There is zero tolerance for discrimination at USDA and we strongly condemn any act of discrimination against any person."[26]  The next day, on CNN, he explained that Sherrod's termination was caused by her own poor judgment: "I don't believe this woman is a racist at all.  This is about a judgment that she made in making a decision to talk about this in a way that created a controversy and made it

---

[25] Ex. X to Bailen Decl. (Cook Dep.) at 42:12-49:21; Ex. Z to Bailen Decl. (Sherrod Dep.) at 167:17-169:8; Ex. AA to Bailen Decl. (Cook e-mail, 7/23/10).

[26] *USDA employee resigns over statements about white farmer*, CNN (July 19, 2010, 10:25 P.M.), http://www.cnn.com/2010/POLITICS/07/19/agriculture.employee.naacp .

more difficult for her to do her job."[27]   NAACP President Jealous issued a statement on July 19,

several hours after Mrs. Sherrod resigned.   He called her actions "appalling" and he also

condemned the behavior of the audience: "The reaction from many in the audience is disturbing.

We will be looking into the behavior of NAACP representatives at this local event."[28]

When news of Mrs. Sherrod's resignation first hit Mr. Breitbart and his colleagues that

evening, they were genuinely surprised--not only by the fact that she had stepped down, but how

quickly it happened.[29]   Not yet aware that she had been forced out (that detail did not become

known until the next morning), they interpreted her swift resignation as an indication that their

conclusions about her views on race were valid and, in essence, had been confirmed, if not

admitted, by Mrs. Sherrod herself.   Exhibit 4 to Herbst Decl. [Solov Depo., 280:25-281:19]

The next morning (July 20, 2010), Mrs. Sherrod appeared live on CNN and began to tell

her side of the story.[31]   She explained how she had been forced to pull off the highway and send

in her resignation on her blackberry.[32]   She defended her speech and claimed her words had been

taken out of context.[33]   She said no one at the USDA wanted to hear her explanation.[34]   And, she

said publicly <u>for the first time</u> something the NAACP audience was *not* told, that Mr. Breitbart

and Mr. O'Connor did *not* know nor even suspected when the Editorial was published, but that

---

[27] Ex. MM to Bailen Decl.; see also July 20, 2010 Transcript, The Situation Room (CNN),
 http://transcripts.cnn.com/TRANSCRIPTS/1007/20/sitroom.02.html.

[28] Ex. V to Bailen Decl. NAACP Press Release (July 19, 2010).

[29] O'Connor dep. at 270:3-272:5

[31] CNN American Morning Transcript (July 20, 2010) available at
 http://transcripts.cnn.com/TRANSCRIPTS/1007/20/ltm.01.html

[32] *Id.*; *see also*, Ex. X to Bailen Decl.  (Cook Dep.) at 42:12-49:21; Ex. Z to Bailen Decl.  (Sherrod Dep.) at 167:17-
169:8; Ex. AA (Cook e-mail, 7/23/10).

[33] *Id.*

[34] *Id.*

**was** known by the USDA *before* Mrs. Sherrod was forced out.[35]  The white farmer incident described in her speech had taken place 24 years earlier, decades before she joined the USDA.

Mrs. Sherrod also said on CNN that morning that the White House forced her out because "the stuff that Fox and the Tea Party does is scaring the administration."[36]  Most tellingly, later that same day, in another CNN interview, Mrs. Sherrod blamed her forced resignation on the NAACP, saying "they are the reason this happened they got into a fight with the Tea Party, and all of this came out as a result of that."[37]

Later that afternoon, the DVD of Mrs. Sherrod's entire speech that Doe had sent arrived. Ex. D (O'Connor Dep.) at 297:7-9.  Several hours thereafter, Mr. Breitbart and his colleagues posted the 43-minute video of her speech on Breitbart.com.[38]  At or around the same time that day, the NAACP also posted its own copy of the same video of Mrs. Sherrod's full speech on its website, and President Ben Jealous issued a second statement.[39]  He offered no explanation as to why he publicly decried her speech the night before, apparently without first seeing its entirety. Rather, he claimed that after having viewed the entire video, he realized he had been "snookered" by Mr. Breitbart, who he said had selectively edited Mrs. Sherrod's speech to create the false appearance that she had made racially offensive remarks.[40]  (Tellingly, however, Mr.

---

[35] Ex. X to Bailen Decl. (Cook Dep.) at 36:10-24; Ex. Y to Bailen Decl.(Tonsager e-mail, 7/19/10).

[36] CNN American Morning Transcript (July 20, 2010) available at http://transcripts.cnn.com/TRANSCRIPTS/1007/20/ltm.01.html.

[37]  Ex. N. to Bailen Decl. at p. 17.

[38] O'Connor posted the full video in five segments on YouTube.com.  O'Connor Decl. at ¶ 9.  The video he posted is attached as Ex. DD(1)-(5).]

[39] *See Watch the Shirley Sherrod Speech in Full*, NAACP.ORG, http://www.naacp.org/news/entry/video_sherrod/, attached as Ex. EE.  For the YouTube page where the NAACP posted the video, see *Shirley Sherrod: the FULL video*, YOUTUBE, https://www.youtube.com/watch?v=E9NcCa_KjXk, attached as Ex. EE to Bailen Decl.

[40] NAACP Press Release, July 20, 2010, available at http://www.naacp.org/press/entry/naacp-statement-on-the-resignation-of-shirley-sherrod1/

Jealous made no mention of the audience reaction, which he deplored in his initial statement.)

He apologized to her.[41]  His apology to Mrs. Sherrod and vilification of Mr. Breitbart set off a

chain reaction of public support for Mrs. Sherrod that spread all the way to President Obama

himself, who called Mrs. Sherrod two days later (on July 22, 2010) to offer his own apologies.[42]

Before that happened, Secretary Vilsack did a 180 of his own and also apologized to her

privately and publicly.[43]

On July 21, 2010, after Roger Spooner—the "white farmer"—also appeared on CNN and

corroborated Mrs. Sherrod's timing of their encounter, Mr. Breitbart, Mr. O'Connor and their

colleagues decided to post a correction at the top of the Editorial stating that although Mrs.

Sherrod was with the USDA when she made the speech, the events she describes in the first

video excerpt took place before she joined the USDA.[44]

On July 22, 2010, with the media, the black community and weight of public opinion

now squarely on her side, Mrs. Sherrod again appeared on CNN.[45]  This time, she didn't blame

the NAACP or the White House as she had done initially.  She joined in on the attacks against

---

[41] *Id.*

[42]  E.g., SHERYL GAY STOLBERG, SHAILA DEWAN and BRIAN STELTER, With Apology, Fired Official Is Offered a New Job, NY Times, (July 21, 2010) available at http://www.nytimes.com/2010/07/22/us/politics/22sherrod.html?_r=0

[43] Michael D. Shear, Vilsack apologizes to Sherrod, offers to rehire her at USDA, Washington Post, (July 21, 2010) http://www.washingtonpost.com/wp-dyn/content/article/2010/07/21/AR2010072104191.html.

[44] Ex D at 296:4-19; Ex. U. Bailen Decl. The correction published at the top of the Editorial stated: "Correction: While Ms. Sherrod made the remarks captured in the first video featured in this post while she held a federally appointed position, the story she tells refers to actions she took before she held that federal position."  Ex. T. to Bailen Decl. The correction appended to the video stated: "While Ms. Sherrod made these remarks while she held a federally appointed position, the story she tells refers to actions she took before she held that federal position."  Ex. P. to Bailen's Declaration.

[45] Ex. N to Bailen Decl. at 53.

Mr. Breitbart.  She called him a racist, she said he'd like to see black people back in the days of slavery, she said she wanted to sue him, and she said she wanted to see his websites shut down.[46]

F.   **Mrs. Sherrod's Full Speech**

Mrs. Sherrod argues that the message of her speech is that people of all races should learn how to work together.[47]  Perhaps that was her intent, but the words she used that night are subject to interpretation, and not everyone sees it that way.  Including the White House.  After watching the entire video of Mrs. Sherrod's speech, White House Cabinet Secretary Christopher Lu wrote "It's not the most enlightened view of race.  If this draft speech went through the clearance process, we'd never let her give it."  *See* O'Connor Ex. GG to Bailen Decl. (Lu e-mail, 7/21/10). White House Press Secretary and Assistant to the President Robert Gibbs added that the speech was "[f]ull of stereotypes and broad generalizations about race, and what I believe [is] a flawed recitation of race relations in this country."  *See*  Ex. HH to Bailen Decl. (Gibbs e-mail, 7/21/10). President Obama's Senior Advisor, Valerie Jarrett responded: "Probably in the eyes of the beholder.  While I did not agree with everything she said on the portion of the tape that was played on MSNBC, I would not have fired her for it.  We just don't need any of this."[48]  *See* Ex. II to Bailen Decl.  (Jarrett e-mail, 7/21/10).

Mrs. Sherrod's counsel had the "full speech" transcribed (marked and introduced in Doe's deposition as Exhibit "PX3").  Herbst Decl. Exhibit 2 [Doe Depo., 100:1-18].  Sherrod Speech Transcript, Exhibit Ex: B to Bailen Decl.  Defendants have stipulated that the transcript accurately reflects the audible portions of the video posted on the NAACP's website.  All parties

---

[46] *Id.*

[47] Complaint ¶  26 (ECF No. 1-2)

[48] Ms. Jarrett's email suggests she had only seen a portion of the speech, but that apparently was enough in her mind not to disagree with the decision to "fire" Mrs. Sherrod to spare the adminstration from political embarassment.

agree there is a missing portion of unknown duration during the section where Mrs. Sherrod continues to speak about encounter with the white farmer.  *Id.* at  ;Ex. A to Bailen Decl. at 20:59; Ex. DD(3) to Bailen Decl. at 01:47.  There are 65 paragraphs in the 29 transcribed pages of her speech.  *Id.*  In more than half of the 65 paragraphs, Mrs. Sherrod either discusses race, describes people according to their race, or otherwise makes statements about race and/or class distinctions.  (*See  Id.*) In the final 10 paragraphs, she openly promotes the programs, politics and policies of the USDA and the Obama administration.

By way of example only, the following passages are but some of the instances where Mrs. Sherrod, a federal official, chose to speak about race and/or class distinctions that evening:

- *I want to just share something with you and I think it helps…. When I learned this, I'm like, "Oh, my goodness." You know, back in the late 17th and 18th century, there were black indentured servants and white indentured servants, and they all would work for the seven years and get their freedom. And they didn't see any difference in each other. Nobody worried about skin color. They married each other, you know. These were poor whites and poor blacks in the same boat, except they were slaves. But they were both slaves and both had their opportunity to work out on the slavery. But then they started looking at the injustices that they faced and started then trying you know—the people with money—you know, they started the---the---the---the poor whites and poor blacks who were --- they – you know, they married each other, you know.  They lived together.  They were just like we would be. And they started looking at what was happening to them and decided we need to do something about it -- you know, about this.  Well, the people with money, the elite, decided, "Hey, we need to do something here to divide them."  So that's when they made black people servants for life. That's when they put laws in place forbidding them to marry each other. That's when they created the racism that we know of today. They did it to keep us divided. And…it started working so well, they said, "Gosh, looks like we've come up on something here that can last generations." And here we are over 400 years later and it's still working. What we have to do is get that out of our heads. There is no difference between us. The only difference is that the folks with money want to stay in power and, whether it's health care or whatever it is, they'll do what they need to do to keep that power, you know. It's always about money, y'all.* [Tr. at 15:25-17:15]

- *You know, I haven't seen such a meanspirited people as I've seen lately over this issue of health care. Some of the racism we thought was buried. Didn't it surface?*

> *Now, we endured eight years of the Bush's and we didn't do the stuff these Republicans are doing because you have a black President.* [Tr. at 17:16-22]

- *One of things in the position I'm in . . . that really hurt . . . one of the programs we had with some of the most money in it, you know, it's with business and industry.  And I sit up their and I'm signing off on six million, three million, two million but who is it going to?  Not one so far.  And when I got a report on where we are with it, we're approaching 80 million dollars since October 1st.  But not one dime to a black business not one, you know.* [Tr. at 21:6-12]

- *In Rural Development, there are 129 employees and guess how many of them are people of color?  Anybody want to take a guess that's in Georgia?  There are 129 in my agency.  How many?  It's more than two.  Little more than 12.  There are less than 20 of us.  We have six area offices in the State and subarea offices and when I look at who's coming up the line in the agency, there are not many of us, because we think 'agriculture' is a bad word.  We think it's working in the fields.  Some of the best paying jobs you ever want to have, okay?* [Tr. at 22:13-24]

- *You know, I was helping a family here recently: 515 acres of land, never had a drop of debt on it since the grandfather bought it years  ago, and he died in 1974.  And two cousins up in the North, guess what they decided?  They tried to force a sale of every acre of it. And they wanted that.  One of their aunts spent all of her life on the land.  She was 93 years old when she died.  And she died after those "For Sale" signs went up out there on that farm – [the] auction sign went up on the farm.  She was in the hospital.  The next month she was dead.  That was January she was dead by October.  But we kept working at it.  And we found some honest lawyers they were white.  I wish I could say that about all lawyers, especially black lawyers, but they will nickel and dime you to death.  I don't have sorry I  don't have two dozen pennies for most lawyers.  But anyway that land has been saved, you know.  But they were trying to force a sale of all of it.  They'll eventually get 62 acres of the 515.  And guess what?  They have a white man already lined up to buy it.* [Tr. at 23:11-24:8]

A copy of the stipulated transcript, highlighted to identify each paragraph where Mrs. Sherrod

discusses issues of race, class and/or politics, is attached to the Herbst Declaration as Exhibit

18.[49]

---

[49] As is evident from comparing the full text with the transcripts of the video excerpts, the clips published on BigGovernment.com were taken directly and verbatim from the speech.  Not one word was omitted, added, or re-ordered from the excerpted portions.  Some of the ensuing

G.     **Mrs. Sherrod Makes Repeated Threats to Sue, Deliberately Waits Until After November 2010 Mid-term Elections, And Finally Serves Mr. Breitbart and Mr. O'Connor When They Attending the Annual Conservative Political Action Committee Convention In Washington DC, Seven Months After The Editorial Was Published**.

Mrs. Sherrod first publicly vowed to sue Mr. Breitbart on July 22, 2010.[50]  She repeated that threat a (again, publicly) week later at a confer of the National Association of Black Journalist on July 29, 2010.[51]  She made that same threat again the next month. .[52]  What she did not reveal publicly was that her threats were tactical, made for the purpose of keeping Mr. Breitbart off balance.  According to an email she produced in discovery, the decision had been made to wait until after the November mid-term election to commence litigation.[53]  Mrs. Sherrod filed her Complaint on February 11, 2011 and personally served Mr. Breitbart and Mr. O'Connor the next day in Washington D.C.—where none of them (including Mrs. Sherrod) resided at the

---

television news reporting of the story on July 19, 2010, was accompanied by video that had been truncated to exclude Sherrod's final, redemptive remarks that were included in the BigGovernment.com posts, such as 1) the language in the post that ultimately Sherrod's "basic humanity informs her that this white man is poor and needs help" and 2) Sherrod's own statement in the embedded video that "That's when it was revealed to me that, y'all, it's about poor versus those who have, and not so much about white – it is about white and black, but it's not – you know, it opened my eyes, because I took him to one of his own."  Rather, some of the subsequent reports included only the statements that she had decided not to assist the white farmer because of his race.  Complaint ¶ 70.

[50] CNN American Morning, Sherrod Appearance July 22, 2010, Ex. N, p. 53 to Bailen Decl.

[51] Description of Shirley Sherrod's NABJ Convention Panel Apperance (July 29, 2010) available at http://www.shallownation.com/2010/07/29/shirley-sherrod-at-nabj-convention-2010-panel-discussion-press-conference-video/

[52] Transcript of Sherrod Public Appearance with Secretary Vilsack, August 24, 8/24/2010 w/ Sen. Vilsack available at http://www.usda.gov/wps/portal/usda/usdamediafb?contentid=2010/08/0421.xml&printable=true&contentidonly=true
[53] *See* Exhibit 17 to Herbst Decl., (Emails between B. Jealous and S. Sherrod, NAACP 200-204).

time—while Mr. Breitbart and Mr. O'Connor were attending the annual Conservative Political Action Committee convention.[54]

## III.   ADDITIONAL ARGUMENTS WARRANTING SUMMARY JUDGMENT IN FAVOR OF MR. BREITBART[55]

### A.   The Plaintiff Bears the Burden of Proof on Summary Judgment in Libel Cases.

In the defamation context, "[s]ummary procedures are of special importance in libel suits brought with respect to reports on the activities of public figures and public officials. . . . For the stake here, if harassment succeeds, is free debate." *Secord v. Cockburn*, 747 F. Supp. 779, 786 (D.D.C. 1990) (citations omitted).  In order to prevail on a defamation claim, plaintiff must show, by clear and convincing evidence, that the defendant made his statements with "actual malice." *New York Times*, 376 U.S. at 280.  "The standard of actual malice is a daunting one." *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996).  To establish actual malice, a plaintiff must show that the defendant either knew that the challenged publication was false or that he "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

"Subjective ill-will does not establish actual malice, nor does a malevolent motive for publication." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989)).  "Even 'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' does not establish actual malice." *Id.* (quoting *Harte-Hanks*, 491 U.S. at 666).  To demonstrate actual malice, a plaintiff can establish that the

---

[54]  O'Connor Dep at 20:5-20:21 ; ECF Nos 20 -21.

[55] Mrs. Breitbart incorporates each of the legal arguments in Mr. O'Connor's Memorandum.  The following additional arguments are made in further support of Mrs. Breitbart's Motion for Summary Judgment.

defendant was "'subjectively aware that it was highly probable that the story was (1) fabricated; (2) so inherently improbable that only a reckless person would have put it in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [the defendant] had obvious reasons to doubt.'" *Id.* (quoting *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003)).

In the summary judgment context, the movant normally bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party in opposition to the motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial." *Tate v. Dist. of Colum.*, 627 F.3d 904, 908-09 (D.C. Cir. 2010) (citations omitted); Fed. R. Civ. P. 56(e).  However, "[i]n the public figure defamation context, this means that the defendant's 'burden in a motion for summary judgment is simply showing — pointing out to this Court — that there is an absence of evidence to support the element of actual malice in the plaintiff's [defamation] case.'" *Parsi*, 890 F. Supp. 2d at 81 (citing *Secord*, 747 F. Supp. at 787).  "Hence, even though defendant has moved for summary judgment here, the Court will focus on plaintiffs' evidence of actual malice." *Id.* at 81.

B. **The Allegedly Defamatory Statements Must Be Considered in the Immediate and Broader Context in Which They Were Published.**

In determining whether statements or expressions are defamatory (*i.e.*, can be proven false and are not mere opinion), courts look not only to the literal meaning of the words or expressions, but also to the context in which they were stated.  *See Farah v. Esquire Magazine*, 736 F.3d 528, 535 (D.C. Cir. 2013) (citing cases); *Afro-American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc).

- 28 -

The Ninth Circuit's test for determining whether a statement is constitutionally protected is instructive with regard to incorporating the broad context in which the statement appears and the specific context of the author's work:

> To determine whether a statement implies a factual assertion, we examine the totality of the circumstances in which it was made. First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (citing cases).

### 1.    Broader Context

In assessing whether a statement can be considered fact or opinion, courts look to the broader social context of the statement.  *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984) ("The 'broader social context,' too, is vital to a proper understanding of the disputed statements.").  *See also, National Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, (284-86 (1974) ("'Context' includes not only the immediate context of the disputed statements, but also the type of publication, the genre of writing, and the publication's history of similar works.");

*Moldea v. New York Times*, 22 F.3d 310, 314-15 (D.C. Cir. 1994) ("*Moldea II*").  This is particularly important in the context of political debate, where courts recognize that political statements are prone to exaggeration and hyperbole, as "[a]ny reasonable reader of political blog commentary knows that it often contains conjecture and strong language." *Farah,* 736 F.3d at 540.

The D.C. Circuit in *Farah* recently considered the broader social context of an online article relative to the reputation of the website and the profile of the website's readers –

> [t]he article's primary intended audience — that is, readers of "The Politics Blog" — would have been familiar with Esquire's history of publishing satirical stories, with recent topics ranging from Osama Bin Laden's television-watching habits to 'Sex Tips from Donald Rumsfeld.' At the same time, followers of 'The Politics Blog' were politically informed readers. The 'update' notes that Esquire.com had previously featured several 'serious' reports on the birth certificate issue.

736 F.3d at 537. *See also, Knievel v. ESPN*, 393 F.3d 1068, 1074-78 (9th Cir. 2005) ("[C]ontext can be dispositive as to whether or not a statement is actionable under the First Amendment…[r]ead in the context of the satirical, risque, and sophomoric slang found on the rest of the site, the word "pimp" cannot be reasonably interpreted as a criminal accusation."). *See also, Adelson v. Harris*, 973 F. Supp. 2d 467, 487-88 (S.D.N.Y. 2013) (applying a context-specific test for determining whether statement is unconstitutional in the broader realm of partisan political speech).

2. <u>Specific Context</u>

With regard to a statement's specific context, when an author makes clear what facts he is relying on, the reader is made aware that the author is drawing on his own interpretation of the facts and the reader is free to do the same. *Moldea II*, 22 F.3d at 317. *See also, Adelson*, 973 F. Supp. 2d at 489 (citations omitted). Thus, with specific context, the court looks to the actual layout of the article and other evidence showing that this is the author's interpretation and opinion. *See e.g., Abbas v. Foreign Policy Grp., LLC*, 975 F. Supp. 2d 1, 16 (D.D.C. 2013) ("First, the rhetorical questions in the Commentary are supported by facts provided in article as well as hyperlinked source material in the form of articles in other publications, company websites, and interviews given by the plaintiff.")

3. <u>The Statement Itself</u>

Lastly, "the Court looks to the statements themselves to determine whether, irrespective of the context in which they were made, the statements at issue are capable of being proven true

or false." *Adelson*, 973 F. Supp. 2d at 491.  In *Greenbelt Coop. Publ'g. Ass'n v. Bresler*, the

Supreme Court analyzed the context of the word "blackmail" to describe the plaintiff's

negotiating tactics and found that the specific use of this seemingly factual accusation could not

reasonably be understood as a literal criminal accusation.  398 U.S. 6, 13-15, (1970).  The Court

held that in context, "even the most careless reader must have perceived that the word was no

more than rhetorical hyperbole, a vigorous epithet used by those who considered [the plaintiff's]

negotiating position extremely unreasonable."  *Id.* at 14.  *See also, Letter Carriers*, 418 U.S. at

283-87 (finding that the use of the word "traitor" could not reasonably be understood to accuse

the listed individuals of treason because the word was used "in a loose, figurative sense" and was

"merely rhetorical hyperbole"); *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624-25 (D.C. Cir.

2001) (finding that in context, a political magazine's statement that a conservative leader "began

to suffer bouts of pessimism and paranoia" was merely "rhetorical sophistry, not a verifiably

false attribution in fact of a 'debilitating mental condition'").

> C.     **When Read In Context, The Rhetorical Hyperbole In The Editorial Is Constitutionally Protected, Non-Actionable Fair Commentary and Opinion**.

"Context is everything."  These prophetic words of Mr. Breitbart are the first three to

appear in the body of the Editorial.  Courts in this Circuit have been guided for more than three

decades by this very concept when faced with the task of analyzing allegedly libelous statements.

As Justice Bork wrote in 1984:

> A statement that, on its face and standing alone, sounds like an assertion of fact may not be actionable.  Context is crucial and can turn what, out of context, appears to be a statement of fact into "rhetorical hyperbole, 'which is not actionable.'  Thus, it is clear that the Supreme Court, in the service of the First amendment, employs a test which requires consideration of the totality of the circumstances in which a statement appears.

> *Ollman v. Evans*, 750 F.2d 970, 1000 (D.C. Cir. 1984, Concurring opinion).

Justice Bork's observations could not be more apt in this case.  Mrs. Sherrod frames her Complaint by identifying five separate supposedly defamatory statements in the Editorial and related video and in a "tweet" by Mr. Breitbart.  She presents each in isolation, without any consideration for the manifest relevance of the context in which they were published, or the broader social and political events that were occurring when she gave her speech and for the months thereafter leading up to the publication of the Editorial.  See Complaint, ¶ 94.

The immediate context—the Editorial itself—is the epitome of hyperbolic rhetoric, written by an outspoken critic of the mainstream media, the left, the NAACP's use of race to vilify the Tea Party, and the policies of the Obama administration.  Although Mr. Breitbart's strong opinions often were considered offensive and stirred controversy, that is the point.  He was a political pundit and his writings and websites reflected his strong personality and conservative ideology.  The fiery criticism and partisan opinion that had come to define Mr. Breitbart's brand were on full display in the Editorial.[56]  The first fourteen paragraphs, which never mention Mrs. Sherrod, are pure protected commentary and critique directed at the NAACP, the mainstream media, and the Democratic Party.  Mr. Breitbart calls the mainstream media the "pro-bono managers" of the NAACP, which he in turn says is "an undeniable weapon in the Democratic Party's arsenal" which they were "more than happy to exploit this nation's sensitive racial schism for possible political gain."   After offering his interpretation of the controversial racial tensions of the previous three months that started with allegations by members of the Congressional Black Caucus, Mr. Breitbart's hyperbole hits its crescendo: "The NAACP and the Congressional Black Caucus do not want racial harmony. They want political victory, and the race card is their Stradivarius."

---

[56] The same is true for the "tweet" Mr. Breitbart later issued where he rhetorically asked (in reference to the Justice Department's decision not to pursue claims of voter fraud against the New Black Panther Party) "Will Eric Holder's DOJ hold accountable fed appointee Shirley Sherrod for admitting practicing racial discrimination?"

The first mention of Mrs. Sherrod comes three paragraphs later, but only after Mr. Breitbart continues his criticism of the mainstream media for its continuous coverage of Tea Party racism while ignoring Mr. Breitbart's claims that the predicate spitting and "N-word" incidents have never been substantiated and indeed, in Mr. Breitbart's mind, have been disproven.  It is not  possible that a reasonable reader—even one unfamiliar with Mr. Breitbart or BigGovernment.com—would get 800 words into the Editorial and not appreciate they are reading a work of opinion and critical commentary.

Mrs. Sherrod also pleads her claims as if the video excerpt of the white farmer portion of her speech (i) was posted on the Internet by Mr. Breitbart out of the blue *(i.e.,* separately from the Editorial), and (ii) that it was "selectively" and "heavily" edited by Mr. Bretibart purposely to distort the overall message of her speech.  Complaint at ¶ 30-61.  Mrs. Sherrod is wrong on both accounts.  First, the video excerpt was published as part of the Editorial and it was intended to be viewed in that context, only after the viewer had read the preceding fourteen paragraphs of the Editorial which explain that the publication of the video excerpt was not gratuitous.  Rather, the 800+ words that come before the video excerpt show that its purpose is to illustrate the hypocrisy of the NAACP; notably, the NAACP audience's reaction as Mrs. Sherrod explains how she discriminated against someone in need because of his race.  The last sentence immediately preceding the video--"Hardly the behavior of the group now holding itself up as the supreme judge of another groups' racial tolerance"—could not make this point any more clear.

The broader social and political context of the allegedly defamatory statements, which cannot escape recognition by anyone who read the Editorial or "followed" Mr. Breitbart on Twitter, is completely ignored by Mrs. Sherrod.  Ironically, although the NAACP, the USDA, the Obama administration and the media all piled on Mr. Breitbart in the aftermath of the

publication, none of them acknowledged the context of the Editorial.  Indeed, only after Mr.

Breitbart died did discovery reveal that no one at the USDA who publicly took responsibility for

demanding her resignation had actually read the Editorial before that decision was made.  Herbst

Decl, Ex. 5, Cooke dep. 75:25-77:14.  They all read different websites (*e.g.*, HotAir.com) and

viewed the "white farmer" video excerpt in isolation, without the benefit of the foundation

articulated in the Editorial.  Moreover, as that video excerpt virally spread that day, various news

organization made edits of their own and cut out the "redemptive portion" where Mrs. Sherrod

explains that she later did give her help to the white farmer—albeit somewhat fortuitously—

when she learned six months later that the lawyer she sent him to had dropped the ball.  And,

none of Mr. Breitbart's critics bothered to mention that in the Editorial, he points out that Mrs.

Sherrod did later help this man.  "Eventually, her basic humanity informs that this white man is

poor and needs help."  Again, context is everything.

> **D.**      **Mrs. Sherrod Must Prove Each Element of Her Claims, Including Actual Malice By Clear and Convincing Evidence, Separately Against Each Defendant.**

Mrs. Sherrod must prove each of the elements of her claims, including actual malice by

clear and convincing evidence, separately with respect to each defendant.  *St. Amant*, 390 U.S. at

730; *Revell v. Hoffman*, 309 F.3d 1228, 1234 (10th Cir. 2002); *Gray v. St. Martin's Press, Inc.*,

221 F.3d 243, 252 (1st Cir. 2000); *Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605

(D.D.C. 1977), *aff'd*, 578 F.2d 442 (D.C. Cir. 1978); *Murray v. Bailey*, 613 F. Supp. 1276, 1281

(N.D. Cal. 1985); *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 276-88 (S.D.N.Y. 2013).  *See e.g.,*

*Parisi v. Sinclair*, 774 F. Supp. 2d 310, 319-321 (D.D.C. 2011) (analyzing plaintiff's showing of

actual malice separately as to each defendant).  Moreover, the essential element of actual malice

cannot be imputed from one defendant to another absent an employer-employee relationship

giving rise to respondent superior.  *Cantrell v. Forest City Publ'g Co.,* 419 U.S. 245, 253 (1974);

*Hoffman v. Washington Post Co.*, 433 F. Supp. 600, 605 (D.D.C. 1977), *aff'd*, 578 F.2d 442

(D.C. Cir. 1978);[57] *McFarlane v. Esquire Magazine*, 1994 U.S. Dist. LEXIS 9497 (D.D.C. June

8, 1994), *aff'd*, 74 F.3d 1296 (D.C. Cir. 1996), *cert denied*, 519 U.S. 809 (U.S. 1996).

There is no such relationship here.  The evidence is uncontroverted that Mr. O'Connor

was employed by one or more of the Breitbart Companies, i.e., Breitbart.com, Breitbart News

Network, LLC, not by Mr. Breitbart.  O'Connor Deposition at 44:2-45:3.  Breitbart.com, LLC is

not and never has been a party in this case.

### E.   Mrs. Sherrod Cannot Satisfy Her Heightened Burden of Establishing That Mr. Breitbart Acted With Actual Malice At the Time of Publication.

Mrs. Sherrod cannot satisfy her burden of proving that Mr. Breitbart acted actual malice

at the time of publication by clear and convincing evidence.  Mr. Breitbart, Mr. O'Connor and

the Breitbart Companies (third parties) have produced all the emails and communications prior to

the time the Editorial was published.  Nothing has been held back on the basis of privilege.  All

of the percipient witnesses to the relevant events have been deposed.  There simply is no

evidence, much less clear and convincing evidence, showing that Mr. Breitbart acted with actual

malice toward Mrs. Sherrod prior to publication.  Again, to meet her daunting burden, Mrs.

Sherrod must show that Mr. Breitbart "in fact entertained serious doubts as to the truth of his

publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).   Here, none of the evidence

even suggests Mr. Breitbart entertained *any* doubts whatsoever about the truth of any statements

published about Mrs. Sherrod.  What the evidence does show, to the contrary, is that *after* Mr.

Breitbart took steps to confirm and verify the tip from Doe, and *after* he confirmed that Mrs.

Sherrod was a public official when she gave her speech, and *after* he consulted with two  trusted,

---

[57] The D.C. Circuit in *Hoffman*—relying on an Arizona Supreme Court case, *Phoenix Newspapers, Inc. v. Church*, 537 P.2d 1345, 1360 (1975), *appeal dismissed*, 425 U.S. 908 (1976)—specifically held that in the context of a boss and his subordinate, actual malice must be proven as to each of the individual defendants.  *Id.* at 1360. .

knowledgeable advisors (Mr. Innis and Mr. Adams) who both recognized the newsworthy nature

of the story and the validity of Mr. Breitbart's thesis vis-à-vis the NAACP, he had no reason to

suspect (and did not suspect) that anything about her speech excerpts were false or that the

manner in which he worked those excerpts into his Editorial was anything other than fair

commentary about inherently truthful facts.  Nevertheless, just to be safe, Mr. Breitbart sent the

Editorial to the company's General Counsel for review before publication.  Most importantly, the

evidence is uncontroverted that Mr. Breitbart and Mr. O'Connor did not have the full video prior

to publishing the Editorial.  That fact, alone, frankly should foreclose any debate.[58]

## IV.    CONCLUSION

Justice Bork recognized in *Ollman* that "in order to protect a vigorous marketplace in

political ideas and contentions, we ought to accept the proposition that those who place

themselves in a political arena must accept a degree of derogation that others need not."  *Ollman

v. Evans*, 750 F.2d  at 1002.  Mrs. Sherrod placed herself in the political arena.  She spoke to the

NAACP that night as an ambassador of the USDA and the Obama administration that appointed

her.  Simply put, the message of her speech was out of step with the USDA's efforts to distance

itself from its past acts of racial discrimination against black people and other racial groups.  Her

choice of words also hit the nerve of the Obama administration, which was and remains hyper-

sensitive when it comes to issues of race.  That is why Mrs. Sherrod was quickly escorted from

the USDA without the benefit of an investigation or even the opportunity to explain her side of

the story.  Although the theme of her case is that Mr. Breitbart distorted her words intentionally,

for "sport," the record demonstrates that is not at all what happened.  The timing and pervasive

---

[58] Because the USDA was not "snookered," as Mr. Jealous later claimed to be, into thinking Mrs. Sherrod discriminated according to race in her official USDA capacity, but rather made her resign because her speech was inappropriate and politically embarrassing, Mrs. Sherrod further cannot establish that the publication of the Editorial proximately caused her pecuniary or reputational damage.  *See* O'Connor Memo at 40-41.

racial content of Mrs. Sherrod's speech, and the way the NAACP audience reacted with approval

as she described how she discriminated against a white man because of his race, were fair game

for constitutionally protected journalistic commentary and criticism.  Summary judgment is not

just proper, it is necessary.

Finally, aside from all the valid legal reasons that warrant summary judgment, as a matter

of equity and morality, Mrs. Breitbart does not belong in this case.  Mrs. Sherrod's beef was with

Mr. Breitbart, not his family.  She cannot get the apology nor the pound of flesh she wanted from

Mr. Breitbart.  It is time for all parties to move on.

Respectfully Submitted,

/s/ *Daniel Z. Herbst*_____
REED SMITH LLP
Eric A. Dubelier (Bar. No. 419412)
Daniel Z. Herbst (Bar. No. 501161)
1301 K Street NW
Suite 1100 – East Tower
Washington DC 20005
Telephone 202-414-9200
Fax 202-414-9299
edubelier@reedsmith.com
dherbst@reedsmith.com

Harrison J. Dossick (*Pro hac vice*)
1901 Avenue of the Stars
Suite 700
Los Angeles, CA 90067
310.734.5200
Fax +1 310.734.5299
hdossick@reedsmith.com

*Attorneys for Susannah Breitbart, successor
to Andrew Breitbart deceased*